1  BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
2  PATRICIA N. SYVERSON (CA SBN 203111)
MANFRED P. MUECKE (CA SBN 222893)
3  600 W. Broadway, Suite 900
San Diego, California 92101
4  psyverson@bffb.com
mmuecke@bffb.com
5  Telephone: (619) 798-4593

6  BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
7  ELAINE A. RYAN (*To Be Admitted Pro Hac Vice*)
CARRIE A. LALIBERTE (*To Be Admitted Pro Hac Vice*)
8  2325 E. Camelback Rd. Suite 300
Phoenix, AZ 85016
9  eryan@bffb.com
claliberte@bffb.com
10  Telephone: (602) 274-1100

11  *Attorneys for Plaintiffs*
*Additional Attorneys on Signature Page*

12

13  **UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

14

| | |
|---|---|
| 15  WARREN GARDNER, LORI MYERS, ANGELA COSGROVE, | Case No.: |
| 16  AUTUMN HESSONG, ROBERT MCQUADE, COLLEEN | **CLASS ACTION COMPLAINT FOR:** |
| 17  MCQUADE, JAMES BORRUSO, FIDEL JAMELO, JOCELYN | 1.  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT |
| 18  JAMELO, ANTHONY LUCIANO, LORI LUCIANO, ROBERT | ORGANIZATIONS ACT. 18 U.S.C. §§1962(c)-(d) |
| 19  NUGENT, AVRAHAM ISAC | 2.  VIOLATION OF THE UNFAIR |
| 20  ZELIG, KEN PETROVCIK, MEGAN KIIHNE, and KATHLEEN MILLER, | COMPETITION LAW – Cal. Bus. & Prof. Code §17200, *et seq.*; |
| 21  On Behalf of Themselves and All | 3.  VIOLATION OF THE CONSUMERS LEGAL REMEDIES |
| 22  Others Similarly Situated, | ACT – Cal. Civ. Code §1750, *et seq.*; |
| 23  | 4.  VIOLATION OF FLORIDA |
| 24  Plaintiffs, | DECEPTIVE AND UNFAIR TRADE PRACTICES ACT – Fla. |
| 25  v. | Stat. §501.201, *et seq.*; |
| 26  | 5.  VIOLATION OF THE NEW YORK |
| 27  STARKIST CO., a Delaware Corporation, | GENERAL BUSINESS LAW § 349; |

28

Defendant.

6.   VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT, § 56:8-2.10;

7.   VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (UNFAIR PRACTICES) – Minn. Stat. §325F.68, *et seq.* and Minn. Stat. §8.31, *et seq.*;

8.   VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT (FALSE STATEMENT IN ADVERTISING) – Minn. Stat. §325F.67, *et seq.*;

9.   VIOLATION OF THE MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT – Minn. Stat. §325D.43, *et seq.*;

10.   VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT, A.R.S. §§44-1521, *et seq.*; and

11.   UNJUST ENRICHMENT

DEMAND FOR JURY TRIAL

1
2
3
4
5
6

Plaintiffs Warren Gardner, Lori Myers, Angela Cosgrove, Autumn Hessong, Robert McQuade, Colleen McQuade, James Borruso, Fidel Jamelo, Jocelyn Jamelo, Anthony Luciano, Lori Luciano, Robert Nugent, Avraham Isac Zelig, Ken Petrovcik, Megan Kiihne, and Kathleen Miller bring this action on behalf of themselves and all others similarly situated against Defendant StarKist Co. ("StarKist" or "Defendant") and state:

7

## FACTUAL ALLEGATIONS

8
9
10

1.      StarKist tuna has been marketed, sold, and distributed throughout the United States, including in California, since 1942. Today, StarKist is the No. 1 selling prepackaged tuna brand in the United States.

11
12
13

2.      Since 1990, StarKist has promised consumers that its tuna is "Dolphin-Safe."  Since the introduction of the dolphin-safe policy in 1990, including the last 4 years (the "Class Period"), however, StarKist's tuna has not been "Dolphin-Safe."

14
15
16
17
18
19
20
21
22
23

3.      Plaintiffs herein allege unjust enrichment and violations of: (1) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq.*; (3) California's Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*; (4) the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.*; (5) the New York General Business Law §349; (6) the New Jersey Consumer Fraud Act, §56:8-2.10; (7) the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§325F.67-325F.68; (8) the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.43, *et seq.*; and (9) the Arizona Consumer Fraud Act, A.R.S. §44-1521, *et seq.*

24
25
26
27

4.      Plaintiffs seek, on behalf of themselves and all Class members, nationwide monetary damages, restitution, injunctive relief, and all relief deemed appropriate, arising out of Defendant's illegal scheme and conspiracy alleged herein. //

28

Class Action Complaint

### Origin of "Dolphin-Safe" Tuna

5.    Prior to the development of modern purse seine fishing techniques, tropical tuna were caught one at a time using traditional pole-and-line methods. NOAA, The Tuna-Dolphin Issue, NOAA Fisheries Southwest Fisheries Science Center (Sept. 2, 2016), *available at* https://swfsc.noaa.gov/textblock.aspx?Division=PRD&ParentMenuId=228&id=1408 (last visited May 3, 2019) ("NOAA 2016").

6.    But by the 1950s, the development of synthetic netting (that would not rot in tropical waters) and hydraulically driven power-blocks (needed to haul very large nets) made it possible to deploy massive purse-seines (vertical net curtains closed by pulling on a chain located along the bottom to enclose the fish, much like tightening the cords of a drawstring purse) around entire schools of tuna.

7.    Recognizing that tuna schools (swimming deeper in the water) often congregate with dolphin schools (swimming at observable depths), fishermen began routinely encircling tuna *and* dolphin schools with purse seine nets and hauling the entire catch aboard.

8.    This practice led to millions of dolphins being killed as unintended bycatch.

9.    In the late 1980s, the world learned of the large numbers of dolphins indiscriminately killed by tuna fishermen.  In 1988, a worldwide telecast showed video images of dolphins being killed in tuna fishing nets.  That video was captured by an undercover environmental activist posing as a ship's cook.  Public outcry was immediate and intense.

10.    Heightened public awareness of these mass dolphin deaths led to the development and enhancement of fishing regulations around the world, including a strengthening of the Marine Mammal Protection Act ("MMPA") and the enactment of the Dolphin Protection Consumer Information Act ("DPCIA") of 1990.

11.    Recognizing these indiscriminate fishing methods were also deflating consumers' enthusiasm for tuna products, the major sellers of tuna fish – including StarKist, Bumble Bee, and Chicken of the Sea – started promising consumers that the tuna they sold would only be procured through dolphin-safe fishing practices.

12.    In the ensuing 25 years, U.S. tuna sellers, led by StarKist, implemented a widespread and long-term marketing campaign that continues to this day – representing to consumers that no dolphins were killed or harmed in capturing their tuna, as well as expressing their commitment to sustainably sourcing tuna.

13.    For at least the last 4 years, reasonable consumers expected that all StarKist canned tuna and pre-packaged tuna in pouches (collectively, "tuna products") are dolphin-safe because they have been indoctrinated to believe precisely that by Defendant's and the other tuna companies' highly effective dolphin safety and sustainable fishing practices marketing campaigns.  In fact, 98% of the prepacked tuna sold today in the United States is labeled with some "dolphin-safe" representation.  Forbes, K. William Watson, <u>'Dolphin Safe' Labels on Canned Tuna Are A Fraud</u> (Apr. 29, 2015), *available at* https://www.forbes.com/sites/realspin/2015/04/29/dolphin-safe-labels-on-canned-tuna-are-a-fraud/#51db16b8295e (last visited May 3, 2019).

14.    StarKist tuna, however, is not dolphin-safe.  Nor is it sustainably sourced.  StarKist's dolphin-safe representations are false, misleading, and/or deceptive.

**StarKist's Dolphin-Safe Representations**

15.    According to StarKist, Defendant "condemns the use" of "indiscriminate fishing methods that trap dolphins."

\\

\\

- 3 -
Class Action Complaint

16.     In 1990, StarKist was the first major tuna company to adopt a "dolphin-safe" policy.   StarKist, <u>FAQ</u>, *available at* https://starkist.com/faq (last visited May 3, 2019).

17.     On every can and pre-packaged tuna pouch, Defendant states that the tuna products are "Dolphin Safe" with a dolphin logo.   The tuna products also encourage consumers to "visit" the StarKist website for more information on StarKist's dolphin-safe policy.

18.     StarKist's website explains what StarKist means by "Dolphin Safe," and how StarKist's pledge promises consumers it will not only protect dolphins but will refrain from any indiscriminate fishing practices that harm other marine life. The meaning StarKist attributes to "Dolphin Safe" also reflects its importance to consumers.  Defendant promises, in pertinent part, that:

- "StarKist will not purchase any tuna caught in association with dolphins."

- "StarKist continues its practice of refusing to purchase tuna caught with gill or drift nets which are known to be dangerous to many forms of marine life.  StarKist condemns the use of these indiscriminate fishing methods that trap dolphins, whales and other marine life along with the intended catch of fish."

- "StarKist was the first major American tuna canning company to make this commitment to the public. We remain committed to this policy and require certification that all tuna we purchase is dolphin-safe.   Our dolphin-safe policy includes StarKist tuna, as well as all of our branded and private label products.   StarKist tuna is labeled with a special "Dolphin-Safe" logo."

StarKist, <u>FAQ</u>, *available at* https://starkist.com/faq (last visited May 3, 2019).

\\

- 4 -
Class Action Complaint

19.     When StarKist announced its dolphin-safe policy, Anthony J.F. O'Reilly – Chairman of StarKist's then-parent company, H.J. Heinz Co – stated at a news conference that his company was responding to consumer concerns in adopting a policy of buying only "dolphin-safe" tuna and "[t]he StarKist policy will save dolphin lives. **Nothing short of dolphin-safe tuna will be acceptable** . . . ." Janet Bass, StarKist adopts dolphin-safe policy for its tuna, UPI Archives (Apr. 12, 1990), *available at* https://www.upi.com/Archives/1990/04/12/StarKist-adopts-dolphin-safe-policy-for-its-tuna/5799639892800/ (last visited May 3, 2019) (emphasis added) ("Bass 1990").

20.     As noted by the Ninth Circuit in a recent case, "[g]iven the choice of whether to purchase dolphin-safe tuna or to purchase tuna not labeled dolphin-safe, American consumers overwhelmingly chose to purchase tuna that was labeled dolphin-safe. As a result, foreign tuna sellers who did not adjust their fishing methods were quickly forced out of the market." *Earth Island Institute v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007) (rejecting Government efforts to lessen restrictions on tuna fisheries in the Eastern Tropical Pacific and upholding previous finding that best evidence available indicates that tuna fishing was having significant adverse impact on dolphin stocks).

21.     The importance to consumers of dolphin safety has not lessened in the ensuing 12 years since the Court's finding, as evidenced by Defendant's continued labeling of its tuna products with a dolphin-safe logo.

22.     If anything, dolphin safety and the sustainable sourcing of seafood has grown in importance to consumers as evidenced by many retailers' refusal to sell tuna that is not caught using dolphin-safe pole-and-line, trolling[1], or handline catch

---

[1] Method of fishing whereby one or more fishing lines with baits are drawn through the water.  Monterey Bay Aquarium Seafood Watch, Fishing & Farming Methods, *available at* https://www.seafoodwatch.org/ocean-issues/fishing-and-farming-methods (last visited May 3, 2019).

methods.  *See, e.g.*, Whole Foods Market, <u>Sustainable Canned Tuna</u>, *available at* https://www.wholefoodsmarket.com/sustainable-canned-tuna (last visited April 17, 2019) ("Our sourcing policy requires all fisheries supplying canned tuna to use pole-and-line, troll or handline catch methods" unlike "[m]uch of conventional canned tuna [which] is caught by vessels using purse seine nets with Fish Aggregating Devices (known as FADs), that attract tuna but also result in high bycatch of … other marine life."); Whole Foods Market, <u>Canned Tuna Sourcing Policy</u> (August 15, 2018), *available at* http://assets.wholefoodsmarket.com/ www/departments/seafood/Whole_Foods_Market_Canned_Tuna_Sourcing_Policy _102017.pdf (last visited Apr. 17, 2019) ("Requirements for Source Fisheries" include "1. All canned tuna must be sourced from pole and line, troll, and handline fisheries. Tuna from longline or purse seine fisheries is prohibited."); PR Newswire, <u>Safeway Announces New Sustainable Sourcing Practice for Tuna</u> (February 10, 2012), *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable-sourcing-practice-for-tuna-1390967 14.html (last visited Apr. 17, 2019); Albertsons/Safeway, <u>Supplier Sustainability Guidelines and Expectations</u> (Aug. 2015), at 21, *available at* https://suppliers.safeway.com/usa/pdf/supplier_sustainability_expectations.pdf (last visited Apr. 29, 2019) ("Suppliers are encouraged to "Not use Purse-seine nets deployed on Fish Aggregation Devices (FADs) and employ alternatives such as pole and line trolling in an effort to reduce or eliminate by-catch"); H-E-B, <u>H-E-B seafood policy</u>, *available at* https://www.heb.com/static-page/article-template/H-E-B-Seafood-Policy (last visited Apr. 17, 2019) (for wild-caught seafood, H-E-B preferentially sources from fisheries that reduce bycatch, and H-E-B "will never knowingly buy or sell any illegal, unreported, or unregulated (IUU) fish"); Giant Eagle, <u>Tuna Policy</u>, *available at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy (last visited Apr. 29, 2019) (encourages suppliers to "eliminate

harvest with the use of non-entangling FADs"); Wegmans, Seafood Sustainability, *available at* https://www.wegmans.com/about-us/making-a-difference/sustain ability-at-wegmans/seafood-sustainability.html (last visited Apr. 29, 2019) ("Our wild-caught seafood suppliers must meet Wegmans' high standards to source seafood that is caught responsibly" including having "[g]ear chosen to reduce bycatch.").

23.     The special "Dolphin-Safe" logo Defendant includes on each StarKist tuna product as shown below is intended by Defendant to convey the message: "No harm to dolphins" (Bass 1990):



24.     However, unknown to consumers, substantial numbers of dolphins and other marine life are killed and harmed by the fishermen and fishing methods used to catch Defendant's tuna.   Thus, Defendant's dolphin-safe label representations are false, misleading, and/or deceptive.

**Dolphin Safety Legislation**

25.     Since the 1980s, Congress has passed a series of laws to protect dolphins and other marine life from indiscriminate fishing methods.   Beginning with the MMPA, which Congress repeatedly strengthened in 1984, 1988, and 1992, Congress "ban[ned] importation of tuna that failed to meet certain conditions regarding dolphin mortality." *Earth Island Institute v. Evans*, No. C 03-0007-THE, ECF No. 293 at 3 (N.D. Cal.).

26.     Then, in 1990, Congress passed the DPCIA, which created the dolphin-

safe mark.  16 U.S.C. §1385.  The Act provided that tuna could only be labeled with the official "dolphin safe" mark codified at 50 CFR §216.95 if, *inter alia*, the tuna was not caught in the Eastern Tropical Pacific ("ETP") using nets intentionally deployed on or to encircle dolphins, was certified as dolphin-safe by an independent observer on the tuna boat, and can be traced from the fishery, to the cannery, to the shelf. *Id.*

27.    The DPCIA imposes heightened dolphin safety requirements which are not limited to ETP fisheries on manufacturers, like StarKist, who label their products with an alternative dolphin-safe logo.  16 U.S.C. §1385(d)(3).

28.    The DPCIA-established official dolphin-safe mark is codified at 50 CFR §216.95. That official mark contains the words "U.S. Department of Commerce", along with the words "Dolphin Safe" in red next to a blue-colored dolphin profile facing the upper left, and a tricolor (light blue, blue, and dark blue) banner along the bottom of the mark that overlaps with the dolphin's fluke:



29.    Defendant elected not to utilize the DPCIA official dolphin-safe logo. By placing an alternative "Dolphin-Safe logo" on StarKist tuna products, rather than the official mark, Defendant voluntarily assumed the heightened dolphin safety requirements under the DPCIA applicable to all locations where Defendant captures

its tuna.  Pursuant to the regulations, Defendant must ensure that (1) "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught"; and (2) the label must be "supported by a tracking and verification program" throughout the fishing, transshipment and canning process; "periodic audits and spot checks" must be conducted, and StarKist must provide "timely access to data required."  16 USC §§1385(d)(3)(C) and (f).

30.     To be clear, the Act and implementing regulations specify that "no" dolphins must be "killed or seriously injured" and if "a" dolphin "was killed or seriously injured [defined as 'any injury that will likely result in mortality' (50 CFR §216.3)]" the tuna is not dolphin-safe and must be stored physically separate from tuna that is dolphin-safe and must be supported by sufficient documentation to enable the National Marine Fisheries Service to trace the non-dolphin-safe tuna back to the fishing trip.  50 CFR §216.91.

31.     Plaintiffs allege that Defendant falsely represents that StarKist tuna products are dolphin-safe – meaning "no" dolphins were killed or seriously injured – when Defendant's tuna fishing practices kill or harm substantial numbers of dolphins each year.  And because Defendant does not adequately trace or otherwise identify the tuna that is not dolphin-safe and physically segregate and store it separately from any tuna that may be dolphin-safe, Defendant may not label any of its products as dolphin-safe.

### World Trade Organization Dispute Regarding "Dolphin Safe" Labels

32.     In 2008, a trade dispute erupted between Mexico and the United States over the use of a dolphin-safe representation on labels of prepacked tuna products sold in the United States pursuant to the DPCIA and the Ninth Circuit's holding in *Earth Island Institute v. Hogarth*, *supra*.

33.     Mexico, which fishes for tuna primarily in the ETP using purse seine nets, alleged that the DPCIA discriminated against Mexican tuna because it imposed

Class Action Complaint

stricter regulations and required more exacting documentary evidence of compliance with the Act for tuna caught in the ETP than in other fisheries.

34.    On September 15, 2011, the WTO Panel hearing the dispute issued its first Report.  The Panel disagreed that the DPCIA discriminates against Mexico, but also found the Act was more trade-restrictive than necessary to fulfill its legitimate objectives of ensuring (i) consumers are not deceived by dolphin safe representations, and (ii) United States markets are not used to encourage tuna fishing practices that harm dolphins.  Both Mexico and the United States appealed.

35.    On May 16, 2012, the WTO Appellate Body issued its Report.  Among other findings, the Appellate Body found the DPCIA and the ruling in *Hogarth* together:

> set out a single and legally mandated definition of a "dolphin-safe" tuna product and disallows the use of other labels on tuna products that use the terms "dolphin-safe", dolphins, porpoises and marine mammals and do not satisfy this definition.  In doing so, the US measure prescribes in a broad and exhaustive manner the conditions that apply for making any assertion on a tuna product as to its "dolphin-safety", regardless of the manner in which that statement is made.

*See* Official Summary, WTO DS381, current through Jan. 31, 2019, *available at* https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds381_e.htm   (last  visited May 10, 2019).

36.    However, the Appellate Body also found the DPCIA discriminated against Mexico.  In doing so, the Appellate Body:

> examined whether the different conditions for access to a "dolphin-safe" label are "calibrated" to the risks to dolphins arising from different fishing methods in different areas of the ocean, as the United States had claimed.  The Appellate Body noted the Panel's finding that the fishing technique of setting on dolphins is particularly harmful to dolphins and that this fishing

method has the capacity of resulting in observed and unobserved adverse effects on dolphins. **At the same time, the Panel was not persuaded that the risks to dolphins from other fishing techniques are insignificant and do not under some circumstances rise to the same level as the risks from setting on dolphins.** The Appellate Body further noted the Panel's finding that, while the US measure fully addresses the adverse effects on dolphins resulting (including observed and unobserved effects) from setting on dolphins in the ETP, it does not address mortality arising from fishing methods other than setting on dolphins in other areas of the ocean. In these circumstances, the Appellate Body found that the measure at issue is not even-handed in the manner in which it addresses the risks to dolphins arising from different fishing techniques in different areas of the ocean.

*Id.* (emphasis added).

37.     In other words, the WTO Appellate Body found that fishing methods being employed in and out of the ETP were likely harming dolphin populations and the U.S. regulatory regime designed to protect dolphins was perhaps not strong enough in its regulation of fisheries outside the ETP.

38.     Following this Report, on May 31, 2012 Defendant, along with Chicken of the Sea and Bumble Bee, issued the following press release through the National Fisheries Institute ("NFI"):

**STATEMENT ON WTO DOLPHIN SAFE TUNA RULING**

NFI is the leading seafood trade association in the United States and represents Bumble Bee, Chicken of the Sea and StarKist.

Household tuna brands Bumble Bee, Chicken of the Sea and StarKist are disappointed in the World Trade Organization's (WTO) appeals court ruling because it is likely to create consumer confusion about whether or not their products continue to be dolphin safe. **The three U.S. brands want to reassure consumers they have no reason to be concerned that their**

- 11 -
Class Action Complaint

**companies are wavering in their commitment to providing dolphin safe tuna as a result of this ruling. These companies do not and will not utilize tuna caught in a manner that harms dolphins. Providing consumers with sustainable and dolphin safe tuna remains a top priority.**

*See* States News Service Press Release, May 31, 2012 (emphasis added).

39.   Following the Appellate Body's Report and recommendations to strengthen the DPCIA, the United States made amendments to it that imposed additional requirements on tuna caught outside the ETP. These amendments required that:

> **all tuna sought to be entered into the United States as "dolphin-safe", regardless of where it was caught or the nationality of the fishing vessel, must be accompanied by a certification that (a) no nets were intentionally set on dolphins in the set in which the tuna was caught; and (b) no dolphins were killed or seriously injured in the sets in which the tuna was caught**.

*See* Official Summary, WTO DS381, current through Jan. 31, 2019 (emphasis added), *available at* https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds381_e.htm (last visited May 10, 2019).

**StarKist's Fishing Practices and Violation of its Dolphin-Safe Representations**

40.   Several tuna companies use traditional pole-and-line and trolling methods of catching tuna. These products include Safe Catch, Ocean Naturals (for its Albacore tuna), and Wild Planet, which are caught using pole-and-line and trolling, and American Tuna, Whole Foods 365 Everyday Value brand (for its skipjack and albacore tuna), and Trader Joe's (for its yellowfin tuna), which are

caught using exclusively pole-and-line.[2]

41.   While more costly, these traditional methods ensure that dolphins (and other bycatch) are not harmed in the fishing process because fish are caught using barbless hooks and poles one at a time near the sea's surface and unintended captured species are easily released.  Tuna caught by these methods are actually "dolphin-safe."

42.   StarKist is not among the tuna companies that use only dolphin-safe pole-and-line or trolling techniques to capture their tuna.  Rather, the fishing vessels that supply StarKist's tuna use indiscriminate fishing methods that kill and harm substantial numbers of dolphins.

43.   For example, during the Class Period StarKist sourced much of its tuna from vessels operated by Imperial Shipping Logistic Co. Ltd.  Those vessels routinely used longlines – which consist of a 40-80 mile long main line to which many smaller branch lines with baited hooks are attached – to catch tuna.  Longlines are highly indiscriminate fishing gear as they attract large numbers of target and non-target fish, as well as dolphins, that get snagged on the hooks by their mouth or other body parts when they go after the bait and then remain on the line for extended periods of time as the lines are drawn in to the vessel and the catch is obtained.  The

---

[2] *See* Safe Catch, The Safe Catch Way, *available at* https://safecatch.com/ (last visited May 3, 2019); Ocean Naturals, Albacore, Responsibly Caught, *available at* https://oceannaturals.com/responsibly-caught/albacore-tuna/ (last visited May 3, 2019); Wild Planet, Good to the Core, Products-Tuna, *available at* https://www.wildplanetfoods.com/products/tuna/ (last visited May 3, 2019); American Tuna, American Tuna, Home, available at https://americantuna.com/ (last visited May 3, 2019); Whole Foods Market, Wild, Salt Added Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket. com/product/365-everyday-value-wild-salt-added-tuna-10e1c0 (last visited May 3, 2019); Whole Foods Market, Albacore Wild Tuna, 5 oz, Products>365 Everyday Value, *available at* https://products.wholefoodsmarket.com/product/365-everyday-value-albacore-wild-tuna-5-oz-b83f86 (last visited May 3, 2019); Trader Joe's, About Trader Joe's Seafood, Announcements>Customer Updates (July 17, 2013), *available at* https://www.traderjoes.com/announcement/a-note-to-our-customers-about-trader-joes-seafood (last visited May 3, 2019).

hooked fish are retrieved by mechanically pulling the main line back onto the fishing vessel which can take 10 hours. As dolphins are oxygen breathers, most do not survive the 10-hour retrieval process. And any that do are often not released.

44. Even when Dolphins are mistakenly caught by these longlines, they are often not released. Rather, the fishermen that catch these dolphins often kill them onboard and have been photographed posing with their catch, mutilating the dolphins and removing their teeth, which can be used as currency. Because of the harm caused to non-target fish, longlines have been condemned by environmental groups like the World Wildlife Foundation ("WWF") as an unsustainable fishing practice. WWF, Bycatch, Threats, *available at* www.worldwildlife.org/threats/bycatch (last visited May 3, 2019).

45. StarKist also uses vessels owned by its parent company, Dongwon Industries Co. Ltd., to catch tuna in the waters around a dozen or so Western Pacific Island nations and more recently in the Atlantic. These vessels employ modern purse seine fishing techniques that also harm substantial numbers of dolphins.

46. Almost all of Dongwon's distant water boats are purse seiners whose nets, which can reach more than 6,500 feet in length and 650 feet deep – the equivalent of 18 football fields by 2 football fields[3] – often entrap dolphins when drawn closed, particularly because many of the purse seine fishing vessels use free floating rafts of flotsam known as fish aggregating devices, or FADs, to capture tuna.

47. FADs are known as floating death traps because dolphins and other marine life get entangled in the devices and their sheer numbers – estimated at 30,000 to 50,000 per year – disrupt behavior and movement patterns of dolphins and other ocean species crucial to their survival.

---

[3] Elizabeth Brown, Fishing Gear 101: Purse Seines – The Encirclers (June 6, 2016), *available at* http://safinacenter.org/2015/12/fishing-gear-101-purse-seines-the-encirclers/ (last visited May 3, 2019) ("Brown 2016").

48.    While FADs are extremely effective at luring tuna, they also attract dolphins – particularly in the ETP where schools of tuna routinely gather beneath schools of dolphins to reduce the risk of predation.  The tuna, dolphins, and other marine life are all then caught in the gigantic mile circumference purse seine nets that are deployed around the FAD to catch the tuna.

49.    Since the 1980s, changes in the design of nets and fishing practices that allow dolphins to escape the net have significantly reduced dolphin mortality.  Brown 2016.  Nonetheless, significant numbers of dolphins (over a thousand a year according to NOAA[4]) are still harmed by this method, as unintended bycatch can account for more than 30% of a ship's haul.  And, even though unintended bycatch may still be alive when dumped out of the nets onto the boat, by the time they are thrown back into the ocean, most are dead or near dead.

50.    Even when dolphins escape the purse seine nets or are released alive from the longlines and nets, dolphins are harmed by these fishing practices.

51.    Several studies have observed a number of indirect ways these fishing practices cause additional unobserved dolphin deaths, including: dolphin mother-calf separation as calves are dependent upon their mothers until weaned 1.5 years postpartum, and, even then, the calves do not reach full muscle maturation until age 3; acute cardiac and muscle damages caused by the exertion of avoiding or detangling from the FADs and purse seine nets; cumulative organ damage in released dolphins due to overheating from escape efforts; failed or impaired reproduction; compromised immune function; and unreported mortalities due to under-counting by purse-seine fishing vessels.  *See, e.g.*, U.S. Department of Commerce, Reilly, *et al.*, Report of the Scientific Research Program Under the International Dolphin Conservation Program Act, NOAA Technical Memorandum NMFS (Mar. 2005), at

---

[4] NOAA 2016.

67-71, 76 *available at* https://swfsc.noaa.gov/ publications/TM/SWFSC/NOAA-TM-NMFS-SWFSC-372.PDF (last visited May 3, 2019). *See also* Wade, et al, *Depletion of spotted and spinner dolphins in the eastern tropical Pacific: modeling hypotheses for their lack of recovery*, Mar Ecog Prog Ser 343:1-14, 2007, at 11 (noting "[a] summary of recent research … clearly illustrates that the purse seine fishery has the capacity to affect dolphins beyond the direct mortality observed as bycatches"); Kellar, et al., *Pregnancy patterns of pantropical spotted dolphins (Stenella attenuata) in the eastern tropical Pacific determined from hormonal analysis of blubber biopsies and correlations with the purse-seine tuna fishery*, Mar Biol (2013) 160:3113-3124, at 3120 (tuna fishery reduces likelihood of female becoming pregnant or maintaining pregnancy).

52.     As the indirect harmful effects of Defendant's fishing practices also "likely result in [dolphin] mortality" (50 CFR §216.3), Defendant's tuna is not dolphin-safe.  It is conservatively estimated that the total reported dolphin mortality is underestimated by 10-15% for spotted dolphins and 6-10% for spinner dolphins given these indirect harmful effects and unobserved and underreported kills.  Reilly, *et al.*, 2005, at 7.

53.     Because the use of FADs, purse seine nets, and longlines are unsustainable fishing practices, several companies that supply the U.S. tuna market will not source their tuna from boats that use these indiscriminate fishing methods. But StarKist is not among these companies.  For example, to avoid competition from its primary market rivals over the sale of FAD-free tuna (which would be more expensive), in or about February 2012, StarKist allegedly entered into a written agreement with Bumble Bee and Chicken of the Sea, who together with Defendant control 70-80% of the U.S. canned tuna market, whereby none of them would sell a branded FAD-free tuna product in the U.S.  *See* Tom Seaman, <u>Lawsuits: US brands colluded on not selling FAD-free tuna</u>, undercurrentnews>analysis>US Investigates

Tuna       Brands>Companies      (July     18,     2016),     *available     at*
https://www.undercurrentnews.com/2016/07/18/lawsuits-us-brands-colluded-on-
not-selling-fad-free-tuna/ (last visited May 3, 2019).

54.     Because "StarKist's failure to take sustainability seriously is devastating the oceans – all while it continues to sell cheap and dirty tuna nationwide" – and because  "StarKist sources from destructive fisheries that kill tons of marine life as bycatch", Greenpeace has consistently ranked StarKist at the bottom of its list of well-known tuna brands when it comes to responsible sourcing of tuna.  Greenpeace, 2017      Tuna      Shopping      Guide,      *available      at*
https://www.greenpeace.org/usa/oceans/tuna-guide/  (last  visited  May  3,  2019) (ranking StarKist 20 out of 20).

## StarKist Does Not Comply with Mandatory Tracking and Verification Requirements

55.     Defendant's use of an alternative dolphin-safe logo on StarKist tuna products requires it to track, audit, and spot check for accuracy that "no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught" from capture, to transshipment[5], to cannery, to shelf.  And, in the event that even a single dolphin is "killed or seriously injured" during the catch, Defendant must physically separate and store that catch from any tuna catches in which no dolphins were harmed (if any) and maintain records tracing the catch(es) in which dolphins were harmed back to the fishing vessel and trip.  50 CFR §216.91

56.     Unlike fisheries in the ETP, boats in the other oceanic regions that

---

[5] Transfer of a shipment from one carrier, or more commonly, from one vessel to another whereas in transit. Transshipments are usually made (1) where there is no direct air, land, or sea link between the consignor's and consignee's countries, (2) where the intended port of entry is blocked, or (3) to hide the identity of the port or country   of   origin.     Business   Dictionary,   transshipment,   *available   at* http://www.businessdictionary.com/definition/transshipment.html (last visited May 3, 2019).

Class Action Complaint

supply StarKist tuna are not required to have independent observers onboard to track and report the number of dolphins killed or seriously injured. 16 U.S.C. §1385(d)(1). Defendant is solely responsible for collecting this information, which Defendant fails to do.  Defendant does not track, trace, and report the number of dolphins killed or harmed by Defendant's tuna fishing vessels or disclose the dolphin hazardous fishing methods used to catch its tuna, even though Defendant is able to do so.  As confirmed on a StarKist webpage entitled "Sustainability Knowledge Center", StarKist claims to trace each tuna Product sold in the U.S. to the vessel that caught it, the ocean where it was caught, the method used to catch the tuna, and the cannery where it was processed.    StarKist, <u>Sustainability Knowledge Center</u>, *available at* https://starkist.com/sustainability-knowledge-center (last visited May 3, 2019). Other tuna brands that claim to have similar tracking methods actually provide that information to consumers via tracking portals on their website that allow consumers to see this critical information.  StarKist's tracking portal provides information only on the ocean in which its tuna was caught.

57.    By not adequately tracking its tuna catch from net or hook to can, StarKist conceals the actual harm to dolphins caused in its supply chain.

58.    StarKist's concealment is wide ranging and multi-layered.  For example, by using Dongwon boats to catch its tuna in the Western Pacific Ocean, StarKist is not required by international law to have an independent observer on board to certify no dolphins were harmed.  It is estimated that observers are aboard only about 1 in 50 WPO tuna longliners.  A declaration from the ship's captain that no purse seines were intentionally set on dolphins suffices.  16 U.S.C. § 1385(d)(1)(B)(ii).  These declarations are limited to certifying that "no purse seine net was intentionally deployed on or used to encircle dolphins during the particular voyage on which the tuna was harvested" and do not require certification that FADs, gillnets, longlines and other dolphin harming fishing techniques were not used.  *Id.*  Nor must the

- 18 -

captain quantify the number of dolphins killed or otherwise harmed.  There is a strong financial incentive for a captain to falsely certify a catch is "dolphin-safe," as any catch that is not "dolphin-safe" is essentially worthless.

59.     Further, as Dongwon's distant water fleet transship their catch at sea to cargo ships and not in port, their unsafe dolphin fishing practices and onboard delay in releasing trapped dolphins, mutilation of dolphins, and other dolphin harming activities escape detection by port authorities.  And since December 2014, when then President Barack Obama signed a new Coast Guard and Maritime Transportation Act into law, the distant water fleet no longer have to make even an annual call into a U.S. port.  Nor do they report the percentage of foreign ownership of the boats or the number of crew injuries and deaths.  Thus, as cargo ships deliver food, fuel, and supplies as well as ferry their frozen fish to shore, they are able to roam the sea for months or years, their unsafe dolphin fishing activities going unchecked and undetected.

60.     To further avoid detection that their tuna products are not dolphin-safe as represented, and to mitigate the risk that authorities will act to stop their unsafe dolphin fishing practices, Dongwon's distant water fleet can and have changed the names of their boats, their port registry, and/or their country of origin flags (a practice known as flying a flag of convenience).

61.     Exemplative is the vessel known as the STS-5O whose chain of ownership includes Defendant Dongwon Industries Company Ltd.  The STS-5O was seized by Indonesian authorities for carrying 18 miles of illegal drifting gill nets (which StarKist has promised consumers it does not use) which are almost invisible to fish and known to be dangerous to dolphins and other marine life as acknowledged on StarKist's website recital of its dolphin-safe policy.  The STS-5O evaded earlier seizure efforts by China and other countries by flying the flags of eight separate countries on different occasions.  *See* Stop Illegal Fishing, <u>Indonesia seeks global</u>

pushback on illegal fishing (January 7, 2019), *available at* https://stopillegalfishing.com/press-links/indonesia-seeks-global-pushback-on-illegal-fishing/ (last visited May 3, 2019).

62.   The ability to purchase the flag of any country and change flags at will effectively prevents the military and enforcement authorities from investigating and stopping harmful fishing practices as they are forbidden from boarding ships flying another country's flag.  Thus, most nations have no ships that regularly patrol beyond their national waters.

63.   Further, most countries are reluctant to give chase and seize vessels suspected of harmful fishing practices given the expense.  The vessels can be a pollution risk, the onboard catch needs to be safely disposed, the crew must be repatriated, pests eradicated, and 24-hour security posted.

64.   As to those few boats – like the STS-5O – that authorities are able to seize, they often are unable to determine the responsible owners and operators.  What confronts them is a nebulous web of companies, some registered in offshore tax havens whose ownership is virtually impossible to determine.  The STS-5O, for example, identified one company as the registered owner, another company as the beneficial owner, and 4 other companies as previous owners including StarKist's parent company, Dongwon Industries Company Ltd.

65.   By not complying with mandatory tracking and verification requirements, StarKist is able to reduce its tuna product costs by using less costly fishing methods that kill or harm dolphins.  This enables StarKist to sell its tuna at a lower price and capture more of the declining tuna market, which has experienced a 40% per capita decline over the last 30 years, as well as mitigate the risk of detection that StarKist tuna products are not dolphin-safe as represented.

### StarKist, Unlike Many Other Tuna Companies, Does Not Use

**Dolphin-Safe Tuna Fishing Methods**

66.     Unlike several other tuna companies who sell to the U.S. market, Defendant has not adopted dolphin-safe fishing practices, such as pole-and-line, trolling, and/or handline catch methods, whereby fishermen catch one fish at a time and release unwanted species soon after a fish takes the bait.

67.     Most U.S. retailers have sustainability guidelines and expectations of their seafood suppliers that include: using recognized dolphin-safe tuna capture methods, having programs in place to trace the tuna back to the boat and place of capture, and guaranteeing the catch method used.  *See, e.g.*, Whole Foods Market, Sustainable Canned Tuna, *available at* https://www.wholefoodsmarket.com/ sustainable-canned-tuna (last visited May 3, 2019); Whole Foods Market, Canned Tuna Sourcing Policy (Aug. 15, 2018), *available at* http://assets.wholefoods market.com/www/departments/seafood/Whole_Foods_Market_Canned_Tuna_Sour cing_Policy_102017.pdf (last visited May 3, 2019); PR Newswire, Safeway Announces New Sustainable Sourcing Practice for Tuna (Feb. 10, 2012), *available at* https://www.prnewswire.com/news-releases/safeway-announces-new-sustainable -sourcing-practice-for-tuna-139096714.html      (last      visited      May      3,      2019); Albertsons/Safeway, Supplier Sustainability Guidelines and Expectations (August 2015),      at      3,      *available      at*      https://suppliers.safeway.com/usa/pdf/supplier_ sustainability_expectations.pdf (last visited May 3, 2019) ("Safeway-Albertsons will strive to purchase environmentally preferable products"); H-E-B, H-E-B seafood policy,      *available      at*      https://www.heb.com/static-page/article-template/H-E-B- Seafood-Policy (last visited May 3, 2019); Sprouts, Sustainable Seafood Policy, *available at* https://about.sprouts.com/product-sourcing/sustainable-seafood-policy/ (last      visited      May      3,      2019);      Giant      Eagle,      Tuna Policy,      *available      at* https://www.gianteagle.com/about-us/sustainable-seafood/tuna-policy      (last      visited May 3, 2019) ("Our goal is to source tuna only from healthy and well-managed

stocks, from fisheries using the most current best practice in methods, bycatch reduction and environmentally responsible, socially responsible, Non GMO, BPA free and priced reasonably for our consumers"); Wegmans, <u>Seafood Sustainability</u>, *available at* https://www.wegmans.com/about-us/making-a-difference/sustainability-at-wegmans/seafood-sustainability.html (last visited May 3, 2019); Publix, <u>Publix Sustainability Report 2019</u>, *available at* https://sustainability.publix.com/wp-content/uploads/sustainability-report.pdf (last visited May 3, 2019) (supplier commitment to sustainable fishing "helps us decide whether to sell a product, enhance fisheries through improvement projects or halt the sale of a product until the issue is resolved.").  Tuna companies who do not use dolphin-safe catch methods and do not adhere to traceability requirements can expect retailers to refuse to sell their products.

68.     By labeling its tuna products as dolphin safe, not tracking and reporting the number of dolphins killed and harmed in capturing its tuna, and not separating tuna that is not dolphin-safe from tuna caught where no dolphins were harmed (if any), Defendant is able to sell its StarKist tuna products in several major retail stores to which it would otherwise be denied entry.

### StarKist's Dolphin-Safe Representations are False, Misleading, and/or Deceptive

69.     Because dolphins are killed and harmed by the fishing methods used to catch the tuna in Defendant's products; Defendant does not adequately track, verify, audit, and spot check the number of dolphins killed and harmed; and Defendant does not separately store the tuna that is not dolphins safe, StarKist's use of the alternative dolphin-safe logo, and its dolphin-safe representations are false, misleading, and/or deceptive.

70.     Reasonable consumers rightly believe StarKist's plain words that "dolphin-safe" means "no" dolphins were harmed in the process of catching the tuna

in Defendant's products.  That is precisely the regulatory definition of dolphin safe.  50 CFR §§216.3, 216.91.  And it is the message that StarKist has consistently conveyed to the public in its widespread and long-term advertising and marketing campaign.

71.    Dolphin safety matters to consumers and it materially affects their decision whether to purchase StarKist tuna.  If consumers knew StarKist's tuna products were not dolphin-safe they would not buy Defendant's tuna products, particularly because there are several competing brands of like tuna products that are dolphin safe.  Thus, Plaintiffs and Class members are entitled to a full refund.

72.    Any nutrient value notwithstanding, because StarKist's false dolphin-safe representations taint the entire purchase – from whether StarKist tuna that was not dolphin-safe would even be made available by retailers for purchase by consumers to whether consumers would purchase StarKist tuna that was not dolphin-safe if available for purchase – consumers, like Plaintiffs here, are entitled to a full refund.  The importance consumers place upon dolphin safety and their abject distaste for indiscriminate and destructive fishing methods makes tuna fish consumers no different from Hindus attributing zero value to beef products, or vegans attributing zero value to animal products, or vegetarians attributing zero value to meat, fish, and poultry, no matter what nutritive value these products may otherwise have. Further, if the retailers of Defendant's tuna products knew they were not sustainably sourced and dolphin safe, they would refuse to sell Defendant's tuna products.  This too entitles Plaintiffs and Class members to a full refund.

73.    Alternatively, Plaintiffs and Class members are entitled to the premium attributable to the dolphin-safe representations.

74.    Plaintiffs bring this action on behalf of themselves and other similarly situated consumers who purchased the tuna products to halt the dissemination of this false, misleading, and deceptive advertising message, correct the misleading

- 23 -
Class Action Complaint

perception it has created in the minds of consumers, and obtain redress for those who have purchased the tuna products. Based on Defendant's violation of RICO, unjust enrichment, and violations of California, Florida, New York, New Jersey, Minnesota, and Arizona unfair competition laws (detailed below), Plaintiffs seek damages, declaratory, injunctive, and restitutionary relief for consumers who purchased the tuna products.

## JURISDICTION AND VENUE

75.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because Plaintiffs' claims arise under RICO, 18 U.S.C. §1962.  The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.  This Court also has jurisdiction pursuant to 28 U.S.C. §1332, as modified by the Class Action Fairness Act of 2005, because at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

76.     Venue properly lies in this District pursuant to 28 U.S.C. §1391(a), because Defendant has transacted substantial business within this District within the meaning of 28 U.S.C. §1391(a), as defined in 28 U.S.C. §1391(c), and because a substantial part of the events giving rise to the claims alleged herein occurred in the Northern District of California.  Specifically, Defendant marketed and sold its tuna products throughout the State of California, including throughout this District, and California Plaintiff Gardner, as well as other members of the Class, purchased Defendant's falsely advertised and labeled tuna products from retail outlets located within this District.

77.     This Court has personal jurisdiction over Defendant pursuant to 18 U.S.C. §1965(b) and (d). Defendant is authorized to conduct and do business in California, including this District.  Defendant marketed, promoted, distributed, and

sold the tuna products in California, and Defendant has sufficient minimum contacts with this State and/or sufficiently availed itself of the markets in this State through its promotion, sales, distribution, and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

## PARTIES

78.    Plaintiff Warren Gardner resides in San Anselmo, California and is a citizen of California.  Throughout the relevant period, Plaintiff Gardner routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna in water at Safeway stores in his area.  Plaintiff Gardner purchased the canned tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Gardner believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins. Had Plaintiff Gardner known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Gardner would not have purchased the StarKist tuna products.  As a result, Plaintiff Gardner suffered injury in fact and lost money at the time of purchase.  Plaintiff Gardner continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Gardner regularly visits stores such as Safeway, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

79.     Plaintiff Lori Myers resides in Moreno Valley, California and is a citizen of California.  Throughout the relevant period, Plaintiff Myers routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned and pouched tuna in water through Instacart, Amazon, and at Ralphs in Canyon Crest Town Center in Riverside, California.  Plaintiff Myers purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Myers believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Myers known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Myers would not have purchased the StarKist tuna products.  As a result, Plaintiff Myers suffered injury in fact and lost money at the time of purchase.  Plaintiff Myers continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Myers regularly purchases online and visits stores such as Ralphs and Stater Brothers, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

80.     Plaintiff Angela Cosgrove resides in Pompano Beach, Florida and is a citizen of Florida.  Throughout the relevant period, Plaintiff Cosgrove routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna in water and canned yellowfin tuna at various stores in her area, including Publix and Walmart.  Plaintiff

Class Action Complaint

Cosgrove purchased the canned tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Cosgrove believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Cosgrove known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Cosgrove would not have purchased the StarKist tuna products.  As a result, Plaintiff Cosgrove suffered injury in fact and lost money at the time of purchase.  Plaintiff Cosgrove continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Cosgrove regularly visits stores such as Publix and Walmart where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

81.    Plaintiff Autumn Hessong resides in Jacksonville, Florida and is a citizen of Florida.  Throughout the relevant period, Plaintiff Hessong routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned and pouched tuna at various stores in in Jacksonville, Florida, including Winn-Dixie.  Plaintiff Hessong purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Hessong believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Hessong known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff

Class Action Complaint

Hessong would not have purchased the StarKist tuna products.  As a result, Plaintiff Hessong suffered injury in fact and lost money at the time of purchase.  Plaintiff Hessong continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Hessong regularly visits stores such as Winn-Dixie, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

82.    Plaintiff Robert McQuade resides in Bronxville, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Robert McQuade routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist tuna products including canned tuna in water and tuna in pouches, at various stores in Bronxville, Yonkers, Eastchester and Tuckahoe, New York, including ACME, Shop-Rite, Stop & Shop, and Costco.  Plaintiff Robert McQuade purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Robert McQuade believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Robert McQuade known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Robert McQuade would not have purchased the StarKist tuna products.  As a result, Plaintiff Robert McQuade suffered injury in fact and lost money at the time of purchase. Plaintiff Robert McQuade continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins,

1   and he would purchase such a product manufactured by Defendant if it were possible
2   to determine prior to purchase whether no dolphins were harmed in capturing the
3   tuna in the product. Indeed, Plaintiff Robert McQuade regularly visits stores such as
4   ACME, Shop-Rite, Stop & Shop, and Costco, where Defendant's tuna products are
5   sold, but will be unable to rely upon the dolphin-safe representations and will not be
6   able to determine if the tuna in the products is dolphin-safe and was caught using
7   fishing methods that do not harm dolphins when deciding whether to purchase the
8   tuna products in the future.

9       83.    Plaintiff Colleen McQuade resides in Bronxville, New York and is a
10  citizen of New York.  Throughout the relevant period, Plaintiff Colleen McQuade
11  routinely was exposed to, saw, and relied upon Defendant's dolphin-safe
12  representations by viewing the dolphin-safe mark on the StarKist tuna products,
13  including canned tuna in water and tuna in pouches, at various stores in Bronxville,
14  Yonkers, Eastchester and Tuckahoe, New York, including ACME, Shop-Rite, Stop
15  & Shop and Costco. Plaintiff Colleen McQuade purchased the tuna products many
16  times throughout the relevant period.   At all relevant times, Plaintiff Colleen
17  McQuade believed the tuna products were dolphin-safe and was unaware that the
18  tuna was not dolphin-safe as represented and was caught using fishing methods that
19  are harmful to dolphins.  Had Plaintiff Colleen McQuade known the tuna was not
20  dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe,
21  Plaintiff Colleen McQuade would not have purchased the StarKist tuna products.  As
22  a result, Plaintiff Colleen McQuade suffered injury in fact and lost money at the time
23  of purchase.  Plaintiff Colleen McQuade continues to desire to purchase StarKist tuna
24  products that contain dolphin-safe tuna caught using fishing methods that do not
25  harm dolphins, and she would purchase such a product manufactured by Defendant
26  if it were possible to determine prior to purchase whether no dolphins were harmed
27  in capturing the tuna in the product. Indeed, Plaintiff Colleen McQuade regularly

28

Class Action Complaint

visits stores such as ACME, Shop-Rite, Stop & Shop, and Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

84.   Plaintiff James Borruso resides in Staten Island, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Borruso routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist tuna products, including canned tuna in water and oil, at stores like Stop & Shop and Pathmark in Staten Island, New York. Plaintiff Borruso purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Borruso believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Borrusso known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Borrusso would not have purchased the StarKist tuna products.  As a result, Plaintiff Borruso suffered injury in fact and lost money at the time of purchase.  Plaintiff Borruso continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Borruso regularly visits stores such as Stop & Shop and Pathmark, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

Class Action Complaint

85.   Plaintiff Fidel Jamelo resides in Bronx, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Fidel Jamelo routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna products, including canned tuna in water, at stores like Costco in New Rochelle, New York.  Plaintiff Fidel Jamelo purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Fidel Jamelo believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Fidel Jamelo known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Fidel Jamelo would not have purchased the StarKist tuna products.  As a result, Plaintiff Fidel Jamelo suffered injury in fact and lost money at the time of purchase.  Plaintiff Fidel Jamelo continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Fidel Jamelo regularly visits stores such as Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

86.   Plaintiff Jocelyn Jamelo resides in Bronx, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Jocelyn Jamelo routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna products, including canned tuna in water, at stores like Costco in New Rochelle, New York.  Plaintiff

Class Action Complaint

Jocelyn Jamelo purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Jocelyn Jamelo believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Jocelyn Jamelo known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Jocelyn Jamelo would not have purchased the StarKist tuna products.  As a result, Plaintiff Jocelyn Jamelo suffered injury in fact and lost money at the time of purchase.  Plaintiff Jocelyn Jamelo continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Jocelyn Jamelo regularly visits stores such as Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

87.    Plaintiff Anthony Luciano resides in Eastchester, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Anthony Luciano routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist tuna products, including canned tuna in water and oil, at various stores in Eastchester, Yonkers, Tuckahoe, New Rochelle and the Bronx, New York, including Stop & Shop, Shop Rite, ACME, Foodtown and Costco.  Plaintiff Anthony Luciano purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Anthony Luciano believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods

Class Action Complaint

that are harmful to dolphins. Had Plaintiff Anthony Luciano known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Anthony Luciano would not have purchased the StarKist tuna products. As a result, Plaintiff Anthony Luciano suffered injury in fact and lost money at the time of purchase. Plaintiff Anthony Luciano continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Anthony Luciano regularly visits stores such as Stop & Shop, Shop Rite, ACME, Foodtown and Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

88. Plaintiff Lori Luciano resides in Eastchester, New York and is a citizen of New York. Throughout the relevant period, Plaintiff Lori Luciano routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist tuna products, including canned tuna in water and oil, at various stores in Eastchester, Yonkers, Tuckahoe, New Rochelle and the Bronx, New York, including Stop & Shop, Shop Rite, ACME, Foodtown and Costco. Plaintiff Lori Luciano purchased the tuna products many times throughout the relevant period. At all relevant times, Plaintiff Lori Luciano believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins. Had Plaintiff Lori Luciano known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Lori Luciano would not have purchased the StarKist tuna products. As a result, Plaintiff Lori Luciano suffered

Class Action Complaint

injury in fact and lost money at the time of purchase.  Plaintiff Lori Luciano continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Lori Luciano regularly visits stores such as Stop & Shop, Shop Rite, ACME, Foodtown and Costco, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

89.    Plaintiff Robert Nugent resides in Staten Island, New York and is a citizen of New York.  Throughout the relevant period, Plaintiff Nugent routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist tuna products, including canned tuna in water, at stores like Stop & Shop, Shop Rite and Key Food in Staten Island, New York.  Plaintiff Nugent purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Nugent believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Nugent known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Nugent would not have purchased the StarKist tuna products.  As a result, Plaintiff Nugent suffered injury in fact and lost money at the time of purchase.  Plaintiff Nugent continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Nugent regularly

Class Action Complaint

visits stores such as Stop & Shop, Shop Rite and Key Food where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

90.    Plaintiff Avraham Isac Zelig resides in Manalapin, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Zelig routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna products, including canned tuna in water, at various stores, including a Costco in Staten Island New York, and a Costco and Shop-Rite in Marlboro, New Jersey.   Plaintiff Zelig purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Zelig believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Zelig known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Zelig would not have purchased the StarKist tuna products.  As a result, Plaintiff Zelig suffered injury in fact and lost money at the time of purchase.  Plaintiff Zelig continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Zelig regularly visits stores such as Costco and Shop-Rite, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

Class Action Complaint

91.     Plaintiff Ken Petrovcik resides in Belvidere, New Jersey, and is a citizen of New Jersey.  Throughout the relevant period, Plaintiff Petrovcik routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna products, including canned tuna in water, at stores like Walmart and Shop Rite in Belvidere, New Jersey. Plaintiff Petrovcik purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Petrovcik believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Petrovcik known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Petrovcik would not have purchased the StarKist tuna products.  As a result, Plaintiff Petrovcik suffered injury in fact and lost money at the time of purchase.  Plaintiff Petrovcik continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and he would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Petrovcik regularly visits stores such as Walmart and Shop Rite, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

92.     Plaintiff Megan Kiihne resides in Winona, Minnesota and is a citizen of Minnesota.  Throughout the relevant period, Plaintiff Kiihne routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna in water and tuna in pouches at various stores in Winona, Minnesota, including Walmart and Midtown Foods.  Plaintiff

Kiihne purchased the tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Kiihne believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Kiihne known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Kiihne would not have purchased the StarKist tuna products.  As a result, Plaintiff Kiihne suffered injury in fact and lost money at the time of purchase. Plaintiff Kiihne continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Kiihne regularly visits stores such as Walmart and Midtown Foods, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

93.    Plaintiff Kathleen Miller resides in Scottsdale, Arizona and is a citizen of Arizona.  Throughout the relevant period, Plaintiff Miller routinely was exposed to, saw, and relied upon Defendant's dolphin-safe representations by viewing the dolphin-safe mark on the StarKist canned tuna in water at Albertson's and Fry's in Phoenix and Scottsdale, Arizona.  Plaintiff Miller purchased the canned tuna products many times throughout the relevant period.  At all relevant times, Plaintiff Miller believed the tuna products were dolphin-safe and was unaware that the tuna was not dolphin-safe as represented and was caught using fishing methods that are harmful to dolphins.  Had Plaintiff Miller known the tuna was not dolphin-safe and/or had Defendant not represented that the tuna was dolphin-safe, Plaintiff Miller would not have purchased the StarKist tuna products.  As a result, Plaintiff Miller suffered

Class Action Complaint

injury in fact and lost money at the time of purchase.  Plaintiff Miller continues to desire to purchase StarKist tuna products that contain dolphin-safe tuna caught using fishing methods that do not harm dolphins, and she would purchase such a product manufactured by Defendant if it were possible to determine prior to purchase whether no dolphins were harmed in capturing the tuna in the product. Indeed, Plaintiff Miller regularly visits stores such as Fry's, where Defendant's tuna products are sold, but will be unable to rely upon the dolphin-safe representations and will not be able to determine if the tuna in the products is dolphin-safe and was caught using fishing methods that do not harm dolphins when deciding whether to purchase the tuna products in the future.

94.     Defendant StarKist Co. is corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its headquarters and principal place of business located at 225 North Shore Drive, Suite 400, Pittsburgh, PA 15212, and is a citizen of Pennsylvania.  StarKist processes much of the tuna it sold during the Class Period in Pago Pago, American Samoa, for shipment to the United States.   During the time period relevant to Plaintiffs' claims, StarKist produced and sold canned tuna and tuna pouches throughout the United States and its territories, sold canned tuna and tuna pouches to Plaintiffs and others in the United States, and engaged in the false, misleading, and deceptive advertising alleged in this Complaint.

## CLASS DEFINITION AND ALLEGATIONS

95.     Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers pursuant to Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure and seek certification of the following Classes:[6]

**Nationwide Class**

---

[6]   For ease of reference, the Nationwide Class and state-only classes alleged herein may sometimes be referred to as the "Class" or the "Classes."

1
2

> All consumers who, within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products in the United States.

3
4
5

> Excluded from this Class are Defendant and its officers, directors, employees and those who purchased the tuna products for the purpose of resale.

6    96.    In addition, Plaintiffs Gardner and Myers seek certification of the

7 following California-Only Class:

8
9
10

> **California-Only Class**
> All California consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

11
12

> Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

13    97.    In addition, Plaintiffs Cosgrove and Hessong seek certification of the

14 following Florida-Only Class:

15
16
17

> **Florida-Only Class**
> All Florida consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

18
19

> Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

20    98.    In addition, Plaintiffs Robert and Colleen McQuade, Plaintiffs Fidel and

21 Jocelyn Jamelo, Plaintiffs Anthony and Lori Luciano, and Plaintiffs Borruso and

22 Nugent seek certification of the following New York-Only Class:

23
24
25

> **New York-Only Class**
> All New York consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

26
27

> Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

28

- 39 -
Class Action Complaint

99.   In addition, Plaintiffs Zelig and Petrovcik seek certification of the following New Jersey-Only Class:

**New Jersey-Only Class**
All New Jersey consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

100.   In addition, Plaintiff Kiihne seeks certification of the following Minnesota-Only Class:

**Minnesota-Only Class**
All Minnesota consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

101.   In addition, Plaintiff Miller seeks certification of the following Arizona-Only Class:

**Arizona-Only Class**
All Arizona consumers who within the applicable statute of limitations period until the date notice is disseminated, purchased the tuna products.

Excluded from this Class are Defendant and its officers, directors and employees, and those who purchased the tuna products for the purpose of resale.

102.   **Numerosity.**   The members of the Classes are so numerous that their joinder is impracticable.   Plaintiffs are informed and believe that the proposed Classes contain thousands of purchasers of the tuna products who have been damaged by Defendant's conduct as alleged herein.   The precise number of Class members is unknown to Plaintiffs.

103. **Existence and Predominance of Common Questions of Law and Fact**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a) whether Defendant's dolphin-safe representations are false, misleading, or objectively reasonably likely to deceive;

(b) whether Defendant failed to comply with traceability and verification requirements;

(c) whether Defendant engaged in fishing practices that harmed dolphins;

(d) whether Defendant's alleged conduct is unlawful;

(e) whether the alleged conduct constitutes violations of the laws asserted, including whether Defendant violated RICO, 18 U.S.C. §1962;

(f) whether Defendant engaged in false, misleading and/or deceptive advertising;

(g) whether the Dolphin-Unsafe RICO Enterprise was an enterprise engaged in, or the activities of which affected, interstate or foreign commerce;

(h) whether Defendant and its RICO Co-Conspirators conducted or participated in the conduct of the Dolphin-Unsafe RICO Enterprise's affairs through a pattern of racketeering activities;

(i) whether Defendant and its RICO Co-Conspirators knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omissions;

(j) whether the statements made or facts omitted as part of the scheme were material; that is, whether they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

(k) whether Defendant and its RICO Co-Conspirators used, or caused to be used, the mails or interstate wire transmission to carry out, or attempt to carry out, an essential part of the scheme;

(l) what is the measure and amount of damages suffered by Plaintiffs and Class Members, and whether Plaintiffs and the Class are entitled to treble and/or punitive damages; and

(m)      whether Plaintiffs and Class members are entitled to appropriate equitable remedies, including damages, restitution, corrective advertising, and injunctive relief.

104.   **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Classes because, *inter alia*, all Class members were injured through the uniform misconduct described above.  Plaintiffs are also advancing the same claims and legal theories on behalf of themselves and all Class members.

105.   **Adequacy of Representation.**   Plaintiffs will fairly and adequately protect the interests of Class members.  Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously.  Plaintiffs have no adverse or antagonistic interests to those of the Classes.

106.   **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would thus be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.   Individualized litigation would create the danger of inconsistent  or  contradictory  judgments  arising  from  the  same  set  of  facts.

Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

107.   Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Classes, on grounds generally applicable to the entire Classes, to enjoin and prevent Defendant from engaging in the acts described and requiring Defendant to provide full restitution to Plaintiff and Class members.

108.   Unless a Class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiffs and Class members.

109.   Unless an injunction is issued, Defendant will continue to commit the violations alleged, and the members of the Classes and the general public will continue to be deceived and not know whether the dolphin-safe representations are true or if the tuna products continue to contain tuna caught using fishing methods that are harmful to dolphins.

110.   Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to: (a) whether Defendant marketed and sold its tuna products as "Dolphin Safe" when they were not; (b) whether Defendant conspired with its RICO Co-Conspirators to violate RICO; (c) whether Defendant's conduct was unlawful, unfair, or fraudulent in violation of state consumer protections law; (d) whether Defendant's misrepresentations would deceive a reasonable consumer; (e) whether Defendant has been unjustly enriched; (f) whether Defendant failed to comply with federal law in branding its tuna products "Dolphin Safe"; and (g) whether Defendant's

Class Action Complaint

misrepresentations regarding its tuna products would be material to a reasonable consumer.

**COUNT I**
**Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO") –**
**18 U.S.C. §§1962(c)-(d)**
**(On Behalf of the Nationwide Class)**

111.   Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

112.   Plaintiffs bring this claim against Defendant individually and on behalf of the Nationwide Class.

113.   Defendant conducts its business—legitimate and illegitimate—in concert with numerous other persons and entities, including, but not limited to, Defendant's parent company, Dongwon Industries Co. Ltd. ("Dongwon"), a South Korean fishing conglomerate that owns the world's largest fishing fleet; Imperial Shipping Logistic Co. Ltd. ("Imperial"), a fishing vessel operation company that sources much of Defendant's tuna products; Ocean Treasure Co. Ltd. ("Ocean Treasure"), another fishing vessel operator for Defendant; Genesis Ocean S.A., another fishing vessel operator for Defendant; StarKist Samoa Co. ("StarKist Samoa"), one of Defendant's top importers; Ping Tai Rong Ocean Fishery Company ("Ping Tai"), another fishing vessel operator for Defendant with a partnership with StarKist Samoa; Société de Conserverie en Afrique SA. ("SCASA"), a Dongwon-owned (since 2011) tuna cannery in Senegal and one of the largest tuna canneries in Africa that exports to the U.S. market through StarKist; Tri Marine International, Inc. ("Tri Marine"), a U.S.-based tuna fishing, processing, and trading group that, *inter alia*, opened Samoa Tuna Processors Inc. ("STP") in Paga Pago, American Samoa which signed a 10-year lease deal with Defendant in May 2018 to use STP's "cold storage freezer" to store Defendant's large volume of tuna products; various other

fishing, import/export, packaging, labeling, and distributing companies (collectively, the "RICO Co-Conspirators").

114.   At all relevant times, Defendant and its RICO Co-Conspirators have each been a "person" under 18 U.S.C. §1961(3) because each was capable of holding "a legal or beneficial interest in property."

115.   Section 1962(c) of RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

116.   Section 1962(d) of RICO makes it unlawful for "any person to conspire to violate" section 1962(c), among other provisions. *See* 18 U.S.C. §1962(d).

117.   As part of a strategy to save millions if not billions of dollars and convince consumers to purchase its tuna products, Defendant and its RICO Co-Conspirators concocted a scheme at or before 2008, and continuing throughout the Class Period, to falsely represent, in various pieces of mail, through wires, and on the Internet, that Defendant's tuna products were dolphin-safe under U.S. law and regulations, including the MMPA as amended, 16 U.S.C. §1361, *et seq.*, the DPCIA 16 U.S.C. §1385, *et seq.*, and 50 CFR §216.95.  In making this express representation, Defendant falsely assured the public and regulators that "no" dolphins were killed or seriously injured, that Defendant adequately traces or otherwise identifies its tuna that is not dolphin-safe, and that Defendant physically segregates and stores tuna that is not dolphin-safe separately from any tuna that may be dolphin-safe.

118.   Defendant and its RICO Co-Conspirators' scheme is similar to that of Volkswagen, General Motors, Fiat Chrysler, and other automobile manufacturers and parts suppliers who brazenly violated federal and state emissions laws and regulations, concomitantly deceiving consumers, car dealers, and regulatory bodies

alike, by marketing and labeling their vehicles as "clean" and "eco" friendly when, in fact, the vehicles contained undisclosed emission control devices that served to "defeat" emissions testing under the Clean Air Act, and actually significantly increased NOx emissions when activated. RICO allegations against these companies have repeatedly been upheld by the federal judiciary. *See*, *e.g.*, *Bledsoe v. FCA US LLC*, No. 16-14024, 2019 WL 1379588, at *16 (E.D. Mich. Mar. 27, 2019); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 984 (N.D. Cal. 2018); *In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1087 (E.D. Mich. 2018); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *18 (N.D. Cal. Oct. 30, 2017).

119.   As alleged in detail above, once the consuming public became aware in the late 1980s that large numbers of dolphins were being indiscriminately killed by tuna fishermen, public outcry and demand for more responsible fishing practices was intense and continues to this day.

120.   Along with other canned tuna companies, Defendant began promising consumers that the tuna it sold would ***only*** be procured through dolphin-safe fishing practices. Defendant thereafter implemented a widespread and long-term marketing campaign that continues to this day – expressly representing to consumers its commitment to sustainably sourcing tuna and that no dolphins are killed or harmed in capturing its tuna and that it is in compliance with federal laws and regulations regarding the use of a special "Dolphin Safe" logo on its tuna products.

121.   However, Defendant was either unable or unwilling to conduct its tuna fishing activities within the constraints of the law. And so, it devised one outside of it. Instead of spending money on more expensive tuna fishing, tracing and segregation operations as the laws required to label tuna as dolphin-safe, or coming

clean, Defendant and its RICO Co-Conspirators agreed to continue using more cost-saving, unsustainable tuna fishing methods that kill and otherwise harm dolphins.

122.   These methods were concealed from, among other persons and entities: consumers throughout the United States, including California (on Defendant's tuna product packaging, labeling, and the Internet); port authorities (such as Pago Pago Harbor in the village of Atu'u on the island of Tutuila, American Samoa; Guayaquil, Ecuador; Papua New Guinea; and Senegal, where much of Defendant's tuna is off-loaded and processed); the U.S. National Oceanic and Atmospheric Administration ("NOAA") in, among other things, NOAA's Form 370[7] and Captain Statements,[8] both part of NOAA's "Fisheries' Tuna Tracking and Verification Program;" and other tracing and tracking reports.

123.   To accomplish their scheme or common course of conduct, Defendant and its RICO Co-Conspirators, along with others, had to work together to conceal the truth.  Each of them was employed by, hired by, or associated with, and conducted or participated in the affairs of, a RICO enterprise (defined below and referred to as the "Dolphin-Unsafe RICO Enterprise" or the "Enterprise").  The purpose of the Dolphin-Unsafe RICO Enterprise was to deceive regulators, retailers, and consumers into believing that Defendant's tuna products were sustainably sourced and "Dolphin Safe" as that term is defined by U.S. laws and regulations.  The motivation was simple: to increase Defendant's revenues and profits and minimize its costs from what would otherwise be more expensive tuna fishing, tracing, and segregation operations.  As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendant and its RICO Co-Conspirators were able to extract

---

[7]   https://www.fisheries.noaa.gov/national/marine-mammal-protection/noaa-form-370-fisheries-certificate-origin (last visited May 2, 2019).
[8]   https://www.fisheries.noaa.gov/national/marine-mammal-protection/captains-statement-templates (last visited May 2, 2019).

billions of dollars from consumers. As explained below, their years-long misconduct violated Sections 1962(c) and (d).

### A.    Description of the Dolphin-Unsafe RICO Enterprise

124.   Defendant, which controls over one-third of the shelf-stable tuna market in the U.S., is owned and controlled by Dongwon, a South Korean fishing vessel conglomerate. Defendant uses Dongwon's fishing vessels, Imperial's fishing vessels, Ocean Treasure's fishing vessels, Genesis Ocean's fishing vessels, Ping Tai's fishing vessels, and other companies' fishing vessels currently unknown to Plaintiffs, as well as those vessels' companies and fishermen, to catch and procure tuna for use in Defendant's tuna products.  Defendant uses, among others, StarKist Samoa to import its tuna into the United States, including into the Port of Oakland in Oakland, California.  Defendant uses, among others, SCASA, Tri Marine, and STP to store and package its tuna products in, among other places, Pago Pago, American Samoa. Defendant uses a network of distributors to distribute its tuna products throughout the United States for sale to consumers.  Throughout this process, Defendant and its RICO Co-Conspirators sent through the mails and wires, among other things, consumer tuna products with product labels, Internet website postings, invoices, wire payment records, shipping manifests, bills of lading, NOAA Form 370s, Captain Statements, and tracing and tracking reports identifying that the tuna being sold was dolphin safe, when it was not.

125.   At all relevant times, Defendant and its RICO Co-Conspirators, along with other individuals and entities, including unknown third parties involved in the procuring, processing, exporting, importing, labeling, packaging, distributing, and sale of Defendant's tuna products, operated an association-in-fact enterprise, which was formed for the purpose of fraudulently marketing, advertising, and labeling Defendant's tuna products as "Dolphin Safe" and sustainably sourced and deceiving consumers and retailers, as well as federal regulators at the Department of Commerce

and NOAA, in order to sell Defendant's tuna products throughout the United States (and California), and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. §1961(4).

126.   At all relevant times, the Dolphin-Unsafe RICO Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendant's and the RICO Co-Conspirators' unlawful profit-making scheme.

127.   The association-in-fact Dolphin-Unsafe RICO Enterprise consisted of at least the following entities and individuals, and likely others:

### 1.   StarKist

128.   StarKist, the Defendant in this action, is one of the largest sellers of shelf-stable tuna products in the United States, holding over one-third of the market. StarKist is wholly owned by Dongwon of South Korea, which purchased StarKist from Del Monte Foods for over $360 million in June 2008.  StarKist is run by Andrew Choe who previously held leadership positions at one of Dongwon's subsidiaries. StarKist is a distinct legal entity, controlled and owned by Dongwon.  As more fully detailed herein, StarKist conspired with Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and other entities and individuals to procure, process, package, label, and sell tuna products as dolphin-safe and sustainably sourced when they are not, to package and label Defendant's tuna products with false and material misrepresentations, and to gather information for submission to port authorities and regulators in the Form 370s and Captain Statements. StarKist knew or recklessly disregarded that its tuna products sold to Plaintiffs and the Class did not comply with U.S. laws and regulations for labeling the products dolphin-safe and yet concealed this information from consumers, retailers, and regulators.

129.   Working with other members of the Dolphin-Unsafe RICO Enterprise, StarKist conspired to procure, process, package, label, and sell tuna products that are not dolphin-safe to illegally circumvent stringent U.S. laws and regulations. Employing these illegal practices, StarKist fraudulently told consumers that its tuna products were "Dolphin Safe" and "sourced responsibly," and submitted false dolphin safe statements to port authorities, the U.S. Department of Commerce (including NOAA), and in written and online marketing and advertising for StarKist's tuna products.

## 2.    The Co-Conspirator Fishing Vessel Entities and Individuals

130.   As explained above, RICO Co-Conspirators Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen, among other third-party fishing vessel companies and employees unknown to Plaintiffs, supplied tuna to Defendant for processing and sale that is not dolphin safe or sustainably sourced, knowing that Defendant would package, label, market, and sell its tuna products to Plaintiffs and the Class as dolphin-safe and compliant with federal laws and regulations.   On information and belief, these RICO Co-Conspirators further supplied false Captain Statements to Defendant knowing that such Captain Statements were false and, if the truth were known, Defendant would not be able to package, label, market, and sell its tuna products to the Class as dolphin-safe, sustainably sourced, and compliant with federal laws and regulations.

131.   RICO Co-Conspirators Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen, among other third-party fishing vessel companies and employees unknown to Plaintiffs were key to the conspiracy with Defendant enabling Defendant to sell its tuna to consumers as dolphin-safe and sustainably sourced.

132.   RICO Co-Conspirators Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen, among other third-

party fishing vessel companies and employees unknown to Plaintiffs worked with Defendant to design and implement the scheme by using cheaper and more efficient tuna fishing techniques they knew would result in the killing and harming of dolphins and render false Defendant's dolphin-safe and sustainably sourced representations to consumers and retailers in the United States, and by submitting false Captain Statements and other documents to Defendant they knew would be relied upon to permit Defendant to import, process and sell its tuna as dolphin-safe and sustainably sourced.

133. Put simply, RICO Co-Conspirators Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen, among other third-party fishing vessel companies and employees unknown to Plaintiffs were well aware that the tuna they procured on their fishing vessels for Defendant would be used to defraud consumers, retailers, and federal regulators. Indeed, these companies and individuals were critical to the concealment of the truth from consumers, retailers, and federal regulators regarding Defendant's tuna products.

### 3.    The Co-Conspirator Importers and Individuals

134. RICO Co-Conspirator StarKist Samoa and its employees, among other third-party importers and employees unknown to Plaintiffs, imported Defendant's tuna products for sale, knowing that Defendant would market and sell its tuna products to Plaintiffs and the Class as dolphin-safe, sustainably sourced, and compliant with federal laws and regulations. On information and belief, these RICO Co-Conspirators further supplied false bills of lading in connection with the importation of the tuna products into the United States knowing that such bills of lading were false and, if the truth were known, Defendant would not be able to package, label, market, and sell its tuna products to the Class as dolphin-safe, sustainably sourced, and compliant with federal laws and regulations.

135.   RICO Co-Conspirator StarKist Samoa and its employees, among other third-party fishing importers and employees unknown to Plaintiffs, were key to the conspiracy with Defendant enabling Defendant to sell its tuna to consumers as dolphin-safe and sustainably sourced.

136.   RICO Co-Conspirator StarKist Samoa and its employees, among other third-party importers and employees unknown to Plaintiffs, worked with Defendant to design and implement the scheme by importing tuna that was neither dolphin-safe nor sustainably caught which they knew would render false Defendant's dolphin-safe and sustainability representations to consumers and retailers in the United States, and by submitting false bills of lading and other documents to port authorities and regulators they knew would be relied upon to permit Defendant to import, process and sell its tuna as dolphin-safe and sustainably sourced.

137.   Put simply, RICO Co-Conspirator StarKist Samoa and its employees, among other third-party importers and employees unknown to Plaintiffs, were well aware that the tuna they imported for Defendant into the United States would be used to defraud consumers, retailers, and federal regulators.  Indeed, these companies and individuals were critical to the concealment of the truth from consumers, retailers, and federal regulators regarding Defendant's tuna products.

### 4.     The Co-Conspirator Storage, Canning, and Processing Entities and Individuals

138.   RICO Co-Conspirators SCASA, Tri Marine, and STP and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, stored, canned, and processed Defendant's tuna products for sale, knowing that Defendant would market and sell its tuna products to Plaintiffs and the Class as dolphin-safe, sustainably sourced, and compliant with federal laws and regulations.

139.   RICO Co-Conspirators SCASA, Tri Marine, and STP and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, were key to the conspiracy with Defendant enabling Defendant to sell its tuna to consumers as dolphin-safe and sustainably sourced.

140.   RICO Co-Conspirators SCASA, Tri Marine, and STP and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, worked with Defendant to design and implement the scheme by storing, canning, and processing tuna that was neither dolphin-safe nor sustainably caught which they knew would render false Defendant's dolphin-safe and sustainability representations to consumers and retailers in the United States.

141.   Put simply, RICO Co-Conspirators SCASA, Tri Marine, and STP and their employees, among other third-party storage, canning, and processing companies and employees unknown to Plaintiffs, were well aware that the tuna they stored, processed, and canned for Defendant prior to importing into the United States would be used to defraud consumers, retailers, and federal regulators.   Indeed, these companies and individuals were critical to the concealment of the truth from consumers, retailers, and federal regulators regarding Defendant's tuna products.

**B.    The Dolphin-Unsafe RICO Enterprise Sought to Increase Defendant's Profits and Revenues, as well as Their Own**

142.   As alleged in detail above, tuna-fishing techniques that meet the "dolphin-safe" standards (not used by Defendant and its RICO Co-Conspirators) are more expensive than other techniques.  They are more time consuming, require more manpower, and are less efficient because fish are caught using barbless hooks and poles one at a time, rather than en masse with longlines or enormous purse seine nets. Consequently, Defendant and its RICO Co-Conspirators' bottom lines are greatly

increased by the indiscriminate killing and harming of dolphins while fishing for tuna.

143.   The Dolphin-Unsafe RICO Enterprise began as early as 2008, when Dongwon acquired StarKist. On information and belief, Defendant has entered into numerous agreements with Dongwon to procure tuna to be used in Defendant's tuna products sold to Plaintiffs and the Class, and has entered into agreements with Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and other fishing vessel companies unknown to Plaintiffs to also procure tuna to be used in Defendant's tuna products sold to Plaintiffs and the Class.  Defendant has also entered into numerous agreements with StarKist Samoa to import Defendant's tuna products, and with SCASA, Tri Marine, and STP to store, process, and can Defendant's tuna products.

144.   The scheme continues to this day, as consumers, retailers, and federal regulators remain in the dark about the truth of Defendant's so-called "Dolphin Safe" tuna products.

145.   At all relevant times, the Dolphin-Unsafe RICO Enterprise: (a) had an existence separate and distinct from Defendant and each RICO Co-Conspirator; (b) was separate and distinct from the pattern of racketeering in which Defendant and each RICO Co-Conspirator engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendant, Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen; StarKist Samoa and its employees; SCASA, Tri Marine, and STP and their employees; and other entities and individuals associated for the common purpose of procuring, storing, processing, importing, packaging, labeling, distributing, marketing, and selling Defendant's tuna products to consumers in the Class through fraudulent representations in, among other places, consumer-facing product packaging and labels, Internet websites, marketing and advertising to consumers, bills of lading, Form 370s, and Captain Statements, and deriving profits

- 54 -

Class Action Complaint

and revenues from those activities. Each member of the Dolphin-Unsafe RICO Enterprise shared in the bounty generated by the enterprise, *i.e.*, by sharing the benefit derived from increased sales revenue generated by the scheme to defraud Class members nationwide.

146.   The Dolphin-Unsafe RICO Enterprise functioned by selling Defendant's tuna products to the consuming public. All of these products are illegitimate.   Defendant and its RICO Co-Conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase revenue for themselves and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme to sell Defendant's falsely-labeled tuna products.

147.   The Dolphin-Unsafe RICO Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state and national boundaries, such as the procuring, importing, storing, processing, packaging, labeling, distributing, marketing, and sale of Defendant's tuna products throughout the country, and the receipt of monies from the sale of the same.

148.   Within the Dolphin-Unsafe RICO Enterprise, on information and belief, there was a common communication network by which co-conspirators shared information on a regular basis. The Enterprise used this common communication network for the purpose of procuring, importing, storing, processing, packaging, labeling, distributing, marketing, and selling Defendant's tuna products to the general public nationwide.

149.   Each participant in the Dolphin-Unsafe RICO Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.  Through the Dolphin-Unsafe RICO Enterprise, Defendant and its RICO Co-Conspirators functioned as a

Class Action Complaint

continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

150.   Defendant and its RICO Co-Conspirators, including Dongwon, participated in the operation and management of the Dolphin-Unsafe RICO Enterprise by directing its affairs, as described herein. While Defendant and its RICO Co-Conspirators participated in, and are members of, the Enterprise, they have a separate existence including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

151.   Defendant exerted substantial control over the Dolphin-Unsafe RICO Enterprise, and participated in the affairs of the Enterprise, by:

(a) procuring tuna in a manner that does not permit a company to market and sell shelf-stable tuna products as "Dolphin Safe" and sustainably sourced;

(b) concealing that tuna products marketed and sold as "Dolphin Safe" and sustainably sourced are, in fact, not;

(c) failing to correct false statements regarding tuna products marketed and sold as dolphin-safe and sustainably sourced;

(d) storing, importing, processing, packaging, labeling, distributing, marketing, and selling Defendant's tuna products that may not contain the "Dolphin Safe" representation;

(e) misrepresenting (or causing such misrepresentations to be made) Defendant's tuna products as "Dolphin Safe" and sustainably sourced;

(f) misrepresenting (or causing such misrepresentations to be made) facts in bills of lading, Form 370s filed with NOAA, and Captain Statements;

(g) introducing Defendant's tuna products into the stream of U.S. commerce with false, deceptive, and misleading representations;

(h) concealing the truth behind the tuna procured for Defendant's tuna products from regulators, retailers, and the public;

(i) misleading government regulators as to the nature of the tuna procured for Defendant's tuna products;

(j) misleading the consuming public as to the nature of the tuna procured for Defendant's tuna products;

(k) misleading retailers as to the nature of the tuna procured for Defendant's tuna products;

(l) designing and distributing marketing materials, product labels, and websites on the Internet that misrepresented Defendant's tuna products;

(m) illegally selling and/or distributing Defendant's tuna products;

(n) collecting revenues and profits from the sale of Defendant's tuna products; and/or

(o) ensuring that the RICO Co-Conspirators and unnamed co-conspirators complied with the scheme or common course of conduct.

152. RICO Co-Conspirators Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen, StarKist Samoa and its employees, and SCASA, Tri Marine, and STP and their employees, among other third parties and employees unknown to Plaintiffs, also participated in, operated and/or directed the Dolphin-Unsafe RICO Enterprise. These RICO Co-Conspirators knew that federal laws and regulations forbade Defendant from importing, storing, packaging, labeling, marketing, and selling Defendant's tuna products containing tuna they procured and processed for Defendant as "Dolphin Safe," and yet formed agreements with Defendant to procure and process tuna for Defendant's tuna products that was neither dolphin-safe nor sustainably sourced.

153. RICO Co-Conspirators Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen, StarKist Samoa and

Class Action Complaint

its employees, and SCASA, Tri Marine, and STP and their employees, among other third parties and employees unknown to Plaintiffs, directly participated in the fraudulent scheme by procuring, storing, importing, and processing the tuna used by Defendant in its tuna products. These RICO Co-Conspirators exercised tight control over the manner and method of fishing for tuna and other aspects of the procurement, storage, importation, and distribution process and closely collaborated and cooperated with Defendant in the process.

154.   RICO Co-Conspirators Dongwon, Imperial, Ocean Treasure, Genesis Ocean, Ping Tai, and their shipping companies and fishermen, also participated in the affairs of the Enterprise by working with Defendant to conceal from U.S. regulators the truth behind the tuna caught for use in Defendant's tuna products, and collected substantial sums of money in revenues and profits because they did not use less efficient and more costly fishing techniques necessary to protect the dolphin population.  The techniques they did employ yielded higher catches at lower costs, thus increasing profits and margins on both accounts.  Through their conspiracy to sell non-dolphin safe tuna as dolphin-safe, all of the co-conspirators profited handsomely from their scheme.

155.   Each of the RICO Co-Conspirators knew that the tuna they procured, stored, canned, processed, imported, and distributed was not sustainably sourced and did not meet the requirements to be labeled as dolphin-safe, and also knew that the tuna would eventually be sold in the United States as dolphin-safe and sustainably sourced.

156.   Without the RICO Co-Conspirators' willing participation, including their necessary involvement in procuring, storing, processing, canning, and importing tuna for use in Defendant's tuna products, the Enterprise's scheme and common course of conduct would have been unsuccessful.

- 58 -
Class Action Complaint

157.   The RICO Co-Conspirators directed and controlled several aspects of the ongoing organization necessary to implement the scheme through communications with each other, with Defendant, with port authorities, and with regulators of which Plaintiffs cannot fully know at present, because such information lies in the Defendant's and others' hands.  Similarly, because many of the RICO Co-Conspirators are foreign entities, and their shipping, storing, processing, and canning companies and employees are foreign citizens, Plaintiffs cannot fully know the full extent of each individual corporate entity's and individual's involvement in the wrongdoing prior to having access to discovery.

### C.   Mail and Wire Fraud

158.   To carry out, or attempt to carry out the scheme to defraud, Defendant and its RICO Co-Conspirators, each of whom is a person associated-in-fact with the Dolphin-Unsafe RICO Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and §1343 (wire fraud).

159.   Specifically, as alleged herein, Defendant and its RICO Co-Conspirators have committed and/or conspired to commit at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years.  The multiple acts of racketeering activity that Defendant and its RICO Co-Conspirators committed were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendant's and its RICO Co-Conspirators' regular use of the facilities, services, distribution channels, and employees of the Dolphin-Unsafe RICO Enterprise.

160.   Defendant and its RICO Co-Conspirators participated in the scheme to defraud by using mail, telephone, and the Internet to transmit mailings and wires in interstate or foreign commerce.   Defendant and its RICO Co-Conspirators used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations.

161.   In devising and executing the illegal scheme, Defendant and its RICO Co-Conspirators devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and the Class or to obtain money from Plaintiffs and the Class by means of materially false or fraudulent pretenses, representations, or promises of material facts.   For the purpose of executing the illegal scheme, Defendant and its RICO Co-Conspirators committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

162.   Defendant's and its RICO Co-Conspirators' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a) **Mail Fraud:** Defendant and its RICO Co-Conspirators violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to procure, store, process, can, import, package, label, distribute, market, and sell Defendant's tuna products by means of false pretenses, misrepresentations, and promises.

(b) **Wire Fraud:** Defendant and its RICO Co-Conspirators violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, and promises.

Class Action Complaint

163.   Defendant's and its RICO Co-Conspirators' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendant and its RICO Co-Conspirators or third parties that were foreseeably caused to be sent as a result of Defendant's and its RICO Co-Conspirators' illegal scheme:

(a) Defendant's tuna products and the tuna itself;

(b) sales and marketing materials, including advertising, websites, packaging, and labeling, concealing the true nature of Defendant's tuna products;

(c) documents intended to facilitate the packing, labeling, and sale of Defendant's tuna products, including bills of lading, invoices, shipping records, reports and correspondence;

(d) documents and communications that facilitated the "passing-off" of Defendant's tuna products as "Dolphin Safe" and sustainably sourced;

(e) documents to process and receive payment for Defendant's tuna products by unsuspecting Class members, including invoices and receipts;

(f) false or misleading Form 370s to NOAA;

(g) false or misleading Captain Statements;

(h) false or misleading port authority reports;

(i) false or misleading tracing and tracking reports;

(j) false or misleading communications intended to prevent regulators, retailers, and the public from discovering the true nature of Defendant's tuna products;

(k) payments to Dongwon;

(l) payments to Imperial;

(m)  payments to Ocean Treasure;

(n) payments to Genesis Ocean;

(o) payments to Ping Tai;

(p) payments to StarKist Samoa;

(q) payments to SCASA;

(r) payments to Tri Marine;

(s) payments to STP;

(t) compensation to ship captains on tuna fishing vessels;

(u) deposits of proceeds; and/or

(v) other documents and things, including electronic communications.

164.   Defendant and its RICO Co-Conspirators (or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of Defendant's tuna products and related documents by mail or a private carrier affecting interstate commerce, including the items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| Genesis Ocean S.A./StarKist Samoa | Port of Oakland, Oakland, CA | December 24, 2017 | Bill of Lading # SUDU27999A8I4GW6 |
| Genesis Ocean S.A./StarKist Samoa | Port of Oakland, Oakland, CA | January 7, 2018 | Bill of Lading # SUDU27999A8OX8JS |

165.   Defendant and its RICO Co-Conspirators (or their agents), for the purpose of executing the illegal scheme, transmitted (or caused to be transmitted) in interstate commerce by means of wire communications, certain writings, signs, signals and sounds, including those items described above and alleged below:

| From | To | Date | Description |
|---|---|---|---|
| StarKist | General Public | 2019 | StarKist Corporate Responsibility Webpage discussing how Defendant's tuna is "sourced responsibly" |
| StarKist | General Public | April 23, 2012 at 7:06 PM | Facebook post discussing Defendant's "Dolphin Safe" tuna |
| StarKist | General Public | 2019 | StarKist FAQs discussing in detail Defendant's "Dolphin-Safe Policy" |
| StarKist | General Public | 2019 | StarKist Natural Resources & Policies Webpage explaining Defendant's "Dolphin Safe" policies |
| StarKist | General Public | January 10, 2018 | StarKist Facebook post stating "and did we mention that [Defendant's tuna products are] soy-free, wild caught and dolphin safe?" |
| StarKist | General Public | January 10, 2018 | StarKist Facebook video showing Defendant's "Dolphin Safe" logo |
| StarKist | General Public | February 3, 2010 | StarKist Facebook post of company press release including language that Defendant has "a dolphin-safe policy" |

Focus

| StarKist | General Public | January 25, 2012 | StarKist Tweet stating that "StarKist tuna is dolphin-safe, not to worry" |
|---|---|---|---|
| StarKist | General Public | April 12, 1990 | Statements by then-Chairman of Heins (owner of StarKist) explaining that StarKist will be the first major tuna company to sell only "dolphin-safe" tuna meaning "No harm to dolphins" |

166.   Defendant, in concert with the RICO Co-Conspirators, also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities. Specifically, Defendant, in concert with the RICO Co-Conspirators, made material misrepresentations about its tuna products on its websites, Facebook, Instagram, Twitter, and through ads online, all of which were made in interstate commerce and intended to mislead regulators and the public about the truth about Defendant's non-dolphin-safe and unsustainably sourced tuna products.

167.   Defendant and its RICO Co-Conspirators also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, packaging companies, distributors, grocery chains, wholesale companies, and other third-party entities in furtherance of the scheme.

168.   The mail and wire transmissions described herein were made in furtherance of Defendant's and its RICO Co-Conspirators' scheme and common course of conduct to deceive regulators, retailers, and consumers and lure consumers

into purchasing Defendant's tuna products, which Defendant and its RICO Co-Conspirators knew or recklessly disregarded as not justifying the "dolphin safe" label, despite their decades-long advertising and marketing campaign that Defendant's tuna products were "Dolphin Safe" and sustainably sourced.

169.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendant's and its RICO Co-Conspirators' books and records.  However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.  These include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

170.   Defendant and its RICO Co-Conspirators have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. §1962(d), Defendant and its RICO Co-Conspirators conspired to violate 18 U.S.C. §1962(c), as described herein.  Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as additional co-conspirators with Defendant and its RICO Co-Conspirators in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for Defendant and its RICO Co-Conspirators and their unnamed additional co-conspirators throughout the illegal scheme and common course of conduct.

171.   To achieve their common goals, Defendant and its RICO Co-Conspirators concealed from the general public the true nature of Defendant's tuna products and obfuscated the fact that the tuna in Defendant's tuna products was not dolphin-safe at all or sustainably sourced.

172.   Defendant and its RICO Co-Conspirators and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud and indecency in procuring, processing, packaging, labeling, distributing, marketing, and/or selling Defendant's tuna products.

173.   Indeed, for the conspiracy to succeed, Defendant and each of its RICO Co-Conspirators had to agree to each play a role in the conspiracy by implementing and using similar devices and fraudulent tactics.

174.   Specifically, Defendant and its RICO Co-Conspirators committed to secrecy about the truth of Defendant's tuna products not being dolphin-safe or sustainably sourced and in compliance with federal laws and regulations.

175.   Defendant and its RICO Co-Conspirators knew and intended that consumers would purchase Defendant's tuna products and incur costs as a result. Defendant and its RICO Co-Conspirators also knew and intended that government regulators would rely on their material misrepresentations made about the tuna in Defendant's tuna products to approve them for marketing and sale in the United States and each state.   Defendant and its RICO Co-Conspirators also knew and intended that retailers would rely on their material misrepresentations made about the tuna in Defendant's products to agree to offer them for sale to the general public.

176.   Plaintiffs' and the Class' reliance on this ongoing concealment is demonstrated by the fact that they purchased, and lost money or property by purchasing, falsely advertised tuna products that never should have been introduced into the U.S. stream of commerce in the manner in which they were.   In addition, NOAA and other regulators relied on the misrepresentations and material concealment and omissions made or caused to be made by Defendant and its RICO Co-Conspirators; otherwise, Defendant would never have been able to market, label,

Class Action Complaint

and sell its tuna products as "Dolphin Safe" in the United States and sell the same to the consuming public.

177. As described herein, Defendant and its RICO Co-Conspirators engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from Plaintiffs and Class members based on their misrepresentations, while providing to Plaintiffs and Class members Defendant's tuna products that were worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

178. The predicate acts had the purpose of generating significant revenue and profits for Defendant and its RICO Co-Conspirators at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by Defendant and its RICO Co-Conspirators through their participation in the Dolphin-Unsafe RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with using fishing methods that permit the capture of tuna sustainably sourced without harming the dolphin population.

179. During the procurement, processing, packaging, labeling, distribution, marketing, and sale of Defendant's tuna products, Defendant and its RICO Co-Conspirators shared among themselves logistical, marketing, and financial information that revealed the existence of the fishing practices employed that prevent Defendant's tuna products from being marketed and sold as "Dolphin Safe", sustainably sourced, and in compliance with federal laws and regulations. Nevertheless, Defendant and its RICO Co-Conspirators chose and agreed to disseminate information that deliberately misrepresented Defendant's tuna products

as "Dolphin Safe" and sustainably sourced in their concerted efforts to market and sell them to consumers.

180. By reason of, and as a result of the conduct of Defendant and its RICO Co-Conspirators, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

(a) purchase of falsely advertised tuna products; and

(b) payment at the time of purchase of falsely advertised tuna products purportedly being "Dolphin Safe," sustainably sourced, and meeting applicable federal laws and regulations, that were not capable of being sold as "Dolphin Safe" and sustainably sourced.

181. Defendant's and its RICO Co-Conspirators' violations of 18 U.S.C. §§1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' and Class members' business and property, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c).

## COUNT II –
### Violation of California Business & Professions Code §§17200, *et seq.*
### (On Behalf of the California-Only Class)

182. Plaintiffs Gardner and Myers (the "California Plaintiffs") repeat and re-allege the allegations contained in paragraphs 1 through 110 above, as if fully set forth herein.

183. The California Plaintiffs bring this claim individually and on behalf of the California-Only Class.

184. The Unfair Competition Law, Business & Professions Code §17200, *et seq.* ("UCL") prohibits any "unlawful," "fraudulent," or "unfair" business act or

practice and any false or misleading advertising.   More specifically, the UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . .."

185.   **Unlawful Business Practices:**   In the course of conducting business, Defendant committed "unlawful" business practices in violation of the UCL by, *inter alia*, making the dolphin-safe representations, which are false, misleading, and deceptive (which also constitute advertising within the meaning of §17200); failing to comply with traceability and verification requirements, as set forth more fully herein; and violating California Civil Code §§1572, 1573, 1709, and 1711; the California Legal Remedies Act, California Civil Code §1750, *et seq.*; California Business & Professions Code §§17200, *et seq.* and 17500, *et seq.;* 16 U.S.C. §1385; and RICO.

186.   The California Plaintiffs reserve the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

187.   <u>**Unfair Business Practices:**</u>   In the course of conducting business, Defendant committed "unfair" business acts or practices by, *inter alia*, making the dolphin-safe representations, which are false, misleading, and deceptive (which also constitute advertising within the meaning of §17200), and failing to comply with traceability and verification requirements, as set forth more fully herein.  There is no societal benefit from false advertising, only harm. While Plaintiffs and the public at large were and continue to be harmed, Defendant has been unjustly enriched by its false, misleading, and deceptive representations as it unfairly enticed Plaintiffs and Class members to purchase its tuna products instead of similar tuna products sold by other manufacturers that were dolphin-safe, traceable, and verified.  Because the utility of Defendant's conduct (zero) is outweighed by the gravity of harm to

Class Action Complaint

Plaintiffs, consumers, and the competitive market, Defendant's conduct is "unfair" having offended an established public policy embodied in, among other things, 16 U.S.C. §1385, where Congress expressly found that it is the policy of the United States to protect the dolphin population and that "consumers would like to know if the tuna they purchase is falsely labeled as to the effect of the harvesting of the tuna on dolphins." 16 U.S.C. §§1385(b)(2)-(3).

188.   Defendant also engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to the public at large.

189.   There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

190.   **Fraudulent Business Practices:**  In the course of conducting business, Defendant committed "fraudulent business act[s] or practices" and deceptive or misleading advertising by, *inter alia*, making the dolphin-safe representations, which are false, misleading, and deceptive to reasonable consumers, and by failing to comply with traceability and verification requirements, regarding the tuna products as set forth more fully herein.

191.   Defendant's actions, claims, and misleading statements, as more fully set forth above, are misleading and/or likely to deceive the consuming public within the meaning of Business & Professions Code §§17200, *et seq*.

192.   The California Plaintiffs relied on Defendant's dolphin-safe representations and Defendant's compliance with traceability and verification requirements and were in fact injured as a result of those false, misleading, and deceptive representations and by Defendant's failure to comply with traceability and verification requirements.

193.   As alleged herein, the California Plaintiffs and the California-Only Class have suffered injury in fact and lost money or property at the time of purchase as a result of Defendant's conduct because they were exposed to and purchased

Defendant's tuna products in reliance on the dolphin-safe representations and Defendant's compliance with tracing and verification requirements, but did not receive tuna products that contain tuna caught using fishing methods that do not harm dolphins.

194.   Unless restrained and enjoined, Defendant will continue to engage in the above described conduct. Accordingly, injunctive relief is appropriate.

195.   The California Plaintiffs, on behalf of themselves all other similarly situated members of the California-Only Class, and the general public, seek declaratory relief and an injunction prohibiting Defendant from continuing such practices, corrective advertising, restitution of all money obtained from the California Plaintiffs and the members of the California-Only Class collected as a result of unfair competition, and all other relief this Court deems appropriate, consistent with Business & Professions Code §17203.

**COUNT III –**
**Violations of the Consumers Legal Remedies Act – Cal. Civ. Code §§1750,** *et seq.*
**(On Behalf of the California-Only Class)**

196.   The California Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 110 above, as if fully set forth herein.

197.   The California Plaintiffs bring this claim individually and on behalf of the California-Only Class.

198.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq.* (the "CLRA").

199.   The California Plaintiffs are consumers as defined by California Civil Code §1761(d). The tuna products are "goods" within the meaning of the CLRA.

200.   Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by California Civil Code §1770(a) in transactions with The California Plaintiffs and the California-Only Class which were intended to

result in, and did result in, the sale of the tuna products:

(5)   Representing that [the tuna products have] . . . characteristics, . . . uses [and] benefits . . . which [they do] not have . . . .

*        *        *

(7)   Representing that [the tuna products] are of a particular standard, quality, or grade … if they are of another.

201.   Pursuant to California Civil Code §1782(d), the California Plaintiffs and the California-Only Class seek a Court Order declaring Defendant to be in violation of the CLRA, enjoining the above-described wrongful acts and practices of Defendant, and ordering restitution and disgorgement.

202.   Pursuant to §1782 of the CLRA, the California Plaintiffs notified Defendant in writing by certified mail of the particular violations of §1770 of the CLRA and demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to so act.  A copy of the letter is attached hereto as Exhibit A.

203.   If Defendant fails to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to §1782 of the CLRA, the California Plaintiffs will amend this Complaint to add claims for actual, punitive, and statutory damages as appropriate.

204.   Pursuant to §1780 (d) of the CLRA, attached hereto as Exhibit B is the affidavit showing that this action has been commenced in the proper forum.

**COUNT IV –**
**Violation of Florida Deceptive and Unfair Trade Practices Act – Fla. Stat.**
**§§501.201, *et seq.***
**(On Behalf of the Florida-Only Class)**

205.   Plaintiffs Cosgrove and Hessong (the "Florida Plaintiffs") repeat and re-allege the allegations contained in paragraphs 1 through 110 above, as if fully set

forth herein.

206.   The Florida Plaintiffs bring this claim individually and on behalf of the Florida-Only Class.

207.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, §§501.201, *et seq.*, Fla. Stat. ("FDUTPA").  The stated purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." §501.202(2), Fla. Stat.

208.   The Florida Plaintiffs and the Florida-Only Class are consumers as defined by §501.203, Fla. Stat.  The tuna products are goods within the meaning of FDUTPA.   Defendant is engaged in trade or commerce within the meaning of FDUTPA.

209.   Florida Statute §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FDUTPA also prohibits false and misleading advertising.

210.   Florida Statute §501.204(2) states that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [section] 5(a)(1) of the Federal Trade Commission Act." Defendant's unfair and deceptive practices are likely to mislead – and have misled – consumers acting reasonably in the circumstances, and violate §500.04, Fla. Stat., and 21 U.S.C. §343.

211.   The Florida Plaintiffs and the Florida-Only Class have been substantially injured and aggrieved by Defendant's unfair and deceptive practices and acts of false advertising in that they paid for tuna products that were not dolphin-safe and/or sustainably caught as represented.   The harm suffered by the Florida Plaintiffs and Florida consumers was directly and proximately caused by the

deceptive, misleading, and unfair practices of Defendant, as more fully described herein.

212.   Pursuant to §§501.211(2) and 501.2105, Fla. Stat., the Florida Plaintiffs and Florida consumers seek damages, injunctive relief, attorneys' fees, and costs against Defendant.

**COUNT V –**
**Violations of the New York General Business Law §349**
**(On Behalf of the New York-Only Class)**

213.   Plaintiffs Robert and Colleen McQuade, Plaintiffs Fidel and Jocelyn Jamelo, Plaintiffs Anthony and Lori Luciano, and Plaintiffs Borruso and Nugent (the "New York Plaintiffs") repeat and incorporate by reference the allegations contained in the paragraphs 1 through 110 above as if fully set forth herein.

214.   The New York Plaintiffs bring this claim individually and on behalf of the New York-Only Class.

215.   Defendant's actions alleged herein constitute unlawful, unfair, and deceptive business practices.  Those actions include misrepresenting that the tuna products are "Dolphin Safe" when they are not.

216.   Defendant's conduct constitutes acts, uses and/or employment by Defendant or its agents or employees of deception, fraud, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods in violation of §349 of New York's General Business Law.

217.   Defendant's deceptive conduct was generally directed at the consuming public.

218.   Defendant's unfair and deceptive trade acts and practices in violation of §349 of New York's General Business Law have directly, foreseeably, and

proximately caused damages and injury to the New York Plaintiffs and other members of the New York-Only Class.

219. Defendant's deceptive conduct has caused harm to New York-Only Class members in that they purchased the tuna products when they otherwise would not have absent Defendant's deceptive conduct.

220. Defendant's violations of §349 of New York's General Business Law threaten additional injury to the New York-Only Class members if the violations continue.

221. The New York Plaintiffs, on their own behalf and on behalf of the New York-Only Class, seek damages, injunctive relief, including an order enjoining Defendant's §349 violations alleged herein, and court costs and attorneys' fees, pursuant to NY Gen. Bus. Law §349.

**Count VI –**
**Violation of the New Jersey Consumer Fraud Act, §56:8-2.10**
**(On Behalf of the New Jersey-Only Class)**

222. Plaintiffs Zelig and Petrovcik (the "New Jersey Plaintiffs"), repeat and incorporate by reference the allegations contained in paragraphs 1 through 110 above as if fully set forth herein.

223. Defendant's tuna product packaging constitutes an "advertisement" within the meaning of §56-8-1(a) of the New Jersey Fraud Act, as it is an attempt by publication, dissemination, solicitation, indorsement, or circulation to induce consumers to acquire an interest in Defendant's merchandise.

224. Defendant's tuna products constitute "merchandise" within the meaning of §56-8-1(c), as they are directly or indirectly offered to the public for sale and fall within one of the statutory categories of objects, wares, goods, commodities, services, or "anything."

225. Defendant's tuna products are misrepresented within the meaning of

§56:8-2.10, as the descriptions of said products are misleading, the descriptions omit information in ways that render the description false or misleading, and/or the descriptions represent the merchandise as having qualities they do not have.

226.   Specifically, Defendant has violated, and continues to violate, the New Jersey Fraud Act by representing that its tuna products are "Dolphin Safe" when they are not.

227.   The New Jersey Plaintiffs, on their own behalf, and on behalf of the New Jersey-Only Class members, seek damages, injunctive relief, including an order enjoining Defendant's violations of the New Jersey Consumer Fraud Act alleged herein, and court costs and attorneys' fees.

**Count VII –**
**Violation of the Minnesota Prevention of Consumer Fraud Act (Unlawful Practices) – Minn. Stat. §§325F.68,** *et seq.* **and Minn. Stat. §§8.31,** *et seq.*
**(On Behalf of the Minnesota-Only Class)**

228.   Plaintiff Kiihne repeats and re-alleges the allegations contained in paragraphs 1 through 110 above, as if fully set forth herein.

229.   Plaintiff Kiihne brings this claim individually and on behalf of the Minnesota-Only Class.

230.   This cause of action is brought pursuant to the Minnesota Prevention of Consumer Fraud Act (Unlawful Practices), Minn. Stat. §325F.68, *et seq.* and Minn. Stat. §8.31, *et seq.* ("MCFA").

231.   The tuna products Defendant sold are "merchandise" as defined in Minn. Stat. §325F.68 and Defendant is a "person" as defined in Minn. Stat. §325F.68.

232.   The MCFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. §325F.69(1).

233.   Defendant engaged in unlawful practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of merchandise in violation of the MCFA in at least the following ways:

(a)   Deceptively representing to Plaintiff Kiihne and the Minnesota-Only Class that its tuna products were dolphin-safe, packaged from tuna caught using sustainable fishing methods, and traceable and verifiable;

(b)   Falsely promising Defendant's tuna products were dolphin-safe, packaged from tuna caught using sustainable fishing methods, and traceable and verifiable;

(c)   Failing to warn or disclose to consumers, including Plaintiff Kiihne and the Minnesota-Only Class that its tuna products were not dolphin-safe, were not packaged from tuna caught using sustainable fishing methods, and were not traceable and verifiable;

(d)   Failing to reveal a material fact – that its tuna products were not dolphin-safe, were not packaged from tuna caught using sustainable fishing methods, and were not traceable and verifiable; and

(e)   Making a misrepresentation of material fact or statement of fact material to the transaction – *i.e.*, that its tuna products were dolphin-safe, were packaged from tuna caught using sustainable fishing methods, and were traceable and verifiable – such that a person reasonably believed Defendant's tuna products had such characteristics when they did not.

234.   That Plaintiff Kiihne and the Minnesota-Only Class believed they were purchasing dolphin-safe tuna caught from sustainable fishing methods with the ability of Defendant to trace and verify its dolphin-safe quality when these representations were not true were material facts and would be material to a reasonable person.

235.   As a direct and proximate result of Defendant's violation of the MCFA, Plaintiff Kiihne and the Minnesota-Only Class have suffered and continue to suffer ascertainable loss in the form of money in that they paid for tuna products that were not dolphin-safe and/or sustainably caught as represented, as more fully described herein.

236.   Plaintiff Kiihne seeks relief under Minn. Stat. §8.31, including, but not limited to, damages, attorneys' fees, and costs.

**COUNT VIII –**
**Violation of the Minnesota Prevention of Consumer Fraud Act (False Statement in Advertising) – Minn. Stat. §325F.67, *et seq.***
**(On Behalf of the Minnesota-Only Class)**

237.   Plaintiff Kiihne repeats and re-alleges the allegations contained in paragraphs 1 through 110 above, as if fully set forth herein.

238.   Plaintiff Kiihne brings this claim individually and on behalf of the Minnesota-Only Class.

239.   The tuna products Defendant sold are "merchandise" as defined in Minn. Stat. §325F.68 and Defendant is a "person" as defined in Minn. Stat. §325F.68.

240.   Defendant made materially misleading and deceptive statements to consumers about its tuna products as being dolphin-safe and/or sustainably caught.

241.   This advertising was and continues to be deceptive and misleading because Defendant's tuna products are neither dolphin-safe nor sustainably caught.

242.   Defendant had superior knowledge and bargaining power in its transactions with consumers and misrepresented its tuna products as being dolphin-safe and/or sustainably caught to induce consumers to purchase Defendant's tuna products.  These facts are material because reasonable consumers, like Plaintiff Kiihne would have paid less or, more likely, not purchased the tuna products at all if they had known the products were not dolphin-safe and/or sustainably caught.

243.   Plaintiff Kiihne and the Minnesota-Only Class seek an order requiring

Defendant to disgorge all ill-gotten gains and provide full restitution of all monies it wrongfully obtained from Plaintiff Kiihne and the Minnesota-Only Class through its false and deceptive advertising of its tuna products.

244. Plaintiff Kiihne and the Minnesota-Only Class also seek an award of damages and attorneys' fees for violations of Minn. Stat. §325F.67 pursuant to Minn. Stat. §8.31, subd. 3a.

**COUNT IX –**
**Violation of the Minnesota Uniform Deceptive Trade Practices Act – Minn.**
**Stat. §§325D.43, *et seq.***
**(On Behalf of the Minnesota-Only Class)**

245. Plaintiff Kiihne repeats and re-alleges the allegations contained in paragraphs 1 through 110 above, as if fully set forth herein.

246. Plaintiff Kiihne brings this claim individually and on behalf of the Minnesota-Only Class.

247. This claim is brought under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §325D.43, *et seq.* (the "MDTPA")

248. Defendant is a "person" as defined in the MDTPA.

249. Under the MDTPA, a person engages in a deceptive trade practice when in the course of business, vocation, or occupation, the person:

(a) "[R]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have";

(b) "[R]epresents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and

(c) "[A]dvertises goods or services with intent not to sell them as advertised." (Minn. Stat. §325D.44 (5)(7)(9)).

250. Defendant violated these provisions of the MDTPA by:

(a)     Deceptively representing to Plaintiff Kiihne and the Minnesota-Only Class that the tuna products were dolphin-safe and/or sustainably caught;

(b)     Falsely advertising the tuna products as dolphin-safe and/or sustainably caught;

(c)     Failing to warn or disclose to consumers, including Plaintiff Kiihne and the Minnesota-Only Class, that the tuna products were not dolphin-safe nor sustainably caught contrary to Defendant's representations;

(d)     Failing to reveal a material fact – that Defendant's tuna products were neither dolphin-safe nor sustainably caught as represented – the omission of which tends to mislead or deceive consumers, and which fact could not reasonably be known by consumers; and

(e)     Making a representation of fact or statement of fact material to the transaction – *i.e.*, that Defendant's tuna products were dolphin-safe and/or sustainably caught – such that a person reasonably believed they were when they were not.

251.   Plaintiff Kiihne and the Minnesota-Only Class believed they were purchasing dolphin-safe and sustainably caught tuna products when they were not. These were material facts and would be material to a reasonable person.

252.   The above unlawful and deceptive acts and practices by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

253.   As a direct and proximate result of Defendant's violation of the MDTPA, Plaintiff Kiihne and the Minnesota-Only Class have suffered and continue to suffer ascertainable loss in the form of money.

254.   Pursuant to Minn. Stat. §325D.45, Plaintiff Kiihne seeks individually and on behalf of all others similarly situated, all available remedies under law,

Class Action Complaint

including, but not limited to, actual damages, costs, and attorneys' fees.

**COUNT X –**
**Violation of the Arizona Consumer Fraud Act, A.R.S. §§44-1521, *et seq.***
**(On Behalf of the Arizona-Only Class)**

255.   Plaintiff Miller repeats and re-alleges the allegations contained in paragraphs 1 through 110 above, as if fully set forth herein.

256.   This cause of action is brought pursuant to the Arizona Consumer Fraud Act, A.R.S. §§44-1521, *et seq.* ("ACFA"), which provides in pertinent part:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A).

257.   Plaintiff Miller and members of the Arizona-Only Class are "persons" as defined by A.R.S. §44-1521(6), and Defendant is engaged in the "sale" and "advertisement" of "merchandise" as those terms are defined in A.R.S. §§44-1521(1), (5), and (7).

258.   Defendant engaged in deceptive and/or unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the ACFA) in violation of the ACFA, including but not limited to the following:

(a) Misrepresenting material facts to Plaintiff Miller and the Arizona-Only Class in connection with the sale of its tuna products, by representing that the tuna products were dolphin-safe and/or sustainably caught;

(b) Failing to disclose to consumers, including Plaintiff Miller and the

Arizona-Only Class, that the tuna products were not dolphin-safe nor sustainably caught contrary to Defendant's representations;

(d) Failing to reveal a material fact – that Defendant's tuna products were neither dolphin-safe nor sustainably caught as represented – the omission of which tends to mislead or deceive consumers, and which fact could not reasonably be known by consumers; and

(e) Making a representation of fact or statement of fact material to the transaction – i.e., that Defendant's tuna products were dolphin-safe and/or sustainably caught – such that a person reasonably believed they were when they were not.

259. Plaintiff Miller relied on Defendant's representations and had Defendant disclosed that its tuna products were not dolphin-safe and/or sustainably caught as represented, Plaintiff Miller would have paid less or, more likely, not purchased the tuna products at all. Thus, as a result of Defendant's representations and omissions, Plaintiff Miller and Arizona-Only Class Members were induced to overpay for and purchase tuna products they otherwise would not have.

260. Defendant intended that Plaintiff Miller and the Arizona-Only Class rely on its deceptive and/or unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with Defendant's sale of the tuna products.

261. Defendant's wrongful practices occurred in the course of trade or commerce.

262. Defendant's wrongful practices were and are injurious to the public interest because those practices were part of a generalized course of conduct that applied to Plaintiff Miller and all Arizona-Only Class Members, and were repeated continuously before and after Defendant sold its tuna products to Plaintiff Miller and the Arizona-Only Class.  All Arizona-Only Class Members have been adversely

Class Action Complaint

affected by Defendant's conduct and the public was and is at risk as a result thereof.

263. Defendant's unfair and/or deceptive conduct proximately caused Plaintiff Miller's and Arizona-Only Class Members' injuries because, had Defendant sourced its tuna from vessels using dolphin-safe and sustainable fishing methods, Plaintiff Miller and the Arizona-Only Class Members would not have suffered injury.

264. Plaintiff Miller and the Arizona-Only Class seek actual damages, compensatory, punitive damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the ACFA.

## COUNT XI –
### Unjust Enrichment/Quasi-Contract

265. Plaintiffs repeat and re-allege the allegations contained in the paragraphs above, as if fully set forth herein.

266. Plaintiffs and Class members conferred a benefit on Defendant by purchasing the tuna products.

267. Defendant appreciated and/or realized the benefits in the amount of the purchase price it earned from sales of the tuna products to Plaintiff and Class members or, at a minimum, the difference between the price it was able to charge Plaintiffs and Class members for the tuna products with the dolphin-safe representations and the price it would have been able to charge absent the same.

268. Defendant has profited from its unlawful, unfair, false, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

269. Plaintiffs do not have an adequate remedy at law against Defendant.

270. Plaintiffs and Class members are entitled to restitution of all monies paid for the tuna products or, at a minimum, the premium paid for the tuna products.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for a judgment:

A.     Certifying the Classes as requested herein;

B.     Issuing an order declaring that Defendant has engaged in unlawful, unfair, and deceptive acts and practices in violation of the consumer fraud laws in the certified states;

C.     Enjoining Defendant's conduct and ordering Defendant to engage in a corrective advertising campaign;

D.     Awarding the Classes damages, including statutory and punitive damages, and interest thereon;

E.     Awarding disgorgement and restitution of Defendant's ill-gotten revenues to Plaintiffs and the Classes;

F.     Awarding attorneys' fees and costs; and

G.     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial of their claims by jury to the extent authorized by law.


Dated:  May 13, 2019                 BONNETT, FAIRBOURN, FRIEDMAN
                                       & BALINT, P.C.

                                      /s/*Patricia N. Syverson*
                                     Patricia N. Syverson (203111)
                                     Manfred P. Muecke (222893)
                                     600 W. Broadway, Suite 900
                                     San Diego, California 92101
                                     psyverson@bffb.com
                                     mmuecke@bffb.com
                                     Telephone:  (619) 798-4593

                                     BONNETT, FAIRBOURN, FRIEDMAN &
                                     BALINT, P.C.
                                     Elaine A. Ryan (*To Be Admitted Pro Hac Vice*)
                                     Carrie A. Laliberte (*To Be Admitted Pro Hac Vice*)
                                     2325 E. Camelback Rd., Suite 300
                                     Phoenix, AZ 85016
                                     eryan@bffb.com

- 84 -
Class Action Complaint

claliberte@bffb.com
Telephone:  (602) 274-1100

GOLDMAN SCARLATO & PENNY P.C.
Brian D. Penny (*To Be Admitted Pro Hac Vice*)
penny@lawgsp.com
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, Pennsylvania 19428
Telephone:  (484) 342-0700

ZAREMBA BROWN PLLC
Brian M. Brown (*To Be Admitted Pro Hac Vice*)
bbrown@zarembabrown.com
40 Wall Street, 52nd Floor
New York, NY 10005
Telephone: (212) 380-6700

ROBBINS GELLER RUDMAN & DOWD LLP
Stuart A. Davidson (*To Be Admitted Pro Hac Vice*)
Christopher C. Gold (*To Be Admitted Pro Hac Vice*)
Bradley M. Beall (*To Be Admitted Pro Hac Vice*)
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000

Attorneys for Plaintiffs