**KELLEY DRYE & WARREN LLP**
  Tahir L. Boykins (State Bar No 323441)
10100 Santa Monica Boulevard, 23rd Floor
Los Angeles, California 90067-4008
Telephone: (310) 712-6100
tboykins@kelleydrye.com

Michael C. Lynch (Admitted *Pro Hac Vice*)
Levi M. Downing (Admitted *Pro Hac Vice*)
101 Park Avenue
New York, NY 10178
Telephone: (212) 808-5082
mlynch@kelleydrye.com
ldowning@kelleydrye.com

Joseph Boyle (*Admitted Pro Hac Vice*)
One Jefferson Road, 2nd Floor
Parsippany, NJ 07054
Telephone: (973) 503-5900
jboyle@kelleydrye.com

*Attorneys for Defendant StarKist Co*

**\*\*ADDITIONAL COUNSEL ON SIGNATURE PAGE**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARREN GARDNER, LORI MYERS, ANGELA COSGROVE, AUTUMN HESSONG, ROBERT MCQUADE, COLLEEN MCQUADE, JAMES BORRUSO, FIDEL JAMELO, JOCELYN JAMELO, ANTHONY LUCIANO, LORI LUCIANO, ROBERT NUGENT, AVRAHAM ISAC ZELIG, KEN PETROVCIK, MEGAN KIIHNE, and KATHLEEN MILLER, on behalf of Themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>      v.<br><br>STARKIST CO., a Delaware Corporation, and DONGWON INDUSTRIES CO. LTD, a South Korea Corporation<br><br>    Defendants. | **Case No.: 3:19-cv-02561-WHO**<br><br>[Hon. William H. Orrick]<br><br>**DEFENDANT'S NOTICE OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date:           September 25, 2019<br>Time:          2:00 p.m.<br>Place:         Courtroom 2<br><br>First Amended<br>Complaint Filed:   June 17, 2019 |

**TO THE COURT, ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 25, 2019, at 2:00 p.m., or as soon thereafter as the parties may be heard before the Honorable William H. Orrick, U.S.D.J., located at 450 Golden Gate Avenue, Courtroom 2, San Francisco, California, 94102, Defendant StarKist Co. ("Defendant") will and hereby does move to dismiss with prejudice the First Amended Complaint of Plaintiffs Warren Gardner, Lori Myers, Angela Cosgrove, Autumn Hessong, Robert McQuade, Colleen McQuade, James Borruso, Fidel Jamelo, Jocelyn Namelo, Anthony Luciano, Lori Luciano, Robert Nugent, Abraham Isac Zelig, Ken Petrovcik, Megan Kiihne, and Kathleen Miller's ("Plaintiffs") pursuant to Rules 8(a), 9(b), 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and as more fully set forth in the accompanying Memorandum of Points and Authorities, on the following grounds:

1. Plaintiffs have failed to allege a "short and plain statement … showing that the pleader is entitled to relief" and further has failed to allege a plausible claim for relief as required by Fed. R. Civ. P. 8(a);

2. Plaintiffs have failed to plead their claims with particularity as required by Fed. R. Civ. P. 9(b);

3. Plaintiffs have not carried their burden of establishing that they have standing to seek relief under Article III of the U.S. Constitution because they have not alleged (and cannot allege) an injury-in-fact and/or that this Court can grant them relief;

4. Plaintiffs' claims under the California Unfair Competition Law, the California Consumers Legal Remedies Act, the Florida Deceptive and Unfair Trade Practices Act, the New York General Business law, the New Jersey Consumer Fraud Act, the Minnesota Prevention of Consumer Fraud Act, the Minnesota Uniform Deceptive Trade Practices Act, the Arizona Consumer Fraud Act, and for unjust enrichment, are preempted by federal law;

5. Plaintiffs' claim under the Racketeering Influenced and Corrupt Organizations Act is not cognizable and/or otherwise fails to state a claim for relief because it relies upon alleged violations of a federal statute, the Dolphin Protection Consumer Information Act, and related regulations, which does not contain a private right of action.

1    This Motion is based upon this Notice of Motion, the attached Memorandum of Points and

2  Authorities, the Request for Judicial Notice filed concurrently herewith, the pleadings, exhibits

3  herein, and upon such other argument as may be presented at the hearing.

4
   DATED: August 9, 2019                **KELLEY DRYE & WARREN LLP**
5                                        Michael C. Lynch (Admitted *Pro Hac Vice*)
                                         Joseph A. Boyle (Admitted *Pro Hac Vice*)
6                                        Michael R. Dover (Admitted *Pro Hac Vice*)
                                         Levi M. Downing (Admitted *Pro Hac Vice*)
7                                        Tahir L. Boykins

8
                                         By   */s/ Michael C. Lynch*
9                                              Michael C. Lynch

10                                       *Attorneys for Defendant StarKist Co.*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................................. 1

II.    SUMMARY OF PERTINENT FACTS ................................................................. 4

       A.    THE DPCIA'S "DOLPHIN-SAFE" LABELING STANDARDS ........................... 4

       B.    NOAA'S TUNA TRACKING AND VERIFICATION PROGRAM .................... 6

       C.    THE DPCIA'S REGULATORY ENFORCEMENT SCHEME ............................. 7

       D.    THE FAC'S ALLEGATIONS ................................................................ 7

III.   ARGUMENT ................................................................................................ 10

       A.    LEGAL STANDARD ON A MOTION TO DISMISS ......................................... 10

       B.    PLAINTIFFS HAVE PLED NO FACTS TO SUPPORT THEIR
             ASSERTION THAT STARKIST TUNA IS NOT DOLPHIN-SAFE
             UNDER FEDERAL LAW ....................................................................... 11

             1.    Plaintiffs Have Not Alleged That StarKist Tuna is Not Dolphin-Safe ....... 13

             2.    Plaintiffs Have Not Alleged A Violation of the  DPCIA's Tracking
                   and Verification Requirements ................................................. 16

       C.    PLAINTIFFS LACK ARTICLE III STANDING ............................................. 18

       D.    PLAINTIFFS HAVE NOT PLED THE ELEMENTS OF RICO ......................... 19

             1.    Plaintiffs Have Failed to Allege a RICO Enterprise ................................. 19

             2.    Plaintiffs Have Not Alleged Injury to Business or  Property Because
                   of Any Alleged RICO Violations ............................................... 22

       E.    PLAINTIFFS' PRIVATE CAUSES OF ACTION FOR ALLEGED
             VIOLATIONS OF THE DPCIA ARE PREEMPTED OR OTHERWISE
             NOT COGNIZABLE ........................................................................... 23

             1.    Federal Law Preempts Plaintiffs' Dolphin-Safe Labeling Claims .............. 23

             2.    The DPCIA Preempts Plaintiffs' Tracking and Verification Claims .......... 24

             3.    Plaintiffs' RICO Claim Fails Because the DPCIA  Does Not Confer
                   a Private Right of Action ........................................................... 26

IV.    CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Black v. Corvel Enter. Comp.*,
   756 Fed. Appx. 706 (9th Cir. 2018) .................................................................... 20

*Bly-Magee v. California*,
   236 F.3d 1014 (9th Cir. 2001) ............................................................................. 11

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ........................................................................................25, 26

*Danielsen v. Burnside-Ott Aviation Training Ctr.*,
   941 F.2d 1220 (D.C. Cir. 1991) .......................................................................... 27

*In re Digimarc Corp. Derivative Litig.*,
   549 F.3d 1223 (9th Cir. 2008) ............................................................................. 28

*Dimas v. JPMorgan Chase Bank, N.A.*,
   No. 17-CV-05205-LHK, 2018 U.S. Dist. LEXIS 21929 (N.D. Cal. Feb. 9,
   2018) .................................................................................................................... 10

*Doan v. Singh*,
   617 F. App'x. 684 (9th Cir. 2015) ...................................................................20, 21

*Eclectic Props. East, LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ............................................................................... 10

*In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*,
   590 F. Supp. 2d 1282 (C.D. Cal. 2008) ............................................................... 27

*Fraker v. Bayer Corp.*,
   No. CV F 08-1564 AWI GSA, 2009 U.S. Dist. LEXIS 125633 (E.D. Cal. Oct.
   2, 2009) ................................................................................................................ 12

*Gaines v. Home Loan Ctr., Inc.*,
   No. SA CV 08-667 AHS (RNBx), 2010 U.S. Dist. LEXIS 153719 (C.D. Cal.
   May 24, 2010) ...................................................................................................... 19

*Gajo v. Chicago Brand*,
   Case No. 17-cv-00380-EMC, 2017 WL 2473142 (N.D. Cal. June 8, 2017) ............ 7

*Hadley v. Kellogg Sales Co.*,
   273 F. Supp. 3d 1052 (N.D. Cal. 2017) ............................................................... 10

*Hall v. SeaWorld Entm't, Inc.*,
   No. 3:15-CV-660-CAB-RBB, 2015 U.S. Dist. LEXIS 174294 (S.D. Cal. 2015) .............. 11-12

*Hamilton v. TBC Corp.*,
   328 F.R.D. 359 (C.D. Cal. 2018) ......................................................................... 11

*Ikechi v. Verizon Wireless,*
   No. 10-CV-4554 JNE/SER, 2011 WL 2118797 (D. Minn. Apr. 7, 2011).............................. 11

*Kearns v. Ford Motor Co.,*
   567 F.3d 1120 (9th Cir. 2009) ..................................................................................... 11

*Lujan v. Defs. of Wildlife,*
   112 S. Ct. 2130 (1992) ..........................................................................................18, 19

*McCulloch v. PNC Bank Inc.,*
   298 F.3d 1217 (11th Cir. 2002) .................................................................................. 27

*Montalvo v. Spirit Airlines,*
   508 F.3d 464 (9th Cir. 2007) ..................................................................................... 23

*Nathan Kimmel, Inc. v. DowElanco,*
   275 F.3d 1199 (9th Cir. 2002) ................................................................................25, 26

*New York Inst. of Dietetics v. Great Lakes Higher Educ. Corp.,*
   No. 94 Civ 4858 (LLS), 1995 U.S. Dist. LEXIS 13692 (S.D.N.Y. Sept. 21,
   1995) ........................................................................................................................ 27

*Norman v. Niagara Mohawk Power Corp.,*
   873 F.2d 634 (2d Cir. 1989) ...................................................................................... 27

*Northstar Fin. Advisors, Inc. v. Schwab Invs.,*
   615 F.3d 1106 (9th Cir. 2010) ................................................................................... 28

*NRDC v. Evans,*
   364 F. Supp. 2d 1083 (N.D. Cal. 2003) ....................................................................... 7

*Parrino v. FHP, Inc.,*
   146 F.3d 699 (9th Cir. 1998) ..................................................................................... 10

*Patton v. Forest Labs.,*
   LLC, No. EDCV 17-922-MWF (DTBx), 2018 U.S. Dist. LEXIS 225874 (C.D.
   Cal., May 10, 2018) .................................................................................................. 20

*Petrochem Insulation, Inc. v. N. California & N. Nevada Pipe Trades Counsel,*
   No. C-90-3628 EFL, 1991 U.S. Dist. LEXIS 6659 (N.D. Cal. April 30, 1991) ................ 27

*Shaw v. Nissan N. Am., Inc.,*
   220 F. Supp. 3d 1046 (C.D. Cal. 2016)....................................................................20, 21

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) .............................................................................................. 18

*Starr v. Baca,*
   652 F.3d 1202 (9th Cir. 2011) ................................................................................... 10

*United Food & Commer. Worker Unions & Emplrs. Midwest Health Bens. Fund v.
   Walgreen Co.,*
   719 F.3d 849 (7th Cir. 2013) ..................................................................................... 20

iii

*United States v. Cathcart*,
     No. C 07-4762 PJH, 2008 U.S. Dist. LEXIS 70100 (N.D. Cal. Sept. 15, 2008) ..................... 11

*United States v. Locke*,
     529 U.S. 89 (2000) ............................................................................................................... 23

*Vess v. Ciba-Geigy Corp. USA*,
     317 F.3d 1097 (9th Cir. 2003) ............................................................................................. 10

*Woolsey v. J.P. Morgan Ventures Energy Corp.*,
     No. 15cv530-WQH-BGS, 2015 U.S. Dist. LEXIS 145120 (S.D. Cal. 2015) ........................ 28

**Statutes**

16 U.S.C. § 1385 ............................................................................................. 4, 5, 6, 7, 13, 16, 23

16 U.S.C. § 1826g ..................................................................................................................... 7, 24

18 U.S.C. § 1964(c) ......................................................................................................................... 22

**Other Authorities**

50 C.F.R. § 216.91 ...................................................................................................... 5, 6, 13, 15

50 C.F.R. § 216.93 ............................................................................................................. 5, 6, 17

Fed. R. Civ. P. 8(a) ................................................................................................ 10, 11, 18, 29

Fed. R. Civ. P. 9(b) ........................................................................................ 10, 11, 18, 19, 29

Fed. R. Civ. P. 12(b)(1) ................................................................................................................ 29

The Tuna-Dolphin Issue, NOAA Fisheries Southwest Fisheries Science Center
     (Sept. 2, 2016) .......................................................................................................... 4, 6, 14

Verification Components, NOAA Fisheries ............................................................... 6, 7, 17

Brands Sampled, NOAA FIsheries ................................................................... 2, 6, 8, 17, 25

NOTICE OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES
Case No.: 3:19-cv-02561-WHO

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiffs' First Amended Complaint (Dkt. No. 37) ("FAC") asserts eleven claims that each purports to challenge the accuracy of the "dolphin-safe" label on Starkist tuna products, which Plaintiffs allege they purchased. Despite attacking the label's central claim, Plaintiffs have inexplicably not alleged a single instance where any dolphin was harmed, let alone killed, in a catch or set that was part of a StarKist tuna haul. This failure is fatal to their claims. The absence of such allegations means that the FAC charges that all tuna fishing that utilizes purse seine nets or longlines is categorically non-dolphin-safe. Congress, however, disagrees. Congress's comprehensive legislation relies on the fact that longline and purse seine tuna finishing methods are dolphin-safe. Congress's designee, the Department of Commerce's National Oceanic and Atmospheric Administration ("NOAA"), has determined that StarKist is complying with federal law and may use the dolphin-safe designation. Plaintiffs' failure to identify a single instance of dolphin harm by StarKist means that their entire case is an effort to have this Court renounce the reticulated federal regulation of tuna fishing. There is no basis for the Court to do so, and as such, their claims are meritless. The FAC should be dismissed in its entirety.

Each of Plaintiffs' eleven claims rely upon the same basic assertions: (i) that reasonable consumers interpret the term "dolphin-safe" consistent with federal labeling standards; and (ii) that StarKist tuna products did not meet federal "dolphin-safe" labeling standards. Thus, in order to state any claim for relief, at a minimum, Plaintiffs must plead that the tuna they purchased did not qualify as "dolphin-safe" under federal law. Furthermore, because all of Plaintiffs' claims sound in fraud, they must plead specific facts concerning how the dolphin-safe label on the StarKist products they allegedly purchased was false. Plaintiffs miss this mark by a wide margin, as their factual allegations, even if taken as true for purposes of this motion, do not allege a violation of federal dolphin-safe labeling standards. Plaintiffs therefore have wholly failed to carry their burden.

First, in order to properly engage this Court in the adjudication of a dispute as to whether the tuna they purchased was "dolphin-safe" under the governing federal standard, Plaintiffs must

plead facts claiming that a dolphin was killed or seriously injured *in the particular set or gear deployments* that captured the tuna contained in products they purchased. Plaintiffs have not. Indeed, Plaintiffs have not identified *any* instance in which *any* dolphin was *ever* killed or harmed in a set or gear deployment that captured *any* tuna that StarKist later sold as dolphin-safe. Plaintiffs' failure to cite such evidence is not coincidental. Plaintiffs do not even make any allegations concerning the specific circumstances under which the tuna they allegedly purchased was captured. Instead, Plaintiffs bring a case that is based on apparent misinterpretation of federal law. Plaintiffs eschew facts for a baseless legal theory that if any dolphin has been harmed during any fishing trip where a particular a fishing method was used, then no tuna caught anywhere, by anyone, using that fishing method can accurately be sold with a dolphin-safe label. That is not what the law provides. As a result, Plaintiffs' claims that they purchased falsely labeled tuna fail as a matter of law.

Second, while Plaintiffs say that StarKist does not comply with federal tuna tracking requirements, they merely allege that information concerning the fishing methods used to catch each StarKist tuna is not made publicly available through an internet portal. Federal law, however, expressly provides that tuna tracking information is deemed confidential; *it does not require that such information be made publicly available*. Moreover, Plaintiffs' allegations are demonstrably false, as just last year NOAA conducted a spot-check of StarKist tuna under the authority expressly conferred to it by Congress and concluded that StarKist tuna available for sale in retail stores "was labeled dolphin safe and met U.S. dolphin-safe standards." (RJN,[1] Ex. 3.)

Plaintiffs' FAC should be dismissed on the independent grounds that Plaintiffs lack standing. They have not asserted facts establishing that they have suffered a concrete and particularized harm that is fairly traceably to any conduct by StarKist. Plaintiffs make generalized allegations that international fishing methods have harmed dolphins, and that the regulatory

---

[1]   "RJN" refers to StarKist's Request for Judicial Notice in Support of Motion to Dismiss Plaintiffs' First Amended Complaint, filed concurrently herewith.

scheme governing international tuna fishing is not stringent enough to protect dolphins, but cite an article in the FAC that notes dolphin mortality from tuna fishing has decreased by more than 99% since the scheme Plaintiffs decry as *ipso facto* 100% unsafe was enacted. But Plaintiffs have not alleged any facts to support an inference that they were personally harmed during this breathtaking drop in dolphin mortality. As noted, they have not alleged that a dolphin was harmed during the capture of any tuna product they purchased. Plaintiffs' speculation of alleged harm to dolphins caused by tuna fishing, generally, is insufficient to establish their standing to pursue claims in federal court.

Plaintiffs' deficient claims as to fraud are also coupled with a failure to sufficiently allege other vital elements of their RICO claim, including (i) that StarKist was engaged in a RICO "enterprise," and (ii) that Plaintiffs suffered an injury to property by reason of an alleged RICO violation. Indeed, stripped of its conclusory allegations that merely mimic the elements of a claim, which are not entitled to a presumption of truth, Plaintiffs have merely alleged that StarKist engages in ordinary business transactions related to tuna fishing with third parties, such as fishing vessels, importers, and canneries. Courts have repeatedly held that allegations of conduct consistent with legitimate business conduct are insufficient to demonstrate the existence of a RICO enterprise. Moreover, Plaintiffs have not alleged that they suffered any injury to property "by reason of" any alleged RICO violations. Rather, they claim that but-for the alleged RICO violations, they would have purchased tuna that was captured by more costly fishing methods.

Plaintiffs' state law claims also are all preempted by the Dolphin Protection Consumer Information Act ("DPCIA") and the implementing regulations. This federal scheme provides a complete regulatory framework for dolphin-safe tuna fishing and labeling that governs every aspect of tuna fishing. It expressly authorizes enforcement by the Secretary of Commerce. The DPCIA occupies the entire field of dolphin-safe tuna labeling and confers no private right of action. It leaves no room for state law claims challenging dolphin-safe labeling.

Plaintiffs' allegations that StarKist failed to properly track the source of its tuna is separately preempted because NOAA has exclusive authority to monitor and enforce compliance with the tuna tracking requirements Plaintiffs allege StarKist violated. Importantly, NOAA has

3

1  expressly found that StarKist complies with federal regulations.

2    Congress's choice not to confer a private right of action under the DPCIA also precludes

3  Plaintiffs' RICO claim, which merely alleges mail and wire fraud in connection with alleged

4  DPCIA violations.  Courts have repeatedly held that RICO may not be used to assert a federal

5  claim for alleged violations of a federal statute that does not confer a private right of action.  That

6  is exactly what Plaintiffs are trying to do here.

7    There is simply no merit to using state consumer fraud laws to regulate commercial tuna

8  fishing that occurs on oceans of the world, is regulated by Congress, overseen by NOAA, and the

9  products of which pass through ports throughout the United States.  To allow Plaintiffs to proceed

10  with their claims would override the extensive federal scheme governing dolphin-safe tuna fishing

11  and the enforcement procedures NOAA employs.  Plaintiffs have failed to state a viable claim for

12  relief and the FAC should be dismissed in its entirety.

13        **II.  SUMMARY OF PERTINENT FACTS**

14  **A.  THE DPCIA'S "DOLPHIN-SAFE" LABELING STANDARDS**

15    The DPCIA (16 U.S.C. § 1385) and its implementing regulations (50 C.F.R. 216.90 *et*

16  *seq*.) contain comprehensive standards governing the labeling of tuna as "dolphin-safe."  Congress

17  enacted the DPCIA to curtail specific types of tuna fishing that it determined harms dolphins.

18  Congress found that "dolphins … are frequently killed in the course of [i] tuna fishing operations

19  in the eastern tropical Pacific Ocean and [ii] high seas driftnet fishing in other parts of the world."

20  16 U.S.C. § 1385(b)(1).  The DPCIA authorizes the Secretary of Commerce ("Secretary") to issue

21  regulations to implement the DPCIA and impose penalties.  NOAA and its National Marine

22  Fisheries Service ("NMFS") are the primary regulators. 16 U.S.C. § 1385(f).

23    As described in a 2016 article cited in the FAC (¶¶ 5, 49) and published on NOAA's

24  website, in certain areas of the eastern tropical Pacific Ocean ("ETP"), schools of yellowfin tuna

25  commonly swim below dolphins in order to reduce the risk of predation.  (RJN, Ex. 1.)  As a

26  result, fishing techniques were developed within the ETP, which methods the DPCIA was enacted

27  to curtail, that specifically target and encircle dolphins with purse seine nets to capture the tuna

28  that swim below.  (*Id*.)  Fisherman that utilized this "dolphin-set" fishing technique frequently

1   captured both tuna and dolphins together in their nets, then released the dolphins.  (*Id.*)  In some

2   cases, however, complications caused dolphins to get trapped in the nets and die.  (*Id.*)

3          As NOAA recognizes, there are many other purse seine net tuna fishing techniques that do

4   not target dolphins.  (*Id.*)  Examples include (i) "log set" or "floating-object set" fishing, which

5   involves encircling schools of tuna associated with logs or fish aggregating devices, and (ii)

6   "school set" or "unassociated set" fishing, which involves encircling unassociated schools of tuna.

7   (*Id.*)  Of the many tuna fishing techniques that utilize purse seine nets, NOAA has recognized that

8   "*[d]olphins are killed almost exclusively in dolphin sets*."  (*Id.*)  The DPCIA therefore prohibits

9   tuna caught in dolphin sets from being labeled as "dolphin-safe," but permits tuna captured using

10  other purse seine fishing techniques to be labeled as dolphin safe.

11         Indeed, tuna (other than those harvested in the ETP and certain high-risk fisheries)[2]—

12  including tuna captured with purse seine nets—may be labeled as dolphin-safe if certain specific

13  conditions are met.  *First*, the tuna must not have been harvested by a vessel engaged in driftnet

14  fishing.  50 C.F.R. 216.91(a)(2).  *Second*, the tuna must be accompanied by a written statement

15  executed by the vessel's captain certifying that (i) "no purse seine net or other fishing gear was

16  *intentionally deployed on or used to encircle dolphins during the fishing trip in which the tuna*

17  *were caught*" and (ii) "no dolphins were killed or seriously injured in the sets or other gear

18  deployments in which the tuna were caught."  50 C.F.R. 216.91(a)(3)(iii) (emphasis added).[3]

19  Tuna that meets these dolphin-safe requirements must also be stored physically separate from any

20  tuna that is not dolphin-safe and must have a proper chain of custody.  50 C.F.R. § 216.91(a)(4);

21  50 C.F.R. § 216.93.

22         The objective evidence suggests that federal and international dolphin-safe tuna regulations

23  _____

24  [2]  Tuna fishing in the ETP and certain other high risk fisheries are subject to certain requirements
    that do not apply to fishing elsewhere.  Plaintiffs, however, do not allege that StarKist falsely

25  labeled any tuna that was caught in the ETP or other high risk fisheries.

26  [3]  For fishing trips that began after May 21, 2016, the captain of the vessel must also have
    completed a Tuna Tracking and Verification dolphin-safe captain's training course. 50 C.F.R.

27  216.91(3)(iii)(B).

28

1  have been tremendously successful in reducing dolphin mortality.  (RJN, Ex. 1.)  According to an

2  international observer program, dolphin mortality in 1986 was approximately 133,000 dolphins

3  per year.  (*Id*.)  By 2016, that number had fallen to about 1,000 dolphins per year, a more than

4  99% reduction over 30 years.  (*Id*.)  Again, Plaintiffs offer no factual allegations to bolster their

5  claim that all longline and purse seine net tuna fishing harms dolphins and the information cited in

6  their own FAC shows a dramatic reduction in dolphin mortality.

7  **B.   NOAA'S TUNA TRACKING AND VERIFICATION PROGRAM**

8        Pursuant to the Secretary's authority under the DPCIA, it has issued regulations

9  establishing "a domestic tracking and verification program that provides for the effective tracking

10  of tuna labeled [as dolphin-safe]."  16 U.S.C. § 1385(f).  Those regulations require importers and

11  U.S. processors of tuna to maintain for two years information reflecting the chain of custody from

12  the time tuna is caught until the time of sale to enable dolphin-safe tuna to be distinguished from

13  non-dolphin-safe tuna and to make such information available to NMFS upon request.  50 C.F.R.

14  216.91(a)(5)(i); 50 C.F.R. 216.91(a)(5)(iii).  All tracking and verification information that is made

15  available to regulators is deemed confidential.  50 C.F.R. 216.93(h).

16        Pursuant to its express authority conferred by Congress (16 U.S.C. § 1385(f)(6)), NOAA's

17  Tuna Tracking and Verification Program ("TTVP") "conducts regular and periodic audits and spot

18  checks on domestic canners and importers to ensure compliance with TTVP regulations."  (RJN,

19  Ex. 2.)  Under TTVP's spot-check program, TTVP staff purchases tuna products from retail store

20  shelves and "asks the importer, distributor or canner to supply the necessary documentation to

21  substantiate its dolphin-safe claims."  (*Id*.)  The TTVP staff conducted its most recent retail market

22  spot checks in August 2018 by purchasing dolphin-safe labeled tuna products from California

23  retail stores.  StarKist was among the tuna brands the TTVP staff audited in its August 2018 spot-

24  check.  (RJN, Ex. 3.)  The results are available on NOAA's public website.  (*Id*.)  Specifically,

25  "[t]he TTVP review of the submitted documentation verified that the tuna products [including

26  StarKist] were eligible to be labeled dolphin-safe in the U.S. marketplace."  (RJN, Exs. 2 and 3.)

27        In August 2016, pursuant to its auditing program, "the TTVP made three site visits to U.S.

28  tuna canner facilities and determined that each company's traceability of product met TTVP

1  requirements." (RJN, Ex. 2.) NOAA's audit determined that "U.S. consumers should continue to

2  maintain a high degree of confidence in the integrity of Dolphin-Safe labeled tuna products they

3  purchase in U.S. markets." (*Id.*)

4  **C.     THE DPCIA'S REGULATORY ENFORCEMENT SCHEME**

5          The DPCIA does not confer a private right of action.[4] Instead, compliance is monitored

6  and enforced by the Secretary and the secretary of the department in which the Coast Guard

7  operates. 16 U.S.C. § 1385; 16 U.S.C. § 1826g(c)(1). The Secretary may, by agreement, utilize

8  the personnel, services, equipment, and facilities of any other Federal agency, and of any State

9  agency, in performing its duties and may engage in international cooperation to help other nations

10  combat illegal, unreported, and unregulated fishing. 16 U.S.C. § 1826g(a), (c), (d). The DPCIA

11  also makes mislabeling a violation of the Federal Trade Commission Act ("FTCA"). 16 U.S.C. §

12  1385(d)(1). The FTCA also does not confer a private right of action. *Gajo v. Chicago Brand*,

13  Case No. 17-cv-00380-EMC, 2017 WL 2473142, at *1 (N.D. Cal. June 8, 2017).

14  **D.     THE FAC'S ALLEGATIONS**

15          Plaintiffs filed the First Amended Class Action FAC on June 17, 2019 (Dkt. 37) ("FAC").

16  The FAC asserts 10 state law claims and one federal RICO claim. All claims are based on

17  Plaintiffs' unsupported, and unsupportable, allegations that StarKist's tuna was falsely labeled as

18  "dolphin-safe." All of Plaintiffs' claims allege that reasonable consumers interpret the phrase

19  "dolphin-safe" in accordance with federal law. (FAC at ¶ 71). Plaintiffs baldly, and falsely,

20  allege that *no* StarKist tuna products meet the federal "dolphin-safe" labeling standards. Plaintiffs

21  do not allege that any of them saw the statements on StarKist's website regarding StarKist's

22  compliance with federal law. Thus, they cannot, and do not, allege that they relied on any of those

23  statements. (FAC at ¶¶ 80-94). The only representation Plaintiffs claim to have seen is the

24  dolphin-safe logo that appears on the packaging of StarKist's tuna products. (*Id.*)

25

26  _____

27  [4]   The Marine Mammal Protection Act likewise does not confer a private right of action. *NRDC
      v. Evans*, 364 F. Supp. 2d 1083, 1094 (N.D. Cal. 2003).

28

The FAC does not identify a single tuna that StarKist ever bought or sold that was captured in a set or gear deployment in which a dolphin was killed or seriously injured.  Nor does the FAC identify any tuna that StarKist ever bought or sold that was captured on a fishing trip during which a purse seine net was intentionally used to encircle dolphins.  Instead, Plaintiffs' claims are premised on their baseless assertion that *only* "traditional pole-and-line and trolling methods of catching tuna" is "actually dolphin-safe" and that all tuna caught by any other means *per se* is not.  (FAC at ¶¶ 40-42, 66-67, 142).  Thus, Plaintiffs case is based on what they wish the law would provide, only allowing pole and line tuna fishing, and not what the law actually provides.  The law allows for acknowledged dolphin-safe tuna fishing methods, including methods that use purse seine and longline, to be labeled as dolphin-safe.

The FAC alleges that StarKist's tuna is not dolphin-safe because StarKist sources tuna from suppliers that utilize "longlines" and "purse seine" fishing methods, notwithstanding that federal law permits tuna caught by such methods to be labeled as dolphin-safe.  (FAC at ¶¶ 43-46.)  While Plaintiffs allege generally that these methods kill or seriously injure dolphins, they do not identify a single instance in which a dolphin was killed or injured during the capture of any tuna *StarKist* ever sold, much less any tuna they allegedly purchased.  (*Id.*)  The FAC also identifies "indirect ways" in which certain fishing allegedly can affect dolphins, such as by separating mothers from their calves.  (FAC at ¶ 51.)  But again, the FAC does not attempt to link any specific instances of such indirect effects to the capture of StarKist tuna.  Indeed, according to Plaintiffs' own allegations, it would be impossible to trace the indirect effects that tuna fishing has on dolphins to any particular brand because, according to the FAC, these indirect effects are "unobserved."  (FAC at ¶ 51.)

Plaintiffs' also allege in conclusory terms that StarKist "may not label *any* of its tuna as dolphin-safe" because it "does not adequately trace or otherwise identify the tuna that is not dolphin-safe and physically segregate and store it separately from any tuna that may be dolphin-safe."  (FAC at ¶ 31.)  The FAC asserts no facts whatsoever to support this allegation.  Nor does it address NOAA's August 2018 spot-check, which concluded that StarKist tuna "*met U.S. dolphin-safe standards*."  (RJN, Ex. 3) (emphasis added).

8

1    In a meritless attempt to manufacture a non-existent RICO claim, Plaintiffs assert that

2  StarKist "conspired with" several entities "to procure, process, package, label and sell tuna

3  products as dolphin-safe and sustainably sourced when they are not."  (FAC at ¶ 141.)  Like the

4  rest of the FAC's allegations, Plaintiffs plead no facts to support any element of their RICO claim.

5    For example, Plaintiffs allege upon information and belief, that StarKist's co-conspirators

6  "supplied false Captain Statements to Defendants knowing that such Captain Statements were

7  false and, if the truth were known, Defendants would not be able to package, label, market, and

8  sell its tuna products to the Class as dolphin-safe … ."  (FAC at ¶ 143.)  But Plaintiffs do not

9  identify a single Captain Statement that was allegedly falsified, much less disclose any basis for

10  their conclusory allegation of falsity.  The FAC also asserts that each alleged co-conspirator knew

11  that tuna did not meet dolphin-safe labeling standards, but it fails to identify any individual within

12  StarKist that had such knowledge or how they allegedly learned that any imported tuna was not

13  dolphin-safe.  (FAC at ¶ 168.)  The FAC likewise pleads no facts to support its conclusory

14  allegations that StarKist and any co-conspirators maintained a "common communication network"

15  (¶ 161), or that StarKist "ensur[ed] that the RICO Co-Conspirators and unnamed co-conspirators

16  complied with the scheme or common course of conduct."  (*Id.* at ¶ 164(o)).  The FAC is entirely

17  conclusory, fails to state an actionable claim, and should accordingly be dismissed.

18    Plaintiffs' claims are plausible only if, among other things, the Court finds that *all* tuna

19  fishing other than pole-and-line, trolling, or handline catch methods are *per se* dolphin unsafe.

20  But that is not what the law provides.  Moreover, Plaintiffs provide no fact-based allegations,

21  indeed no allegations at all, that could support such a finding.  Such a finding would entirely

22  upend the federal regulatory scheme and place this Court in the role of Congress and NOAA when

23  it comes to dolphin protection on the high seas.  If Plaintiffs want to change tuna fishing practices,

24  it should petition the appropriate federal agency.  The rambling FAC is not the vehicle to prohibit

25  common tuna fishing methods that are sanctioned by Congress as dolphin-safe.

26  / / /

27  / / /

28  / / /

# III.  ARGUMENT

## A.   LEGAL STANDARD ON A MOTION TO DISMISS

On a motion to dismiss, a court may consider (i) documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," and (ii) documents upon which the plaintiff's FAC necessarily relies.  *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998) (internal quotations omitted); *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1061 (N.D. Cal. 2017).  The Court may also take judicial notice of public records and government documents available from reliable sources on the internet. *Dimas v. JPMorgan Chase Bank, N.A.*, No. 17-CV-05205-LHK, 2018 U.S. Dist. LEXIS 21929, at *14-19 (N.D. Cal. Feb. 9, 2018).

The Ninth Circuit has established two principles that apply in assessing the sufficiency of a pleading under Rule 8(a)(2)'s general pleading standard.  First, allegations that simply recite the elements of a cause of action are not entitled to a presumption of truth.  *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014).  Second, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  Moreover, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation."  *Eclectic Props. East, LLC*, 751 F.3d at 996. Rather, "[s]omething more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible."  *Id.* at 996-97 (internal quotations omitted).

Additionally, claims grounded in fraud must satisfy Rule 9(b)'s heightened pleading standard.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-05 (9th Cir. 2003).  Rule 9(b) applies to averments of fraud even where fraud is not an essential element of a claim.  *Id.* at 1103-04.  Here, all of Plaintiffs' claims are based on their conclusory assertion that Defendant defrauded consumers into purchasing tuna products that were allegedly falsely labeled as dolphin-safe. Thus, they are all subject to, and fail to meet, Rule 9(b)'s heightened pleading standard.

10

NOTICE OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES
Case No.: 3:19-cv-02561-WHO

1    In order to satisfy the heightened pleading standard, averments of fraud "must be

2  accompanied by the who, what, when, where, and how of the misconduct charged." *Id.* at 1106

3  (internal quotations omitted). Plaintiffs must also "set forth what is false or misleading about a

4  statement, and why it is false." *Id.* (internal quotations omitted). Furthermore, allegations of fraud

5  based on information and belief must, at a minimum, include "the source of the information and

6  the reasons for the belief." *United States v. Cathcart*, No. C 07-4762 PJH, 2008 U.S. Dist. LEXIS

7  70100, at *7 (N.D. Cal. Sept. 15, 2008).  Rule 9(b) serves "to deter the filing of complaints as a

8  pretext for the discovery of unknown wrongs," and "to prohibit plaintiffs from unilaterally

9  imposing upon the court, the parties and society enormous social and economic costs absent some

10  factual basis." *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001).

11    The FAC falls well short of either Rule 8(a)'s general plausibility standard, or Rule 9(b)'s

12  heightened pleading standard and should accordingly be dismissed in its entirety.

13  **B.    PLAINTIFFS HAVE PLED NO FACTS TO SUPPORT THEIR ASSERTION**
14  **THAT STARKIST TUNA IS NOT DOLPHIN-SAFE UNDER FEDERAL LAW**

15    All of Plaintiffs' claims, Counts I through XI of the FAC, should be dismissed pursuant to

16  Rule 12(b)(6), 8(a) and 9(b).  Each and every one of Plaintiffs' claims seek to recover based on

17  their assertion that they purchased StarKist tuna that was falsely labeled as "dolphin-safe."   (FAC

18  at ¶¶ 190-194 (Count I), ¶ 201, ¶ 207 (Count II), ¶ 214 (Count III), ¶ 224 (Count IV), ¶ 232 (Count

19  V), ¶ 239 (Count VI), ¶ 249 (Count VII), ¶ 254 (Count VIII), ¶ 263 (Count IX), ¶ 271 (Count X), ¶

20  280 (Count XI).  Plaintiffs, however, have failed to plead any facts to plausibly support their

21  allegations that any tuna they purchased did not satisfy the federal "dolphin-safe" standard.[5]  All

---

[5]    The FAC identifies a number of statements from Starkist's website.  But none of the Plaintiffs allege that they ever saw any statements other than the logo on Starkist's tuna products. They therefore have not alleged that they relied on any such statements, an essential element of their Second, Third, Eighth and Tenth counts.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) (reliance required to plead claim under California UCL ((Count II)) and CLRA (Count III)); *Ikechi v. Verizon Wireless, No. 10-CV-4554 JNE/SER, 2011 WL 2118797 (D. Minn. Apr. 7, 2011), adopted by* No. CIV. 10-4554 JNE/SER, 2011 WL 2118791 (D. Minn. May 25, 2011) (reliance required for a Minnesota consumer fraud claim); *Hamilton v. TBC Corp.*, 328

(footnote continued)

1    of Plaintiffs' claims must be dismissed for this reason alone.  *Hall v. SeaWorld Entm't, Inc.*, No.

2    3:15-CV-660-CAB-RBB, 2015 U.S. Dist. LEXIS 174294, at *35 (S.D. Cal. 2015) (dismissing

3    complaint containing seventy pages of allegations regarding the defendants conduct and "simply

4    list[ed] statements and [said] they are false"); *Fraker v. Bayer Corp.*, No. CV F 08-1564 AWI

5    GSA, 2009 U.S. Dist. LEXIS 125633, at *22 (E.D. Cal. Oct. 2, 2009) (dismissing false advertising

6    claims where "evidence presented in the FAC, even if admissible, does not go to show that any of

7    Plaintiffs claims … are false.").

8         Plaintiffs assert that reasonable consumers interpret the term "dolphin-safe" consistent

9    with the governing federal labeling standard.  (Compl. at ¶ 71.)  Plaintiffs, however, have not

10   alleged that StarKist tuna failed to satisfy that standard.  Plaintiffs merely assert that StarKist

11   sources tuna from vessels that engage in longline and purse seine net fishing methods.  Under the

12   federal standard, however, tuna caught using longline and purse seine methods qualifies as

13   dolphin-safe as long as no dolphin was killed or seriously injured in the particular sets or gear

14   deployments in which the tuna was caught.  Plaintiffs have not identified a single instance in

15   which a dolphin was killed or seriously injured in any set or gear deployment that captured tuna

16   StarKist subsequently labeled as dolphin-safe.  Nor do they make any allegations at all concerning

17   the circumstances in which the particular tuna they claim to have purchased was captured.

18   Plaintiffs therefore have utterly failed to plead facts to support an inference that they purchased

19   falsely labeled tuna.

20        Plaintiffs also pled no facts to support their allegation that StarKist failed to track their

21   tuna.  Plaintiffs merely allege that StarKist does not make tuna tracking information available to

22   the public through a portal.  Federal law, however, expressly provides that tuna tracking

23   information is proprietary and confidential.  There is no requirement that it be made publicly

24   available.  Plaintiffs' allegation therefore does not allege a violation of any federal standard.

25

26   ───────────────────

27        F.R.D. 359, 379 (C.D. Cal. 2018) (Under Arizona's Consumer Fraud Act ((Count X))
         "plaintiffs must prove reliance").

28

1   Plaintiffs' allegation is also demonstrably false, as NOAA regularly audits StarKist's tuna tracking

2   information, including just last year, and determined that StarKist is compliant with federal

3   requirements.  Plaintiffs' conclusory and false allegations fail to state a claim and the FAC should

4   be dismissed in its entirety.

5         **1.**      **Plaintiffs Have Not Alleged That StarKist Tuna is Not Dolphin-Safe**

6         Plaintiffs seek to supplant a federal regulatory system that relies on agency expertise to

7   identify the methods of tuna fishing that are designed to be dolphin-safe.  According to Plaintiffs,

8   because pole and line tuna fishing allegedly never harms dolphins only tuna caught in this manner

9   can be labeled dolphin-safe.  That is the labeling regime Plaintiffs desire but it is not the one that

10  Congress enacted.  StarKist has fully complied with the federal dolphin-safe tuna labeling

11  standards enacted by Congress and implemented by the Department of Commerce.

12        Under the DPCIA and its implementing regulations, tuna captured in areas other than

13  certain high risk fisheries may properly be labeled as dolphin-safe if: (i) it was not harvested "on

14  the high seas by a vessel engaged in driftnet fishing" 16 U.S.C. § 1385(d)(1)(A); (ii) "the captain

15  of the vessel certif[ies] that no purse seine net was intentionally deployed on or used to encircle

16  dolphins during the fishing trip in which the tuna" were caught; (iii) the captain of the vessel

17  certifies that "no dolphins were killed or seriously injured in the sets or other gear deployments in

18  which the tuna were caught;" (iv) any tuna caught in sets or gear deployments designated as

19  dolphin-safe was stored physically separate from tuna caught in a non-dolphin-safe set or other

20  gear deployment by the use of netting, other material, or separate storage from the time of capture

21  through unloading; and (v) it has a proper chain of custody.  50 C.F.R. § 216.91(a)(3)(i)-(iii), (5).

22  Plaintiffs have not identified any instance in which StarKist has ever labeled tuna as dolphin-safe

23  that did not satisfy these criteria, much less that the particular tuna product they purchased did not.

24  Plaintiffs have therefore failed to plead that StarKist tuna is falsely labeled as dolphin-safe under

25  federal law and each of their claims should be dismissed.

26        Plaintiffs allege that reasonable consumers interpret the term "dolphin-safe" in accordance

27  with its precise regulatory meaning under federal law.  (FAC at ¶ 71.)  Nonetheless, they make no

28  attempt to establish that StarKist tuna did not meet that definition.  Instead, Plaintiffs attempt to

1   make up their own definition of "dolphin-safe" that finds no support in federal law, and ask the

2   Court to adopt it:

3       Several tuna companies use traditional pole-and-line and trolling methods of
        catching tuna … While more costly, these traditional methods ensure that
4       dolphins (and other bycatch) are not harmed in the fishing process because fish
        are caught using barbless hooks and poles one at a time near the sea's surface and
5       unintended capture species are easily released.  Tuna caught by these methods are
        actually "dolphin-safe."  StarKist is not among the tuna companies that use only
6       dolphin-safe pole-and-line or tolling techniques to capture their tuna."

7   (FAC at ¶¶ 40-42; *see also id.* at ¶ 66) ("Unlike several other tuna companies who sell to the U.S.

8   market, Defendant has not adopted dolphin-safe fishing practices, such as pole-and-line, trolling,

9   and or handline catch methods, whereby fisherman catch one fish at a time and release unwanted

10  species soon after a fish takes the bait.").

11      Nothing whatsoever in the DPCIA, or its implementing regulations, limits the definition of

12  "dolphin-safe" only to tuna caught using "barbless hooks and poles one at a time near the sea's

13  surface."  Rather, the federal definition includes tuna caught using any fishing method other than

14  driftnet fishing and "dolphin set" fishing, including purse seine methods, as long as no dolphin

15  was killed or seriously injured in the particular set or gear deployment in which the tuna was

16  caught.  While Plaintiffs may disagree with Congress over whether the DPCIA adequately protects

17  dolphins, empirical data referenced in an article Plaintiffs cite in the FAC suggests that it has been

18  overwhelmingly effective, as dolphin deaths caused by tuna fishing have been reduced by more

19  than 99% over the last 30 years (the DPCIA was enacted in 1990), and there is no evidence that

20  any tuna that are captured in connection with dolphin death is sold as dolphin-safe in the U.S.

21  (RJN, Ex. 1.)  Regardless, if Plaintiffs wish to have the regulatory definition of "dolphin-safe"

22  changed, they must make their arguments to Congress, not the Court.  Plaintiffs' assertion that

23  StarKist tuna is not caught using exclusively pole-and-line and trolling methods fails as a matter of

24  law to identify a DPCIA violation.  The reasonable consumer's belief, according to Plaintiffs,

25  align exactly with the law, as does StarKist's practices.  Thus, there is no deceit.

26      Plaintiffs' contention that no tuna sourced from vessels that use "longlines" may be labeled

27  as "dolphin-safe" is meritless.  (FAC at ¶ 43.)  The DPCIA does not prohibit tuna caught with

28  longlines from being labeled as dolphin-safe.  Rather, tuna caught using longlines may be properly

14

1    labeled as dolphin-safe under federal law where no "fishing gear was intentionally deployed on or

2    used to encircle dolphins *during the fishing trip in which the tuna were caught*" and "no dolphins

3    were killed or seriously injured *in the sets or other gear deployments in which the tuna were*

4    *caught*." 50 C.F.R. 216.91(a)(3)(iii) (emphasis added). While Plaintiffs plead generally that

5    longline fishing has the potential to kill dolphins, they do not identify any instance in which a

6    dolphin was killed or seriously injured in the particular "sets or other gear deployments in which

7    the tuna [they purchased] were caught." Plaintiffs make no attempt to link any dolphin death to

8    *any* tuna StarKist *ever* sold, much less the particular product they purchased. Plaintiffs'

9    allegations concerning the dangers posed to dolphins by longline fishing generally fail woefully to

10   state a claim that any StarKist tuna did not meet the federal "dolphin-safe" standard and that

11   Plaintiffs suffered an injury as a result.

12        Plaintiffs' contentions that StarKist sells tuna that was captured using "purse seine fishing

13   techniques" and "fish aggregating devices" fail for the same reasons. (FAC at ¶¶ 46-53). Again,

14   federal law *permits tuna caught using purse seine nets and fish aggregating devices to be labeled*

15   *as dolphin-safe* as long as no purse seine net or other fishing gear was intentionally deployed on or

16   used to encircle dolphins during the fishing trip in which the tuna were caught and no dolphins

17   were killed or seriously injured in the sets or other gear deployments in which the tuna were

18   caught 50 C.F.R. §§ 216.91(a)(iii). In order to allege a violation of federal law under this theory,

19   Plaintiffs must plead facts to support the inferences that (i) a purse seine net or other fishing gear

20   was intentionally deployed on or used to encircle dolphins during the fishing trip in which the tuna

21   contained in the particular StarKist product they purchased was caught, or (ii) a dolphin was killed

22   or seriously injured in the particular set or gear deployment that captured such tuna. The FAC

23   does neither. Absent such allegations, there is no basis for Plaintiffs' contention that they

24   purchased falsely labeled tuna.

25        Plaintiffs' disingenuous allegations concerning a fishing vessel that was seized by

26   Indonesian authorities exemplifies the FAC's lack of substance. (FAC at ¶ 62.) Plaintiffs allege

27   that the particular fishing vessel's "chain of ownership includes Defendant Dongwon," which, at

28   most, would merely suggest that Dongwon was one of several companies that owned the vessel

1    some time in the past, *not at the time it was seized with driftnets*. (*Id*.) Of course, the FAC makes

2    no attempt to establish that Dongwon, StarKist, or anyone affiliated with StarKist ever used a

3    driftnet or otherwise illegally fished from the vessel. Furthermore, according to media reports, the

4    seized vessel was engaged in cod fishing, not tuna fishing, and Plaintiffs do not allege otherwise.[6]

5    On their face, these allegations have *absolutely no relevance whatsoever* to Plaintiffs' claims.

6    Their inclusion in the FAC, however, is demonstrative of the FAC's overall theme, which seeks to

7    blame StarKist and hold it liable for all of Plaintiffs' general grievances with the international

8    fishing industry, and its governing law, without any legal or factual basis for doing so. Plaintiffs

9    plead no facts whatsoever to support a plausible inference that StarKist engaged in any

10    wrongdoing, or that any tuna product they purchased was falsely labeled. Their claims in this

11    lawsuit are patently meritless.

          **2.**      **Plaintiffs Have Not Alleged A Violation of the**

12                             **DPCIA's Tracking and Verification Requirements**

13

14          Plaintiffs' also allege in wholly conclusory terms that StarKist "may not label *any* of its

15    tuna as dolphin-safe" because it "does not adequately trace or otherwise identify the tuna that is

16    not dolphin-safe and physically segregate and store it separately from any tuna that may be

17    dolphin-safe." (FAC ¶ 31.) The entire factual basis for Plaintiffs' allegation is that StarKist does

18    not make certain information publicly available through an internet portal:

19          StarKist claims to trace each tuna Product sold in the U.S. to the vessel that caught

20          it, the ocean where it was caught, the method used to catch the tuna, and the
cannery where it was processed. [citation omitted]. Other tuna brands that claim to

21          have similar tracking methods actually provide that information to consumers via
tracking portals on their website that allow consumers to see this critical

22          information. Defendants' tracking portal provides information only on the ocean in
which StarKist tuna was caught. By not adequately tracking StarKist tuna catch

23          from net or hook to can, Defendants conceal the actual harm to dolphins caused in
its supply chain.

24    (FAC at ¶ 57.) But the DPCIA does not require StarKist to make tracking and verification

25

26    [6]   *See e.g.* https://www.reuters.com/article/us-oceans-fishing-indonesia/the-one-that-got-away-

27         indonesia-seizes-illegal-fishing-boat-with-30-km-nets-idUSKBN1HG0SB (last visited August
5, 2019).

28

1    information publicly available.  Rather, it provides just the opposite.

2         The DPCIA provision that authorizes the Secretary to establish a domestic tracking and

3    verification program provides that "the Secretary shall establish appropriate procedures for

4    ensuring the confidentiality of proprietary information the submission of which is voluntary or

5    mandatory."  16 U.S.C. § 1385(f).  The implementing regulations, in turn, provide that all tracking

6    and verification information is treated as confidential.  50 C.F.R. 216.93(h).  Plaintiffs' allegation

7    that StarKist does not provide public access to its tracking and verification information through an

8    internet portal therefore comes nowhere close to stating a claim that StarKist's tuna products are

9    falsely labeled.  Plaintiffs are trying to equate the absence of a disclosure scheme that meets

10   Plaintiffs' made-up standards with StarKist selling tuna falsely labeled as dolphin-safe.   This *ipse*

11   *dixit* is based on disclosure standards that find no support in the law.

12        Plaintiffs' assertion that StarKist did not comply with mandatory tracking and verification

13   requirements under the DPCIA is also demonstrably false.  Indeed, NOAA's TTVP "regularly

14   spot checks canned/pouched tuna products in retail stores throughout the country to verify the

15   authenticity of the dolphin-safe label and/or to verify that the product has been imported into the

16   United States legally."  (RJN, Ex. 2.)  NOAA's most recent spot check occurred in August 2018.

17   NOAA purchased StarKist tuna products from retail stores in California and determined that

18   StarKist's "product was labeled dolphin-safe and met U.S. Dolphin safe standards." (RJN, Ex. 3).

19        Unable to plead any facts to support their bald assertion that StarKist fails to comply with

20   federal tracking and verification requirements, Plaintiffs argue that the DPCIA and its

21   implementing regulations are not stringent enough to guarantee dolphin safety.  Plaintiffs allege,

22   for example, that fishing boats outside of the ETP "are not required to have independent observers

23   onboard to track and report the number of dolphins killed or seriously injured" and that a

24   declaration from the ship's captain suffices.  (FAC at ¶ 57, 59.)  Plaintiffs also allege that captain

25   certifications "are paper-based and typically filled in by hand … making it virtually impossible to

26   adequately verify these certifications."  (FAC at ¶ 59.)  But Plaintiffs' perceived deficiencies in

27   NOAA's tracking and verification program does not support an inference that StarKist failed to

28   follow the law or that its tuna was otherwise falsely labeled.  Plaintiffs' complaints are with

1    federal regulations, not StarKist.

2          Plaintiffs have pled no facts whatsoever that could plausibly support their accusations of

3    fraud against StarKist.  They have utterly failed to state a claim under the standards of either 8(a)

4    or 9(b) of the Federal Rules of Civil Procedure with respect to any of their claims, and the FAC

5    should be dismissed in its entirety with prejudice.

6    **C.      PLAINTIFFS LACK ARTICLE III STANDING**

7          As set forth above, Plaintiffs have pled no facts whatsoever to support a plausible inference

8    that the alleged StarKist tuna product *they purchased* was caught in a set or gear deployment in

9    which a dolphin was killed or seriously injured.  Indeed, Plaintiffs have not even identified the

10   particular tuna products they purchased or when they were made, much less have they identified

11   any information concerning the manner in which the tuna was captured.  Instead, the FAC

12   purports to seek a determination that tuna captured using longline or purse seine fishing

13   techniques generally pose risks to dolphins and therefore tuna caught using such methods should

14   never be allowed to be labeled as dolphin-safe.  Absent allegations that the particular product *they*

15   *purchased* are not dolphin-safe under federal law, however, Plaintiffs have not and cannot

16   demonstrate they suffered an injury-in-fact relating to any of their allegations, and they therefore

17   lack standing to assert claims.

18         The Supreme Court has established "that the irreducible constitutional minimum of

19   standing contains three elements."  *Lujan v. Defenders of Wildlife*, 112 S. Ct. 2130, 2136 (1992);

20   *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  First, "the plaintiff must have suffered an

21   injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized

22   and (b) actual or imminent, not conjectural or hypothetical[.]"  *Lujan*, 112 S. Ct. at 2136 (internal

23   quotations omitted).  Second, "there must be a causal connection between the injury and the

24   conduct complained of – the injury has to be fairly … traceable to the challenged action of the

25   defendant[.]"  *Id.* (internal quotations omitted).  "Third, it must be likely, as opposed to merely

26   speculative, that the injury will be redressed by a favorable decision."  *Id.* (internal quotations

27   omitted).  The "injury in fact test requires more than an injury to a cognizable interest[;] [i]t

28   requires that the party seeking review *be himself among the injured*."  *Id.* at 2136 (emphasis

18

1  added).  The party invoking federal jurisdiction bears the burden of establishing standing.  *Id.* at

2  2137.  Plaintiffs have failed to carry their burden.

3       Under the DPCIA, the "dolphin-safe" status of tuna captured using longlines or purse seine

4  nets is analyzed on a catch-by-catch basis, such that, two tuna catches may be made by the exact

5  same fishing vessel using the exact same fishing technique, in the exact same location and one of

6  them may be dolphin-safe while the other is not.  Plaintiffs' generalized allegations that tuna is

7  sometimes captured that does not qualify as "dolphin-safe" does not establish that Plaintiffs have

8  been harmed.  Noticeably absent from the FAC are any allegations at all concerning how the tuna

9  Plaintiffs allegedly purchased was captured, or, more specifically, facts supporting an inference

10  that any tuna Plaintiffs purchased was captured in a set or gear deployment that killed or seriously

11  injured a dolphin.  Plaintiffs, therefore, have not pled that they suffered a concrete or

12  particularized injury from any alleged dolphin unsafe tuna fishing practices.  For the same reasons,

13  Plaintiffs have not established that their alleged injury is "fairly traceable to the challenged action

14  of the defendant."  *Lujan*, 112 S. Ct. at 2136 (internal quotations omitted) (no standing where the

15  plaintiffs failed to show "not only that listed species were in fact being threatened by funded

16  activities abroad, but also that one or more [plaintiffs] would thereby be directly affected").

17  Plaintiffs therefore have not carried their burden of establishing the constitutional minimum to

18  confer standing.

19  **D.    PLAINTIFFS HAVE NOT PLED THE ELEMENTS OF RICO**

20       For the reasons set forth above, Plaintiffs have wholly failed to plead that StarKist's tuna

21  was falsely labeled under the DPCIA, much less with the particularity required to satisfy Rule

22  9(b)'s heightened pleading standard.  All of Plaintiffs' claims, including their RICO claim (Count

23  I), should be dismissed for that reason alone.  Additionally, Plaintiffs' RICO claim should be

24  dismissed for the independent reason that Plaintiffs have not adequately pled the existence of a

25  RICO "enterprise," or that they have suffered injury to business or property.

26       **1.    Plaintiffs Have Failed to Allege a RICO Enterprise**

27       "To maintain a civil RICO claim, a plaintiff must allege that the defendant engaged in (1)

28  conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally,

must establish that (5) the defendant caused injury to plaintiff's business or property." *Black v. Corvel Enter. Comp.*, 756 Fed. Appx. 706, 708 (9th Cir. 2018) (internal quotations omitted).  To satisfy the second element, "Plaintiffs must do more than mimic the statutory language to plead the existence of an 'enterprise'." *Gaines v. Home Loan Ctr., Inc.*, No. SA CV 08-667 AHS (RNBx), 2010 U.S. Dist. LEXIS 153719, at *17 (C.D. Cal. May 24, 2010) (internal quotations omitted).  Plaintiffs must describe "a group of persons associated together for a common purpose of engaging in a course of conduct[] . . . [and] must provide both evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *Doan v. Singh*, 617 F. App'x. 684, 686 (9th Cir. 2015) (internal quotations omitted); *Patton v. Forest Labs., LLC*, No. EDCV 17-922-MWF (DTBx), 2018 U.S. Dist. LEXIS 225874, at *31 (C.D. Cal. May 10, 2018).  Plaintiffs have failed to satisfy this standard.

Courts have repeatedly dismissed purported RICO claims that merely allege ordinary business activity was conducted fraudulently.  *See e.g. Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046 (C.D. Cal. 2016); *United Food & Commer. Worker Unions & Emplrs. Midwest Health Bens. Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013).  In *Shaw*, the court held that the plaintiff failed to plead a RICO enterprise with a "common purpose" where the complaint merely alleged that the defendants engaged in a "fraudulent enterprise to sell cars with defective parts at inflated values." *Id.* at 1054-55.  The court held that the complaint "allege[d] no more than that Defendants' primary business activity—the design, manufacture, and sale or lease of Toyota vehicles—was conducted fraudulently."  *Id.* at 1056 (internal quotations omitted).  The complaint therefore, "fail[ed] to demonstrate a common purpose," but rather, "only demonstrate[d] that the parties are associated in a manner directly related to their own primary business activities." *Id.* at 1057 (internal quotations omitted).  The court distinguished cases where the operative complaint "included pages of references to specific communications showing the defendants acting as an enterprise and engaged in a collaborative scheme to defraud." *Id.* (internal quotations omitted).  In *Shaw*, like here, the complaint did not include "any specific facts that [would] move their allegations from the realm of the possible to the plausible." *Id.* at 1057.

Plaintiffs' allegations of a so-called RICO enterprise here consist merely of identifying a

20

1    number of entities StarKist allegedly engages in business with and alleging in conclusory terms

2    that each of them "knew" StarKist would label its tuna as dolphin-safe and knew it allegedly did

3    not qualify as such under the DPCIA.  For example, Plaintiffs allegations against certain alleged

4    storage, canning, and processing co-conspirators merely assert that these companies "stored,

5    canned, and processed Defendants tuna products for sale" and knew the products would be

6    marketed as dolphin-safe.  (FAC at ¶ 151.)  Such "bare assertions of a pattern of racketeering

7    activity do not establish an enterprise and they do not, therefore, satisfy Plaintiffs' burden."  *Doan*,

8    617 F. App'x. at 686.

9           Plaintiffs also fail to provide evidence "that the various associates function as a continuing

10   unit."  *Id.* (internal quotations omitted).  The FAC alleges, upon information and belief only, that

11   "there was a common communication network by which co-conspirators shared information on a

12   regular basis."  (FAC at ¶ 161.)  Plaintiffs, however, fail to identify any "information" upon which

13   their so-called "belief" is based.  Nor do they identify how the alleged co-conspirators

14   communicated, anyone that was involved in any such communications, or what information they

15   allegedly shared.  Indeed, stripped of its conclusory "information and belief" allegations that

16   merely parrot the elements of a claim, the allegations in the FAC "suggest ordinary business

17   activity on the part of the relevant actors."  *Shaw*, 220 F. Supp. 3d at 1056.  Plaintiffs' conclusory

18   "information and belief" allegation is grossly insufficient to require StarKist to subject itself to

19   intrusive, costly and burdensome discovery relating to Plaintiffs' meritless claims.

20          The plausibility of Plaintiffs' assertion that all of the eight or more allege co-conspirators

21   somehow "knew" that any tuna that was supported by a DPCIA compliant captain statement was

22   not dolphin-safe is also undermined by Plaintiffs' own allegations.  According to Plaintiffs, it is

23   "virtually impossible to verify these certifications."  (FAC at ¶ 59.)  If these certifications are in

24   fact "virtually impossible to verify" as Plaintiffs allege, how could eight or more alleged co-

25   conspirators have possibly known that any certifications were false?  And what incentive would

26   any captain have to disclose to StarKist, or any other alleged co-conspirator, that it intentionally

27   falsified a captain's statement?  Plaintiffs' conclusory allegations are contradictory and

28   inconceivable.  They come nowhere close to attaining plausibility.

1      Plaintiffs' conclusory allegations of a RICO enterprise are not entitled to a presumption of

2  truth.  Plaintiffs' remaining allegations allege nothing more than ordinary business activity and are

3  insufficient to support an inference that a RICO enterprise existed.

4          **2.      Plaintiffs Have Not Alleged Injury to Business or**
           **Property Because of Any Alleged RICO Violations**
5

6      Nor have Plaintiffs alleged that they have been injured in "business or property by reason

7  of" any alleged RICO violation.  18 U.S.C. § 1964(c).  Plaintiffs have alleged two theories of

8  damages, both of which are contradicted by their own allegations.  First, Plaintiffs seek a full

9  refund of the price they paid for StarKist tuna under the theory that the product they purchased

10  was worthless.  But Plaintiffs concede, as they must, that they received "nutrient value" from the

11  tuna products they allegedly purchased.  (FAC at ¶ 73.)  Thus, plainly they did not receive a

12  worthless product.  Had Plaintiffs' not purchased the StarKist product, they would have spent

13  money purchasing another product.  Plaintiffs' assertion that the product had no value, is therefore

14  false, and their associated damages theory is implausible.

15      Plaintiffs' second theory, that they paid a "price premium" for StarKist tuna, is likewise

16  contradicted by their own allegations.  Plaintiffs have not identified any alternative comparable

17  product they would have purchased for less than the purchase price of StarKist tuna but-for the

18  alleged false representations.  Instead, they allege they would have purchased a more expensive

19  product.  Indeed, applying their own misinterpretation of federal law, Plaintiffs allege that only

20  pole-and-line tuna is "actually dolphin-safe," and that but-for the alleged misrepresentation by

21  StarKist, they would have purchased "similar products sold by other manufacturers that were

22  dolphin-safe, traceable, and verified."  (FAC at ¶¶ 41, 67, 201.)  Plaintiffs admit, however, that

23  pole-and-line tuna fishing methods "are more expensive than other techniques."  (FAC at ¶ 155.)

24  Thus, Plaintiffs do not allege that they would have saved any money but-for the alleged false

25  representations.  Accordingly, Plaintiffs have failed to allege that they suffered any injury to

26  business or property by reason of those representations.

27  / / /

28  / / /

**E.    PLAINTIFFS' PRIVATE CAUSES OF ACTION FOR ALLEGED VIOLATIONS OF THE DPCIA ARE PREEMPTED OR OTHERWISE NOT COGNIZABLE**

Even if Plaintiffs' could adequately plead the elements of their claims—which they have not and cannot—their claims, nonetheless, fail as a matter of law because they are either preempted by the DPCIA (Counts II through XI), or otherwise seek unavailable redress under a federal statute that does not confer a private right of action (Count I).

**1.    Federal Law Preempts Plaintiffs' Dolphin-Safe Labeling Claims**

Plaintiffs' ten state-law claims (Counts II through XI), each of which seeks to recover alleged damages based on StarKist's labeling of its tuna as "dolphin-safe," are preempted by federal law.  The DPCIA and its implementing regulations occupy the entire field of dolphin-safe tuna fishing and leaves no room for states to regulate the field.  Plaintiffs' state law challenges to StarKist's alleged fishing practices and the labeling of its tuna as dolphin-safe therefore fail to state a viable claim.

Implied preemption of state law "exists when federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007) (internal quotations omitted).  Field preemption occurs "when Congress indicates in some manner an intent to occupy a given field to the exclusion of state law." *Id.*  Furthermore, where, as here, legal issues bear upon national and international maritime commerce "there is no beginning assumption that concurrent regulation by the State is a valid exercise of its police powers." *United States v. Locke*, 529 U.S. 89, 108 (2000).

Here, the DPCIA and its implementing regulations provide a complete framework governing the labeling of tuna as "dolphin" safe, including a comprehensive enforcement scheme that does not include a private right of action.  The DPCIA specifies the circumstances under which tuna products may be sold in the U.S. bearing a dolphin-safe label, or any label or mark that refers to dolphins, porpoises, or marine mammals. 16 U.S.C. § 1385(d).  The WTO Appellate Body cogently summarized the extent to which the DPCIA occupies the field of dolphin-safe tuna labeling in its May 16, 2012 Report cited in the FAC (¶¶ 35-37):

23

[T]he measure sets out a single and legally mandated definition of a 'dolphin-safe' tuna product and disallows the use of other labels on tuna products that do not satisfy this definition.  In doing so, the US measure prescribes in a broad and exhaustive manner the conditions that apply for making any assertion on a tuna product as to its "dolphin-safety", regardless of the manner in which that statement is made.  As a consequence, the US measure covers the entire field of what "dolphin-safe" means in relation to tuna products.

Appellate Body Report, United States – *Measures Concerning the Importation, Marketing and Sale of Tuna and Tuna Products*, ¶ 193, WTO Doc. WT/DS381/AB/R (adopted May 16, 2012), 2012 WL 1777463.

The enforcement mechanisms under the DPCIA are also comprehensive and exclusive, and leave no room for supplemental private state law remedies.  Indeed, the DPCIA directs the Secretary to track and verify compliance.  16 U.S.C. § 1385(e), (f).  The Secretary has enacted detailed regulations that govern every aspect of dolphin-safe tuna fishing, from the catching of the tuna to its shipping, storage, processing, importing and labeling.  50 C.F.R. §§ 216.90-216.95.  The DPCIA also provides that the Secretary and the Secretary of the department in which the Coast Guard is operating "shall enforce" the DPCIA.  16 U.S.C. § 1826g.  Indeed, to avoid doubt as to whether the DPCIA left room for supplemental state law enforcement, the DPCIA specifies the circumstances under which states may participate in enforcing the Act.  In particular, the Secretary may, by agreement, "utilize the personnel services, equipment (including aircraft and vessels), and facilities of any other Federal agency, and of any State agency, in the performance of such duties."  16 U.S.C. § 1826g(a).  States are permitted to enforce the DPCIA if authorized to do so by the Secretary.  16 U.S.C. § 1826g(d).  This limitation on the states' authority to enforce the DPCIA clearly evidences Congress's intent for federal law to occupy the entire field of dolphin-safe tuna fishing and labeling, to the exclusion of state law claims.

2.      **The DPCIA Preempts Plaintiffs' Tracking and Verification Claims**

Plaintiffs' state law claims that allege StarKist did not adequately track the source of its tuna and concealed that fact from federal regulators are also preempted for the independent reason that Congress has authorized the Secretary to implement and enforce the domestic tracking and verification program, and NOAA has determined as recently as August 2018 that StarKist complies with those requirements.  Under the guise of state law, Plaintiffs' tuna tracking claims

24

1   impermissibly ask the Court to second-guess NOAA's determination with respect to matters over

2   which it has direct responsibility.

3       "[T]he relationship between a federal agency and the entity it regulates is inherently

4   federal in character because the relationship originates from, is governed by, and terminates

5   according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001).  In

6   *Buckman*, the Supreme Court dismissed state tort claims that were based on alleged false

7   statements to the FDA in an application for market clearance for a medical device.  The court

8   explained that if the plaintiffs' "fraud-on-the-FDA claims" were allowed to proceed, FDA

9   applicants would "fear that their disclosures to the FDA, although deemed appropriate by the

10  Agency, will later be judged insufficient in state court," and would therefore "have an incentive to

11  submit a deluge of information that the Agency neither wants nor needs, resulting in additional

12  burdens on the FDA's evaluation of an application." *Id.* at 351.  The court concluded that "this

13  sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is

14  therefore pre-empted by that scheme." *Id.* at 353.

15      In *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199 (9th Cir. 2002), the Ninth Circuit

16  similarly held that a tortious interference claim based on alleged misrepresentations to the EPA

17  were preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").  The

18  plaintiff alleged that the defendant falsely represented to the EPA that the defendant's pesticide

19  could only be safely used with a related product the defendant manufactured, and could not be

20  safely used with the plaintiff's similar product.  The court explained that "[a]s was the case in

21  *Buckman*, . . . the statutory scheme amply empowers the EPA to punish and deter fraud against the

22  Agency, and . . . this authority is used by the Agency to achieve a somewhat delicate balance of

23  statutory objectives." *Id.* at 1206.  Like the Supreme Court in *Buckman*, the Ninth Circuit was

24  "troubled that an applicant's disclosures under FIFRA, although not challenged by the EPA (the

25  very agency empowered by Congress to enforce FIFRA), may be judged illegal under state law."

26  *Id.* at 1207.  The court held that "[s]uch an approach would force FIFRA applicants to ensure that

27  their disclosures to the EPA would satisfy not only the standards imposed by that agency under

28  federal law, but also the potentially heterogeneous standards propounded by each of the 50 states[

]" and motivate FIFRA applicants "to submit a deluge of information that the [EPA] neither wants nor needs, resulting in additional burdens on the [EPA's] evaluation of an application." *Id.* at 1207.

In addition to the DPCIA's preemption of the field of tuna fishing, discussed above, the Supreme Court's holding in *Buckman* and Ninth Circuit's holding in *Nathan Kimmel* apply equally to Plaintiffs' tuna tracking claims against StarKist. The federal agency charged with implementing, monitoring, and enforcing tuna tracking requirements has audited the documentation supporting StarKist's dolphin-safe labeling and determined that StarKist tuna available for sale in the U.S. "was labeled dolphin-safe and met U.S. dolphin-safe standards." (RJN, Ex. 3.) Unable to deny NOAA's findings, of which the court may take judicial notice, Plaintiffs vaguely suggest that StarKist "concealed" the true nature of its tuna from NOAA (FAC, ¶¶ 59, 61), and argues that federal tracking requirements are not stringent enough. But, like in *Buckman* and *Nathan Kimmel*, if compliance with federal tuna tracking requirements is allowed to be challenged under state law, tuna companies would have an incentive to submit a "deluge of information" to NOAA that NOAA "neither wants nor needs" and needlessly drain NOAA's limited resources. Indeed, "this sort of litigation would exert an extraneous pull on the scheme established by Congress, and it is therefore pre-empted by that scheme." *Buckman Co.*, 531 U.S. at 353.

### 3. Plaintiffs' RICO Claim Fails Because the DPCIA Does Not Confer a Private Right of Action

Plaintiffs' RICO claim, Count I of the FAC, alleges that StarKist engaged in a racketeering enterprise that used the mail and wires to (i) violate the DPCIA and (ii) conceal DPCIA violations from federal regulators. The DPCIA, however, does not confer a private right of action. It contains a comprehensive enforcement scheme that authorizes the Secretary to penalize and sanction violators through administrative proceedings. The law is well-settled that RICO claims are not cognizable where they are predicated on alleged violations of a federal statute that does not confer a private right of action. Plaintiffs' RICO claim seeks to improperly circumvent the DPCIA's exclusive enforcement scheme and must therefore be dismissed.

Courts have consistently rejected attempts by private plaintiffs to assert RICO claims based on alleged violations of federal statutes that do not confer private rights of action. *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634 (2d Cir. 1989) (dismissing RICO claim based on violations of Energy Reorganization Act regulations); *Petrochem Insulation, Inc. v. N. California & N. Nevada Pipe Trades Counsel*, No. C-90-3628 EFL, 1991 U.S. Dist. LEXIS 6659 (N.D. Cal. April 30, 1991) (dismissing RICO claim predicated on Hobbs Act violations); *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290 (C.D. Cal. 2008) ("what the FDCA does not create directly, RICO cannot create indirectly."); *Danielsen v. Burnside-Ott Aviation Training Ctr.*, 941 F.2d 1220, 1228 (D.C. Cir. 1991) ("To call the violation of the SCA 'a pattern of racketeering' does nothing to persuade this Court that Congress intended the SCA to create a private cause of action.").

In *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217 (11th Cir. 2002), for example, the court dismissed a RICO claim that alleged mail and wire fraud in connection with violations of the Higher Education Act ("HEA"). The court found that Congress did not intend to confer a private right of action under the HEA because the statute contained a detailed enforcement scheme under which the Secretary of Education was authorized to monitor and sanction noncompliance. *Id*. at 1222-23. The plaintiffs' RICO claims based on alleged HEA violations were therefore precluded:

> In the instant case, the Court finds that Plaintiffs' mail and wire fraud claims are nothing more than purported HEA violations pled in RICO terms. Thus, since Congress did not intend for Plaintiffs to have a private right of action against [defendants] … and instead provided administrative remedies, it follows that Congress could not have intended for that same failure to disclose to constitute a violation of the mail and wire fraud statute.

*Id*. at 1226-27 (*citing New York Inst. of Dietetics v. Great Lakes Higher Educ. Corp.*, No. 94 Civ 4858 (LLS), 1995 U.S. Dist. LEXIS 13692, at *4 (S.D.N.Y. Sept. 21, 1995)).

More recently, in *Woolsey v. J.P. Morgan Ventures Energy Corp.*, No. 15cv530-WQH-BGS, 2015 U.S. Dist. LEXIS 145120 (S.D. Cal. 2015), the court dismissed a purported class-action RICO claim by a consumer based on alleged mail and wire fraud in connection with Federal Power Act ("FPA") violations. *Id*. at *3. The court held that the claim constituted an impermissible attempt to circumvent the Federal Energy Regulatory Commission's ("FERC")

27

1   exclusive authority to enforce the FPA because the claim was "wholly dependent" on alleged

2   violations of federal law. The court explained that "because FERC has exclusive authority to

3   remedy violations of the FPA and the FPA does not confer a private right of action, Defendants

4   alleged violations of the FPA cannot form the basis of a RICO claim." *Woolsey*, 2015 U.S. Dist.

5   LEXIS 145120, at \*25.

6          Here, Plaintiffs' RICO claim is similarly "wholly dependent" upon alleged violations of

7   the DPCIA.  The DPCIA, however, does not confer a private right of action and therefore cannot

8   form the basis of a RICO claim.

9          "In the absence of *clear evidence* of congressional intent, [courts] may not usurp the

10  legislative power by unilaterally creating a cause of action."  *In re Digimarc Corp. Derivative*

11  *Litig.*, 549 F.3d 1223, 1230 (9th Cir. 2008) (emphasis added).  In determining whether a federal

12  statute confers a private right of action, courts "look to see whether Congress designated a method

13  of enforcement other than through private lawsuits, because 'the express provision of one method

14  of enforcing a substantive rule suggests that Congress intended to preclude others." *Northstar*

15  *Fin. Advisors, Inc. v. Schwab Invs.*, 615 F.3d 1106, 1115 (9th Cir. 2010) (internal quotations

16  omitted).  Here, there is no evidence that Congress intended to create a private right of action.  To

17  avoid any doubt, the DPCIA contains a comprehensive regulatory enforcement scheme that

18  authorizes the Secretary to impose steep civil penalties for violations and to revoke, suspend or

19  deny permits of violators.  These express enforcement provisions make clear Congress's intend

20  not intend to create a private right of action.  Plaintiffs' private RICO claim based entirely on

21  DPCIA violations therefore fails as a matter of law and must be dismissed.

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1

## IV.  <u>CONCLUSION</u>

2

For the foregoing reasons, the Court should dismiss the FAC in its entirety for lack of

3

subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and/or for failure to state a claim

4

pursuant to Fed. R. Civ. P. 12(b)(6), 8(a) and 9(b), and grant such other further relief as the Court

5

deems just and proper.

6

DATED: August 9, 2019                    **KELLEY DRYE & WARREN LLP**
                                          Michael C. Lynch (Admitted *Pro Hac Vice*)

7

                                          Joseph A. Boyle (Admitted *Pro Hac Vice*)
                                          Michael R. Dover (Admitted *Pro Hac Vice*)

8

                                          Levi M. Downing (Admitted *Pro Hac Vice*)
                                          Tahir L. Boykins

9

10

                                          By   */s/ Michael C. Lynch*

11

                                               Michael C. Lynch

12

                                          *Attorneys for Defendant StarKist Co.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

NOTICE OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES
Case No.: 3:19-cv-02561-WHO