1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| WARREN GARDNER, et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>STARKIST CO., et al.,<br><br>                    Defendants. | Case No.  19-cv-02561-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART STARKIST'S MOTION TO DISMISS; GRANTING DONGWON'S MOTION TO DISMISS**<br><br>Re: Dkt. Nos. 44, 48 |

7
8
9
10
11
12

**INTRODUCTION**

13
14

Plaintiffs are purchasers of StarKist Co. ("StarKist") tuna from various states who bring a

15

class-action lawsuit alleging that StarKist promises consumers that its tuna products are 100%

16

"dolphin-safe" and sustainably sourced and that those promises are false and misleading.  First

17

Amended Complaint ("FAC") [Dkt. No. 37] ¶ 14. They have met the pleading standard for their

18

state law fraud claims because they sufficiently allege that: (i) StarKist entered into a pervasive

19

advertising campaign since 1990 that led consumers to believe it sets itself to a higher dolphin-

20

safe standard than required under the Dolphin Protection Consumer Information Act ("DPCIA")

21

16 U.S.C. § 1385; (ii) StarKist tuna cannot be 100% dolphin-safe given that the fishing techniques

22

it uses are known to harm or kill at least some dolphins; and (iii) consumers would not have

23

bought StarKist tuna but-for its dolphin-safe promises.

24

However, plaintiffs do not adequately plead a RICO claim between StarKist and its alleged

25

co-conspirators because they simply characterize StarKist's routine commercial dealings as

26

evidence of a RICO enterprise.  They have also not pleaded an alter ego or agent relationship

27

between StarKist and its South Korean parent company Dongwon Industries ("Dongwon")

28

sufficient to confer personal jurisdiction over Dongwon.  I GRANT Dongwon's motion to dismiss

for lack of personal jurisdiction. I DENY StarKist's motion to dismiss the state law fraud claims but GRANT its motion to dismiss the RICO claim.

BACKGROUND

## I.     FACTUAL BACKGROUND

### A.     Origin of "Dolphin-Safe" Tuna

In the 1950s, fishermen recognized that tuna schools (swimming deeper in the water) often congregate with dolphin schools (swimming at observable depths) and began encircling tuna and dolphin schools with purse seine nets to haul both schools aboard. FAC ¶ 7. This led to millions of dolphins being killed as unintended bycatch. *Id.* ¶ 8. Heightened public awareness of these mass dolphin deaths led to the development and enhancement of fishing regulations, including a strengthening of the Marine Mammal Protection Act and enactment of the DPCIA in 1990. *Id.* ¶ 10. This also prompted major U.S. sellers of tuna fish products – including StarKist, Bumble Bee, and Chicken of the Sea – to promise consumers that the tuna they sold would only be procured through dolphin-safe fishing practices. *Id.* ¶ 11.

Plaintiffs allege that, in the last four years ("Class Period"), reasonable consumers expected that all StarKist tuna products "are dolphin-safe because they have been indoctrinated to believe precisely that by Defendants' and other tuna companies' highly effective dolphin safety and sustainable fishing practices marketing campaigns." FAC ¶¶ 2, 13. However, plaintiffs contend, StarKist tuna is not dolphin-safe or sustainably sourced and that defendants' representations are false, misleading and/or deceptive. *Id.* ¶ 14.

### B.     Defendants' Dolphin-Safe Representations

As the Ninth Circuit recognized, "[g]iven the choice of whether to purchase dolphin-safe tuna or to purchase tuna not labeled dolphin-safe, American consumers overwhelmingly chose to purchase tuna that was labeled dolphin-safe." *Earth Island Institute v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007). Plaintiffs allege that the importance consumers place on dolphin-safety continues to this day. FAC ¶ 21; *see also id.* ¶ 22 (listing many retailers have refused to sell tuna that is not caught using dolphin-safe methods, including Whole Foods Market, Safeway, Giant Eagle, and Wegmans).

United States District Court
Northern District of California

Plaintiffs point to StarKist's labels, website, and press releases as evidence of how StarKist has marketed its tuna.  FAC ¶ 15.  Every StarKist tuna product has a "Dolphin Safe" logo on it, and directs consumers to visit its website for more information on its dolphin-safe policy.  *Id.* ¶ 17.  The website explains its definition of "Dolphin Safe" and promises that it will not purchase any tuna caught in association with dolphins, and will refuse to purchase tuna caught with "gill or drift nets," which it describes as indiscriminate fishing methods that trap dolphins and other marine life.  *Id.* ¶ 18.

Plaintiffs contend that the special dolphin-safe logo defendants place on each StarKist product is intended to convey the message "No harm to dolphins."  FAC ¶ 23.



They allege that reasonable consumers believe that "dolphin-safe" means "no" dolphins were harmed in the process of catching the tuna in StarKist products.  FAC ¶ 71.  They assert that "unbeknownst to consumers, substantial numbers of dolphins and other marine life are killed and harmed by the fishermen and fishing methods used to catch Defendants' tuna," and that these "dolphin-safe label representations are false, misleading, and/or deceptive, and constitute systematic acts of mail and wire fraud."  *Id.* ¶ 24.

**C.    Dolphin Safety Legislation**

The DPCIA created its own official dolphin-safe mark, codified in 50 C.F.R. § 216.95.  FAC ¶ 26.  This mark contains the words "U.S. Department of Commerce," along with the words "Dolphin Safe" in red with a blue-colored dolphin profile on the logo.  *Id.* ¶ 28.

United States District Court
Northern District of California

3



StarKist elected not to utilize the official dolphin-safe logo, but rather use their own alternate logo to convey its tuna products are dolphin-safe. *Id.*

The DPCIA provides a separate rule for those who label their tuna products with any label or mark other than the official dolphin-safe mark. Such labels violate the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, unless:

> (i) no dolphins were killed or seriously injured in the sets or other gear deployments in which the tuna were caught; (ii) the label is supported by a tracking and verification program which is comparable in effectiveness to the program established under subsection (f); and (iii) the label complies with all applicable labeling, marketing, and advertising laws and regulations of the Federal Trade Commission, including any guidelines for environmental labeling.

16 U.S.C. § 1385(d)(3)(C). The DPCIA further adds that it is a violation of the FTCA to "willingly and knowingly [] use a label referred to in subparagraph (C) in a campaign or effort to mislead or deceive consumers about the level of protection afforded [to] dolphins under the International Dolphin Conservation Program." 16 U.S.C. § 1385(d)(3)(E). Plaintiffs allege that defendants set themselves to a higher standard than the DPCIA and falsely represent that its tuna products are completely dolphin-safe because its tuna fishing practices are known to kill or harm at least some dolphins each year. FAC ¶ 31.

**D.     Defendants' Violation of their Dolphin-Safe Representations**

**1.     Plaintiffs Claim Defendants' Fishing Practices Are Not In Fact Dolphin-Safe**

Plaintiffs argue that only tuna caught by "traditional methods" are "actually 'dolphin-safe.'" FAC ¶ 41. They contend that these traditional methods, described as "traditional pole-

and-line and trolling methods," ensure that dolphins are not harmed in the process because "fish are caught using barbless hooks and poles one at a time near the sea's surface and unintended captured species are easily released in a timely manner." *Id.*; *see also id.* ¶ 5 (citing to United States National Oceanic and Atmospheric Administration ("NOAA") article that describes different types of fishing methods).[1]  They allege that defendants are not among the tuna companies that "use only dolphin-safe pole-and-line or trolling techniques to capture their tuna." *Id.* ¶ 42.  Rather, they list other methods used on defendants' fishing vessels that they claim are not "actually dolphin safe." *Id.* ¶ 43 (describing longlines, modern purse seine fishing techniques, and fish aggregating devices ("FADs") as not dolphin-safe and alleging defendants employ these techniques).

Plaintiffs claim that defendants' fishing techniques not only often lead to dolphin deaths but also harm dolphins in other ways like mother-calf separation, acute cardiac and muscle damages, cumulative organ damage, failed or impaired reproduction and compromised immune function.  FAC ¶ 51.  They allege that these "indirect harmful effects" of defendants' fishing practices also "likely result in [dolphin] mortality."  *Id.* ¶ 53 (quoting 50 C.F.R. § 216.3, which defines "serious injury" as "any injury that will likely result in mortality"); *see also id.* ("It is conservatively estimated that total reported dolphin mortality rate is underestimated by 10-15% for spotted dolphins and 6-10% for spinner dolphins given these indirect harmful effects and unobserved and underreported kills.") (internal citation omitted).  Therefore, they conclude, defendants' tuna is not actually dolphin-safe as they represent it to be.  *Id.* ¶ 53.

Plaintiffs further contend that the use of FADs, purse seine nets, and longlines are recognized as "unsustainable" fishing practices; several companies "will not source their tuna from boats that use these indiscriminate fishing methods."  FAC ¶ 54.  Defendants are not among these companies.  *Id.*  Instead, plaintiffs claim that StarKist entered into agreements with Bumble

---

[1] StarKist's request for judicial notice of this NOAA article, titled "The Tuna-Dolphin Issue" is granted pursuant to the incorporation by reference doctrine.  *See* StarKist Request for Judicial Notice ("StarKist RJN") [Dkt. No. 44], Ex. 1; NOAA, *The Tuna-Dolphin Issue*, NOAA Fisheries Southwest Fisheries Science Center (Sept. 2, 2016), *available at* https://swfsc.noaa.gov/textblock.aspx? Division=PRD&ParentMenuId=228&id=1408.

United States District Court
Northern District of California

1    Bee and Chicken of the Sea to not sell FAD-free tuna in order to avoid competition.  *Id.*

2         **2.    Plaintiffs Claim Defendants Do Not Comply with Mandatory Tracking**

3              **and Verification Requirements**

4         Plaintiffs also claim that defendants' "use of an alternative dolphin-safe logo on StarKist

5    tuna products legally requires them to track, audit, and spot check for accuracy that no dolphins

6    were killed or seriously injured."  FAC ¶ 56.  In the event that a single dolphin is killed or

7    seriously injured, defendants are required to "physically separate and store that catch" from

8    dolphin-safe catches and "maintain records tracing the catch(es) in which dolphins were harmed

9    back to the fishing vessel and trip."  *Id.* (citing to 50 C.F.R. § 216.91).

10        Plaintiffs allege that defendants "do not track, trace, and report the number of dolphins

11   killed or harmed by their tuna fishing vessels or disclose the dolphin hazardous fishing methods

12   used to catch [its] tuna, even though defendants are able to do so."  FAC ¶ 57.  StarKist's website

13   states that it traces each tuna product sold in the U.S., but plaintiffs contend that, unlike other tuna

14   brands, StarKist "does not provide this information to consumers via tracking portals on their

15   website that allow consumers to see this critical information."  *Id.* ¶ 58.

16        Plaintiffs also assert that StarKist is able to escape liability by fishing in the Western

17   Pacific Ocean because the law does not require them to have an independent observer on board to

18   certify that no dolphins were harmed.  FAC ¶ 59.  Instead, a declaration to the NOAA from the

19   ship's captain suffices.  *Id.* (citing to 16 U.S.C. § 1385(d)(1)(B)(ii)).  They claim these ship

20   captain certifications are limited because the certification only requires them to certify that no

21   purse seine nets were intentionally deployed; it does not require certification that "other dolphin

22   harming fishing techniques were not used," such as "FADs, gillnets, [and] longlines."  *Id.*

23   Plaintiffs also assert that there is a strong financial incentive for captains to falsely report dolphin

24   mortality or harm.  *Id.*[2]

25   _____

26   [2] StarKist's request that I take judicial notice of two webpages on NOAA's public website titled
     "Verification Components" and "Brands Sampled" is granted because a court may take judicial

27   notice of "records and reports of administrative bodies."  *See* StarKist RJN, Exs. 2, 3; *Cal.
     Sportfishing Prot. All. V. Shiloh Grp., LLC*, 268 F. Supp. 3d 1029, 1038 (N.D. Cal. 2017) (citation

28   omitted).  Plaintiffs oppose judicial notice, but also contend that their claims "are not based on any
     fraud on the NOAA or violations of the tracking and verification requirements."  *See* Opposition

United States District Court
Northern District of California

Altogether, plaintiffs allege that "[b]y not complying with mandatory tracking and verification requirements, defendants are able to reduce their tuna product costs, by using less costly fishing methods that kill or harm dolphins."  FAC ¶ 66.  Plaintiffs claim that this in turn enables defendants to "mitigate the risk of detection that defendants' tuna products are not dolphin-safe as represented."  *Id.*

### 3.   Relief Sought

In sum, plaintiffs claim that "[b]ecause dolphins are killed and harmed by the fishing methods used to catch the tuna in Defendant[s'] products; Defendants do not adequately track, verify, audit, and spot check the number of dolphins killed and harmed; and they do not separately store the tuna that is not dolphins safe, Defendants' use of the alternative dolphin-safe logo, and its dolphin-safe representations are false, misleading, and/or deceptive, as well as systemic acts of mail and wire fraud."  FAC ¶ 70. Plaintiffs argue that because defendants' false dolphin-safe representations "taint the entire purchase," consumers are entitled to a full refund.  *Id.* ¶ 73. Alternatively, they claim that consumers are entitled to the premium attributable to the dolphin-safe representations.  *Id.* ¶ 74.

Plaintiffs bring this class action "to halt the dissemination of this false, misleading, and deceptive advertising message, [to] correct the misleading perception it has created in the minds of consumers, and [to] obtain redress for those who have purchased the tuna products."  FAC ¶ 75. They allege unjust enrichment and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") under 18 U.S.C. § 1962, and violations of California, Florida, New York, New Jersey, Minnesota and Arizona unfair competition laws.  *Id.*

## II.   PROCEDURAL BACKGROUND

On May 13, 2019, plaintiffs filed their initial complaint.  Dkt. No. 1.  On June 17, 2019,

to StarKist RJN [Dkt. No. 54]; the 13.  Rather, plaintiffs' claims are based on "the representation that all StarKist tuna products are sustainably sourced and dolphin-safe is false, misleading and deceptive" towards consumers.  Oppo. StarKist Mot. 13.  Recognition of these documents clarifies what the agency guidelines are and the agency's conclusion that StarKist met those guidelines.  This recognition does not necessarily mean that plaintiffs have failed to state a claim against StarKist for false advertising.  That is a separate question, given that plaintiffs argue that StarKist set itself to a higher standard.

plaintiffs filed their First Amendment Complaint, adding Dongwon as a defendant.  *See* FAC.

StarKist moves to dismiss the FAC for failure to state a claim.  StarKist Motion to Dismiss

("StarKist Mot.") [Dkt. No. 44].  Dongwon moves to dismiss the FAC for lack of personal

jurisdiction, and alternatively for failure to state a claim.  Dongwon Motion to Dismiss

("Dongwon Mot.") [Dkt. No. 48].  I heard arguments on November 6, 2019.

## LEGAL STANDARD

### I.    RULE 12(B)(6): MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim

fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to

dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when

the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant

is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation

omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

While courts do not require "heightened fact pleading of specifics," a claim must be supported by

facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555,

570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the

circumstances constituting fraud or mistake," including "the who, what, when, where, and how of

the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)

(internal quotation marks omitted).  However, "Rule 9(b) requires only that the circumstances of

fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule

8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011).  In deciding

a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as

true and draws all reasonable inferences in favor of the plaintiff.  *Usher v. City of Los Angeles*,

828 F.2d 556, 561 (9th Cir. 1987).  But the court is not required to accept as true "allegations that

are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead*

*Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## II.      RULE 12(B)(2): MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Under Rule 12(b)(2) of the Federal Rules of Civil Procedure, a defendant may move to dismiss for lack of personal jurisdiction.  The plaintiff then bears the burden of demonstrating that jurisdiction exists.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).  The plaintiff "need only demonstrate facts that if true would support jurisdiction over the defendant."  *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995); *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th Cir. 1986).  "Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true."  *Schwarzenegger*, 374 F.3d at 800 (citations omitted).  Conflicts in the evidence must be resolved in the plaintiff's favor.  *Id.*  "Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts.  In such cases, we only inquire into whether [the plaintiff's] pleadings and affidavits make a prima facie showing of personal jurisdiction."  *Caruth v. International Psychoanalytical Ass'n*, 59 F.3d 126, 128 (9th Cir. 1995) (internal punctuation and citation omitted).

DISCUSSION

## I.      FAILURE TO STATE A CLAIM AGAINST STARKIST

### A.      Plaintiffs Sufficiently Allege Their Fraud-Based State Law Claims

Plaintiffs contend that StarKist violated the consumer protection and false advertising laws of six states.  FAC ¶ 75 (alleging violations of California, Florida, New York, New Jersey, Minnesota and Arizona state laws).  These laws generally prohibit companies from misrepresenting the characteristics of their goods to consumers.  To plausibly allege their claims sounding in fraud under Rule 9(b), plaintiffs must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged."  *Vess*, 317 F.3d at 1106 (internal quotation marks omitted).

#### 1.      Clarification of the Case

Before determining whether plaintiffs have met the pleading standard for their fraud-based

United States District Court
Northern District of California

claims, I will explain what I understand this case is about because StarKist mischaracterizes it throughout its papers.  It asserts that this case is about whether it complies with the federal labeling standard set in the DPCIA.  StarKist Mot. 11–12.  It interprets the FAC as claiming that only traditional fishing techniques, like pole-and-line and trolling, are actually dolphin-safe and that all tuna caught by any other means *per se* is not.  *Id.* at 8.  It argues that plaintiffs are attempting to develop "their own definition of 'dolphin safe' that finds no support in federal law," because the definition of "dolphin-safe" is not as limiting under the DPCIA as plaintiffs advocate.  *Id.* at 14.  It argues that plaintiffs' case is "based on what they wish the law would provide . . . and not what the law actually provides."  *Id.* at 8.  It concludes that "[w]hile plaintiffs may disagree with Congress over whether the DPCIA adequately protects dolphins," plaintiffs must "make their arguments to Congress, not the Court."  *Id.* at 14.

Plaintiffs' complaint is not directed to whether StarKist has complied with federal labeling standards under the DPCIA.  Rather, it "is about what consumers in the United States reasonably believe StarKist's own 'dolphin safe' and sustainability promises mean and whether StarKist breached those promises."  Opposition to StarKist Motion to Dismiss ("Oppo. StarKist Mot.") [Dkt. No. 53] 1.  Plaintiffs acknowledge that the DPCIA does not ban the use of longlines, purse seine nets, and FADs that do not "target" dolphins.  *Id.* at 5.  However, they contend that while the DPCIA set the floor for what a "dolphin-safe" promise must mean, the federal regulations "do not prevent manufacturers of tuna products from making their own, albeit more stringent, dolphin-safe promises to consumers."  *Id.*  They claim that StarKist has set itself to a higher standard because it promises consumers that its tuna products are 100% dolphin-safe and sustainably sourced.  *Id.* at 1.  The only way StarKist tuna could be 100% dolphin-safe is if it uses traditional fishing methods like pole-and-line and trolling.  *Id.* at 5.  But StarKist uses other methods like purse seine nets, longlines and FADs that are known to kill or harm at least some dolphins.  *Id.* at 5–6.  While that might suffice for the DPCIA labeling standard, plaintiffs allege that it cannot meet the higher standard that StarKist has advertised for itself, and that therefore StarKist's promise to consumers is false and misleading.  *Id.* at 5.

Defendants point to one paragraph in plaintiffs' 91-page FAC to prove that this case is

about a DPCIA violation.  In Paragraph 71, plaintiffs allege that reasonable consumers believe "dolphin-safe" means "no" dolphins were harmed in the process of catching the tuna in StarKist products.  FAC ¶ 71.  They describe this are "precisely the regulatory definition of dolphin safe" as stated in 50 C.F.R. §§ 216.3 and 216.91.  *Id.*  But the rest of the FAC, including the type of causes of actions alleged, clarify what this case is really about – false advertising.  In other portions of the FAC, plaintiffs assert that the federal standards set the minimum requirements but that StarKist set itself to a higher standard.  *See* FAC ¶¶ 29, 59.  One inartfully pleaded paragraph is not enough to recharacterize the rest of the allegations in the FAC.

The question presented in this case is "whether StarKist violates its *own* dolphin-safe and sustainability promises to plaintiffs and other consumers when it sources its tuna in ways it knows kill and harm dolphins."  Oppo. StarKist Mot. 3 (emphasis in original).  With that understanding, I proceed to whether plaintiffs have plausibly alleged their fraud claims.

### 2.    Plaintiffs Adequately Plead Factual Allegations Under Rule 9(b)

Plaintiffs' state law claims are all based on the assertion that they purchased StarKist tuna that was falsely or misleadingly labeled as dolphin-safe.  FAC ¶ 70.  They allege that: (i) they purchased StarKist tuna because they believed it was "dolphin-safe based on defendants' statements about the product"; (ii) "the statements were not true" given that the fishing methods used by defendants are known to harm or kill at least some dolphins; and (iii) they "would not have purchased the products if they had known the statements were not true."  *Id.*

### a.    Plaintiffs Believed That StarKist Promised 100% Dolphin-Safe Tuna

Plaintiffs sufficiently allege that they believed, as consumers, that StarKist set itself to a high dolphin-safe standard.  They point out that StarKist "was the first major tuna company to adopt a 'dolphin-safe' policy in April 1990."  FAC ¶ 16 (citing to StarKist, FAQ, *available at* https://starkist.com/faq).[3]  When StarKist announced its dolphin-safe policy, Anthony J.F. O'Reilly, chairman of StarKist's then-parent company H.J. Heinz Co., stated at a news conference

---

[3] At the hearing, plaintiffs asserted that StarKist's dolphin-safe policy and logo predated the DPCIA, showing that it set itself a different and higher standard than the DPCIA.  That purported fact is not in the FAC.

that "[t]he StarKist policy will save dolphin lives. Nothing short of dolphin-safe tuna will be acceptable . . ." *Id.* ¶ 19 (citing to Janet Bass, *StarKist adopts dolphin-safe policy for its tuna*, UPI Archives (Apr. 12, 1990), *available at* https://www.upi.com/Archives/1990/04/12/StarKist-adopts-dolphinsafe-policy-for-its-tuna/5799639892800/).  StarKist's products include a dolphin-safe logo and direct consumers to visit its website for more information on its policy. *Id.* ¶ 17.  The website states that it "continues its practice of refusing to purchase tuna caught with gill or drift nets which are known to be dangerous to many forms of marine life." *Id.* ¶ 18.

Plaintiffs also point to StarKist's statement after the World Trade Organization ("WTO") ruling in 2012.  The WTO found that fishing methods used in certain parts of the Pacific Ocean are likely harming dolphins and that the U.S. regulatory regime was not strong enough. FAC ¶ 37. StarKist, along with two other major tuna companies, announced that they were "disappointed" in the WTO's ruling because "it is likely to create consumer confusion about whether or not their products continue to be dolphin-safe." *Id.* ¶ 37 (citation omitted).  These companies stated that they "want to reassure consumers they have no reason to be concerned that their companies are wavering in their commitment to providing dolphin safe tuna as a result of this ruling." *Id.*  The companies emphasized that "[p]roviding consumers with sustainable and dolphin safe tuna remains a top priority" and that they "do not and will not utilize tuna caught in a manner that harms dolphins." *Id.*  StarKist also reiterates its dolphin-safe pledge in multiple social media posts till this day. *Id.* ¶ 179 (listing social media posts, including a 2012 tweet stating that "StarKist tuna is dolphin-safe, not to worry").  These allegations are sufficient at the pleading stage to allege that StarKist set itself to a higher dolphin-safe standard that led consumers to believe no dolphins were harmed in the making of their tuna products.

StarKist argues that plaintiffs are required to identify the dolphin-safe advertisements and website statements that they personally relied on in order for the dolphin-safe and sustainability source media representations to form a basis for their claims.  StarKist Mot. 11, n.5. As plaintiffs correctly point out, they are not required to allege the specific advertisements that they personally relied on; allegations of a long-term, pervasive advertising campaign suffice at this stage. *See, e.g.*, *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009) (finding plaintiffs are not required to

"plead or prove an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements when the unfair practice is a fraudulent advertising campaign").

### b. StarKist's Tuna is Not Actually Dolphin-Safe

Plaintiffs plausibly assert that StarKist's tuna is not actually dolphin-safe because the fishing methods it uses are known to harm or kill at least some dolphins. Specifically, they allege that StarKist uses modern purse seine nets, longlines, and FADs and that these techniques are known to harm or kill at least some dolphins. FAC ¶ 42.

Plaintiffs contend that StarKist has sourced much of its tuna from vessels operated by Imperial Shipping Logistics Co. Ltd., which routinely uses longlines to capture tuna. FAC ¶ 43. Longlines harm dolphins because dolphins are attracted to the baited hooks. *Id.* When dolphins get caught, they often remain on the line for extended periods of time while fishermen take the time to draw the lines back up and unhook the catch. *Id.* Because dolphins are oxygen breathers, most do not survive the retrieval process. *Id.* Plaintiffs assert that the World Wildlife Foundation has condemned longlines for this reason. *Id.* ¶ 44. Many other retailers and manufacturers have banned using these fishing techniques because of the harm it causes to dolphins. *Id.* ¶¶ 22, 42.

Plaintiffs also claim that StarKist obtains its tuna from vessels that use modern purse seine fishing techniques and FADs. FAC ¶¶ 45–46. They contend that FADs are "known as floating death traps because dolphins and other marine life get entangled in the devices and their sheer numbers—estimated at 30,000 to 50,000 per year—disrupt behavior and movement patterns of dolphins and other ocean species crucial to their survival." *Id.* ¶ 47. They cite several studies that have observed indirect ways these fishing practices cause additional harm to dolphins. *Id.* ¶ 51 (citing to scientific studies that conclude these fishing methods cause mother-calf separation, cardiac and muscle damage, impaired reproduction, and compromised immune function). Putting the allegations together, plaintiffs claim that StarKist has falsely and misleadingly advertised its tuna as 100% dolphin safe, which cannot be true given that the fishing techniques StarKist uses are known to kill or harm dolphins. Oppo. StarKist Mot. 5.

StarKist claims that these allegations are not enough. Instead, it argues that "plaintiffs are required to plead facts claiming that a dolphin was killed or seriously injured *in the particular set*

*or gear deployments* that captured the tuna contained in products they purchased." StarKist Mot. 2 (emphasis in original). Using this as the pleading standard, it asserts that plaintiffs have failed to not only allege the "specific circumstances under which the tuna they allegedly purchased was captured," but also have "not identified *any* dolphin *ever* killed or harmed in a set or gear deployment that captured *any* tuna that StarKist later sold as dolphin-safe." *Id.* (emphasis in original).

Such specific allegations are unnecessary. StarKist mischaracterizes the pleading standard that plaintiffs must meet here. While Rule 9(b) sets the pleading standard higher for fraud claims such as the ones alleged here, plaintiffs are not required to point to specific circumstances under which StarKist has killed or harmed a dolphin. Plaintiffs have sufficiently alleged that the fishing techniques StarKist uses are known to kill or harm at least some dolphins. "By virtue of its sheer size as the biggest tuna manufacturer in the [United States]," and its documented fishing techniques, at least some dolphins are harmed and killed in the capture of StarKist tuna, thereby not making all of its tuna products 100% dolphin-safe. Oppo. StarKist Mot. 9 (citing FAC ¶¶ 43–51). Plaintiffs allege that the "very fact that StarKist's fishing practices are known to kill and harm dolphins makes its own dolphin-safe pledge misleading to consumers." *Id.* at 7. I find these allegations are sufficient to allege that StarKist tuna is not 100% dolphin safe as they allegedly depict to their consumers.[4]

     **c.**     **Plaintiffs Would Not Have Purchased StarKist's Tuna If They Knew Dolphin-Safe Statements Were Not True**

---

[4] Plaintiffs also assert that StarKist does not adequately track, audit, and spot check for accuracy that no dolphins were harmed or killed. In the FAC, they claim that StarKist does not comply with mandatory tracking and verification requirements prescribed in 50 C.F.R. § 216.91. FAC ¶ 56. But in their opposition to the motion, they argue that they are not seeking to allege violations of the federal tracking and verification requirements or fraud on the NOAA, the federal agency that ensures companies are complying with the requirements. Oppo. StarKist Mot. 13. This is probably what prompted StarKist to request judicial notice of NOAA's finding that it does comply with federal tracking requirements. *See supra* n.2. While their assertions about StarKist's inadequate tracking record are unclear, they are not essential to plead a fraudulent advertising claim against StarKist. Plaintiffs plead enough other facts to meet the Rule 9(b) pleading standard.

United States District Court
Northern District of California

1      Plaintiffs sufficiently plead that they would not have purchased StarKist's tuna if they

2  knew its tuna was not actually dolphin-safe.  They allege that StarKist's false dolphin-safe

3  representations taint the entire purchase because they would not have bought its products but for

4  the fact that it was marketed as dolphin-safe.  FAC ¶ 73.  As the Ninth Circuit recognized,

5  "[g]iven the choice of whether to purchase dolphin-safe tuna or to purchase tuna not labeled

6  dolphin-safe, American consumers overwhelmingly chose to purchase tuna that was labeled

7  dolphin-safe." *Earth Island Institute v. Hogarth*, 494 F.3d 757, 761 (9th Cir. 2007).

8  Alternatively, plaintiffs claim they are entitled to the premium attributable to the dolphin-safe

9  representations.  FAC ¶ 74.

10      StarKist argues that plaintiffs lack Article III standing.  It asserts that because plaintiffs

11  have not pleaded facts to support "a plausible inference that the alleged StarKist tuna product they

12  purchased was caught in a set or gear deployment in which a dolphin was killed or seriously

13  injured" they have not pleaded harm for Article III standing.  StarKist Mot. 18.  It asserts that

14  plaintiffs' allegation that tuna is sometimes captured in a way that is not "dolphin-safe" does not

15  establish they were harmed.  *Id.*

16       This again mischaracterizes the case.  Plaintiffs sufficiently allege an injury-in-fact that

17  confers standing because had they known that StarKist's tuna was not dolphin-safe they would not

18  have purchased it.  FAC ¶ 80.  They were damaged by paying for products they never would have

19  purchased "but for" deception, and/or by paying a price premium attributable to misstatements by

20  StarKist.  *Id.*; *see Krueger v. Wyeth, Inc.*, 396 F. Supp. 3d 931, 950 (S.D. Cal. 2019) (restitution of

21  full purchase price would be appropriate remedy where plaintiff shows she would not have

22  purchased product despite its medicinal benefit but for defendants' misrepresentations).

23      Plaintiffs have plausibly alleged how StarKist advertised a higher dolphin-safe standard to

24  its consumers and why this promise is false given the fishing techniques it uses.  Because plaintiffs

25  would not have purchased StarKist tuna but for the dolphin-safe promise, they were harmed when

26  they purchased falsely advertised tuna.   They have sufficiently alleged that StarKist's dolphin-

27  safe representations are false, misleading, and/or deceptive.

28

### 3.     State Law Claims Are Not Preempted

StarKist argues that plaintiffs have failed to allege their state law claims because the claims are preempted by the DPCIA.  StarKist Mot. 23.  As emphasized above, the plaintiffs' state law claims are not premised on DPCIA violations, but on how StarKist fraudulently advertised its own heightened dolphin-safe standard.  Even the DPCIA itself recognizes that falsely labeled dolphin-safe tuna is a violation of the Federal Trade Commission Act, not a violation of the DPCIA.  *See* 16 U.S.C. § 1385(d)(3)(E) (stating that it is a violation of the FTCA "[to] willingly and knowingly [] use a label referred to in subparagraph (C) in a campaign or effort to mislead or deceive consumers about the level of protection afforded [to] dolphins under the International Dolphin Conservation Program"); *id.* § 1385(d)(3)(C) (addressing tuna that is labeled by a mark other than the official mark).  The relevant issue is not whether the DPCIA preempts plaintiffs' state law claims but whether the FTCA does.

Where the FTC has been given authority to police violations of federal advertising regulations, as it has under the DPCIA, its enforcement does not preempt similar state law claims. In *United States v. Philip Morris Inc.*, 263 F. Supp. 2d 72, 78 (D.D.C. 2003), the court explained that state prohibitions of unfair or deceptive trade practices are not preempted by the FTCA unless they conflict with an express FTC rule.  The court stated:

> Even though the FTC has exclusive jurisdiction under the FTCA, the statute has never been interpreted to give the agency exclusive jurisdiction over advertising or marketing conduct.  Nor has the FTC's authority to administer the FTC Act been an obstacle to suits premised on overlapping state statutes or on common law [citation omitted].  State prohibitions of unfair or deceptive trade practices are not preempted unless they conflict with an express FTC rule. *American Financial Services Assn. v. FTC*, 767 F.2d 957, 989–990 (D.C. Cir. 1985).  Indeed, the Agency has long *encouraged* use of overlapping state deceptive practices statutes because problems in the marketplace exceed the Agency's enforcement capabilities.

*Id.* (emphasis in original).  For example, claims that are based on a defendant's alleged fraud on a federal agency are preempted because each agency has the authority to police such claims; claims based on a defendant's fraud on consumers are not preempted.  *See In re Trader Joes Tuna Litig.*, 289 F.Supp.3d 1074, 1083 (C.D. Cal. 2017) (refusing to find preemption where plaintiffs alleged that Trader Joe's misled its customers regarding the amount of tuna in its products, not the Food and Drug Adminstration).  Here, plaintiffs' fraud allegations are about the misrepresentations

StarKist made to consumers, not to another federal agency such as the NOAA. Oppo. StarKist Mot. 26. Plaintiffs' state law claims are not preempted. I DENY StarKist's motion to dismiss the fraud-based state law claims.[5]

### B.    Plaintiffs Do Not Plausibly Allege a RICO Claim

In addition to their state law claims, plaintiffs also assert a RICO violation committed by StarKist and its alleged co-conspirators. To maintain a civil RICO claim, a plaintiff must allege that the defendant engaged in: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property." *Black v. Corvel Enter. Comp Inc.*, 756 F. App'x 706, 708 (9th Cir. 2018) (citing 18 U.S.C. §§ 1962(c), 1964(c)). StarKist argues that plaintiffs do not state a RICO claim because they do not adequately plead the existence of a RICO enterprise and injury to a business or property. StarKist Mot. 19.[6] I agree that a RICO enterprise has not been plausibly alleged.

To adequately plead an existence of a RICO enterprise, plaintiffs must describe "a group of persons associated together for a common purpose of engaging in a course of conduct[] . . . [and]

---

[5] Dongwon also argues that plaintiffs' state law claims are preempted by the DPCIA. In support of this argument, it requests that I take judicial notice of the transcript of a hearing held by a United States Senate committee regarding a bill related to the DPCIA. Dongwon Request for Judicial Notice [Dkt. No. 62-1], Ex. A (Hearing Tr., Committee on Commerce, Science, and Transportation, U.S. Senate, 101 Cong. S. 2044 (July 25, 1990)). A statute's legislative history "constitute[s] judicial facts sufficiently capable of accurate and ready determination" and is therefore judicially noticeable. *Hunt v. Check Recovery Sys., Inc.*, 478 F. Supp. 2d 1157, 1161 (N.D. Cal. 2007). Plaintiffs did not file an opposition to Dongwon's request for judicial notice. I grant Dongwon's request for judicial notice, although, as explained above, the legislative history is not helpful to defendants' arguments because this case is not about DPCIA violations, but rather about false advertising.

[6] StarKist also argues that plaintiffs' RICO claims are not cognizable because they seek to improperly circumvent the DPCIA's exclusive enforcement scheme. StarKist Mot. 26. As discussed, StarKist repeatedly mischaracterizes this case. Although the DPCIA defines the minimum requirements for labeling tuna products as dolphin-safe, it does not prevent companies from making additional assurances to consumers, and its purview does not encompass fraudulent marketing because it leaves that to the Federal Trade Commission. *See* 16 U.S.C. § 1385(d)(3)(E); *see also* 50 C.F.R. § 216.91(b) (similarly stating that it is a violation of the FTCA to "to willingly and knowingly use a label referred to in this section in a campaign or effort to mislead or deceive consumers about the level of protection afforded dolphins under the [International Dolphin Conservation Program]").

1   must provide both evidence of an ongoing organization, formal or informal, and evidence that the

2   various associates function as a continuing unit." *Doan v. Singh*, 617 F. App'x 684, 686 (9th Cir.

3   2015) (internal quotation marks and citation omitted).

4          Plaintiffs identify StarKist's "RICO Co-Conspirators" as several fishing vessel operation

5   companies, importers, non-U.S. tuna cannery companies, and a tuna, fishing, processing, and

6   trading group that have all conducted business with StarKist.  FAC ¶ 126.  They allege that as

7   "part of a strategy to save millions (if not billions) of dollars and convince consumers to purchase

8   StarKist tuna products, [StarKist] and [its] RICO Co-Conspirators concocted a scheme at or before

9   2008, and continuing throughout the Class Period, to falsely represent [to the public], in various

10  pieces of mail, through wires, and on the Internet, that StarKist tuna products were dolphin-safe."

11  *Id.* ¶ 130.  They claim the purpose of the enterprise was to fraudulently market, advertise, and

12  label StarKist tuna products as sustainably sourced and dolphin-safe in order to deceive consumers

13  and retailers.  *Id.* ¶ 136.  They conclude that this was done so that the enterprise could sell StarKist

14  tuna products throughout the United States, increase their revenues, and minimize their costs from

15  otherwise more expensive tuna fishing, tracing, and segregation operations.  *Id.* ¶ 138.

16         StarKist argues that plaintiffs have failed to allege this element because they merely

17  identify a number of entities StarKist allegedly engages in business with and conclusorily state

18  that each of them "knew" StarKist would falsely label its tuna as dolphin-safe.  StarKist Mot. 21.

19  As an example, it points to plaintiffs' allegations against the alleged storage, canning and

20  processing co-conspirator.  *Id.*  Plaintiffs merely asserted that this company "stored, canned, and

21  processed Defendants tuna products for sale" and "knew" the products would be marketed as

22  dolphin-safe.  *Id.* (citing to FAC ¶ 151).  StarKist contends that such "bare assertions of pattern of

23  racketeering activity do not establish an enterprise and they do not, therefore, satisfy plaintiff's

24  burden.  *Id.* (internal citation omitted).

25         Plaintiffs' RICO allegations are conclusory.  They allege that the "common purpose"

26  between StarKist and co-conspirators was to fraudulently market, advertise and label StarKist tuna

27  as dolphin-safe, FAC ¶ 136, but have failed to plausibly allege facts that show StarKist and RICO

28  Co-Conspirators committed acts towards this alleged common purpose.  Simply characterizing

United States District Court
Northern District of California

18

routine commercial dealing as a RICO enterprise is not enough.  *See Gomez v. Guthy–Renker, LLC*, No. 14-cv-01425-JGB, 2015 WL 4270042, at *11 (C.D. Cal. Jul. 13, 2015) ("RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client.").

For example, in *Shaw v. Nissan North America, Inc.*, plaintiffs alleged that defendants engaged in a "fraudulent enterprise to sell cars with defective parts at inflated values."  220 F.Supp.3d 1046, 1054–55 (C.D. Cal. 2016).  The court found that the complaint "allege[d] no more than that Defendants' primary business activity—the design, manufacture, and sales or lease of Toyota vehicles—was conducted fraudulently."  *Id.* at 1056 (citation omitted).  The court distinguished it from other cases where complaints "include[] pages of references to specific communications [that] show[] the defendants acting as an enterprise and engag[ing] in a collaborative scheme to defraud."  *Id.* (internal citation omitted).  The court also found plaintiffs failed to plead a common fraudulent purpose for the same reasons.  *Id.* at 1057.  It concluded that plaintiffs did not provide "any specific facts that move[d] their allegations from the realm of the possible to the plausible."  *Id.*

Similarly, plaintiffs describe the business interactions between StarKist and RICO Co-conspirators and then assert that these business interactions were done fraudulently and that the co-conspirators knew that StarKist was fraudulently advertising its tuna as dolphin-safe.  FAC ¶ 137.  Plaintiffs must add facts to their conclusions.  Between StarKist and Dongwon, plaintiffs allege that the two conspired to label and sell tuna products that are not dolphin-safe.  *Id.* ¶ 142.  Between StarKist and fishing vessel entities, plaintiffs allege that they supplied captain verification statements, but did so fraudulently because the statements were false.  *Id.* ¶ 143.  Between StarKist and importers, plaintiffs allege that the importers supplied bills of lading in connection with the importation of tuna products into the United States," but did so fraudulently because the bills of lading were false.  *Id.* ¶ 147.  Between StarKist and the storage, canning, and processing entities, as described by example in StarKist's motion, plaintiffs allege that these entities stored StarKist's tuna, but did so fraudulently because they knew the tuna they stored and processed was going to be used by StarKist to defraud consumers.  *Id.* ¶ 154.  More facts are

1   required to plausibly allege an existence of a RICO enterprise. [7]

2   ## II.   LACK OF PERSONAL JURISDICTION OVER DONGWON

3          Plaintiffs allege that Dongwon cannot escape personal jurisdiction because StarKist has

4   operated as Dongwon's alter ego or agent. FAC ¶ 107.  They argue that StarKist's California

5   contacts may be imputed to Dongwon for purpose of establishing jurisdiction.  I GRANT

6   Dongwon's motion to dismiss for lack of personal jurisdiction because plaintiffs fail to plead facts

7   sufficient to make out a prima facie case that StarKist and Dongwon are alter egos or agents of

8   each other.

9          ### A.   Alter Ego Theory

10         To survive a motion to dismiss, a plaintiff asserting application of the alter ego doctrine to

11  extend personal jurisdiction to a foreign parent or subsidiary must "allege specifically both the

12  elements of alter ego liability, as well as facts supporting each." *MH Pillars Ltd. v. Realini*, No.

13  15-CV-1383-PJH, 2017 WL 916414, at *12 (N.D. Cal. Mar. 8, 2017) (citation omitted).  The

14  plaintiff must show that "(1) there is such unity of interest and ownership that the separate

15  personalities or the two entities no longer exists, and [that] (2) failure to disregard their separate

16  identities would result in fraud or injustice." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015,

17  1021 (9th Cir. 2017) (citing *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015)).  Plaintiffs

18  fail to plausibly allege both elements of alter ego liability.

19

20  _____

21         [7] I disagree with StarKist's contention that plaintiffs failed to adequately allege injury.
    Plaintiffs plead that they have been injured in their business and/or property because they
22  purchased falsely advertised tuna products.  FAC ¶ 194.  They identify two forms of economic
    loss – loss of the total price paid for StarKist tuna products and loss of the price of premium
23  attributable to StarKist's dolphin-safe and sustainably sourced misrepresentations.  Oppo. StarKist
    Mot. 20.  These forms of injury have been recognized by courts as "business or property" injuries.
24  *Id.* at 21–22; *see, e.g.*, *Krueger*, 396 F. Supp. 3d at 950 (restitution of full purchase price would be
    appropriate remedy where plaintiff shows she would not have purchased product despite its
25  medicinal benefit but for defendants' misrepresentations); *In re Volkswagen "Clean Diesel"*
    *Mktg., Sales Practices, & Prod. Liab. Litig.*, 349 F. Supp. 3d 881, 904 (N.D. Cal. 2018) (finding
26  plaintiffs, who paid premium and overcharges for "clean diesel" cars that were supposed to but
    were not low emissions, adequately plead a RICO injury because premiums plausibly constitute an
27  injury to their "property").

28

United States District Court
Northern District of California

### 1.   Unity of Interest Factors

The "unity of interest" prong requires "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Ranza*, 793 F.3d at 1073. (internal quotation marks and citations omitted).  Courts generally consider nine factors in assessing whether the unity of interest prong of an alter ego relationship is satisfied:

> (1) the commingling of funds and other assets of the entities, (2) the holding out by one entity that it is liable for the debts of the other, (3) identical equitable ownership of the entities, (4) use of the same offices and employees, (5) use of one as a mere shell or conduit for the affairs of the other, (6) inadequate capitalization, (7) disregard of corporate formalities, (8) lack of segregation of corporate records, and (9) identical directors and officers.

*Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040 (N.D. Cal. 2014) (citation omitted).

While a court need not find that every factor is present, *Updateme Inc. v. Axel Springer SE*, No. 17-CV-05054-SI, 2018 WL 1184797, at *10 (N.D. Cal. Mar. 7, 2018), the Ninth Circuit has specifically found that "[t]otal ownership and shared management personnel are alone insufficient to establish the requisite level of control." *Ranza*, 793 F.3d at 1073.  A parent's involvement in "macro-management issues" do not satisfy this element, such as reviewing and approving major decisions, placing several of its directors on the subsidiary's board, and involving itself in the subsidiary's pricing decisions. *Id.* at 1074–75.  Instead, the plaintiff must show that the parent directs the subsidiary's "day-to-day operations" and that the "entities failed to observe their separate corporate formalities." *Id.* at 1075.

Plaintiffs claim that they have adequately alleged the following factors:  "(1) StarKist is an inadequately capitalized subsidiary of Dongwon; (2) Dongwon uses StarKist as a marketing conduit for tuna mislabeled as dolphin-safe to shield itself from liability; (3) Dongwon and StarKist are operated as a *chaebol*, meaning that formalities of corporate separateness are disregarded and the two entities are operated as a single entity; (4) Dongwon and StarKist share overlapping board members; and (5) Dongwon has placed executives in key control positions at StarKist."  Opposition to Dongwon Motion to Dismiss ("Oppo. Dongwon Mot.") [Dkt. No. 55] 2. These alleged facts do not appear in the FAC.  Plaintiffs' claims are conclusory and not supported by factual allegations.

### a.      Inadequate Capitalization

The FAC alleges that StarKist "has operated as Dongwon's alter ego or agent."  FAC ¶

107.  For the first time in their opposition brief, plaintiffs argue that StarKist's admission that it

cannot afford to pay a $100 million criminal fine and civil damages to consumers to settle a

separate pending tuna price-fixing case shows that it is inadequately capitalized.  Oppo. Dongwon

Mot. 7 (citing Alexander Gladstone & Andrew Scurria, *StarKist, Facing $100 Million Fine, Says*

*It Can't Pay*, WALL ST. J. (Aug. 8, 2019), *available at*

https://www.wsj.com/articles/starkistfacing-100-million-cartel-fine-says-it-cant-pay-

11565297682).

Dongwon responds that inadequate capitalization of a corporation is measured at its

inception.  Dongwon Reply in Support of Motion to Dismiss ("Dongwon Reply") [Dkt. No. 61] 8;

*see Laborers Clean-Up Contract Admin. Tr. Fund v. Uriarte Clean-Up Serv., Inc.*, 736 F.2d 516,

524 (9th Cir. 1984).  It points out that StarKist was originally established in 1917 and operated for

more than ninety years before it purchased the company in 2008.  *Id.*; FAC ¶¶ 1, 98, 141.

Alleging that StarKist cannot afford current debts does not allege that it was not adequately

capitalized at the time the company was formed.  *See Oddenino & Gaule v. United Fin. Grp. Of*

*Illinois*, 201 F.3d 444, 444 (9th Cir. 1999) (finding a subsidiary is not considered inadequately

capitalized where it was "once adequately capitalized but subsequently fell upon bad financial

times") (internal quotation marks omitted).

At the hearing, plaintiffs cited a 1989 Ninth Circuit case to support its contention that

courts may look to post-formation inadequate capitalization under the alter ego theory.  *See Bd. of*

*Trustees of Mill Cabinet Pension Tr. Fund for N. California v. Valley Cabinet & Mfg. Co.*, 877

F.2d 769, 772 (9th Cir. 1989).  That case arose in a different context.  The court looked at whether

to pierce the corporate veil and hold a shareholder personally liable for corporate debts because

plaintiffs alleged that defendant had not made required  contributions to their pension fund.  *Id.*  It

held that "post incorporation misuse of the corporate form in appropriate cases can satisfy the

fraudulent intent element" and thereby make shareholders personally liable.  *Id.*

Even if courts may look to post-formation inadequate capitalization for purposes of

United States District Court
Northern District of California

personal jurisdiction, plaintiffs have not clearly alleged how StarKist is undercapitalized.  They

point to a separate criminal case before Judge Edward M. Chen, where StarKist provided its

financial statements and argued that it should not be required to sell its $154 million asset in

Techpack Solutions Co. Ltd. in order to pay a criminal fine greater than $50 million.  *See*

Memorandum of Points and Authorities Regarding Techpack Solutions Co. Ltd., *United States v.

StarKist Co.*, No. 18-cr-00513-EMC-1 (Jul. 3, 2019), Dkt. No. 111.  At the hearing, Judge Chen

inquired into Dongwon to the extent that it shows StarKist has ample resources to pay a higher

criminal fine because its parent company guarantees its loans.  *See* Hearing Transcript, *United

States v. StarKist Co.*, No. 18-cr-00513-EMC-1 (Aug. 8, 2019), Dkt. No. 164, at 22–23.  Judge

Chen ultimately found that StarKist had not done enough to show that its Techpack asset could not

be sold, and entered a judgment of $100 million. *See* Judgment, *United States v. StarKist Co.*, No.

18-cr-00513-EMC-1 (Sept.12, 2019), Dkt. No. 181.  Plaintiffs do not explain how Judge Chen's

finding that Dongwon could help StarKist pay its criminal fine necessarily shows that StarKist is

inadequately capitalized such that it cannot function as a company.  To the contrary, Dongwon

argues that StarKist can still pay on-going operations costs despite the criminal fine.

### b.      Marketing Conduit

To show this factor, a plaintiff must allege facts "as to the subsidiary's role as a marketing

conduit for the parent were specific to the subsidiary's marketing function."  *NetApp, Inc. v.

Nimble Storage, Inc.*, No. 5:13-CV-05058-LHK, 2015 WL 400251, at *7 (N.D. Cal. Jan. 29,

2015).  For example, in *Toyota Motor*, the court found that this factor showed that an alter ego

relationship existed because the plaintiff adequately alleged facts "that the subsidiary was the

exclusive importer of the parent's products, that the subsidiary coordinated distribution and sales

logistics in the United States, and that the parent realized specific sales and revenue figures from

the subsidiary."  *Id.*  (citing *United States v. Toyota Motor Corp.*, 561 F. Supp. 354, 356 (C.D. Cal.

1983)).

Plaintiffs here do not allege facts regarding the marketing and product relationship between

Dongwon and StarKist.  Instead, they bluster that Dongwon had a "conscious commitment to"

selling falsely-labeled tuna which it "knew would cause harm to U.S. consumers as the tuna was

captured on its own boats, by its own fishing crews, and under the watchful eye of Dongwon which oversees [StarKist's] day-to-day operations."  Oppo. Dongwon Mot. 8 (citing FAC ¶¶ 45– 53).  Facts, not argument, are needed to state a cause of action.  Plaintiffs also claim that "Dongwon once admitted on its website that 'StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008."  FAC ¶ 107.  Generic language "on [a defendant's] website and in its press releases simply do not rise to the day-to-day control required to impute the subsidiary's contacts to the parent."  *Moody v. Charming Shoppes of Delaware, Inc.*, No. C 07-06073 MHP, 2008 WL 2128955, at *7 (N.D. Cal. May 20, 2008).

### c.     Overlapping Officers and Directors

Plaintiffs identify Dongwon executives placed in key control positions at StarKist and overlapping board members.  Oppo. Dongwon Mot. 7; FAC ¶¶ 99–105.  Dongwon responds that plaintiffs only show that three of StarKist's board members have worked for a Dongwon-affiliated company at one point in time.  Dongwon Reply 6.  Even if I find this factor in favor establishing unity of interest, the Ninth Circuit has made clear that "[t]otal ownership and shared management personnel are alone insufficient to establish the requisite level of control."  *Ranza*, 793 F.3d at 1073 (internal citation omitted); *see also, e.g.*, *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 956 (N.D. Cal. 2015) (finding three factors—equitable ownership, use of same offices and identical officers and directors—weighed in favor of finding unity of interest but concluding these factors "even when considered together, are not sufficient to support a finding of unity of interest").  Plaintiffs have failed to adequately allege the first element of unity of interest to establish an alter ego relationship between Dongwon and StarKist that would subject Dongwon to personal jurisdiction.

### 2.     Inequitable Result

"To establish inequity in the absence of alter ego liability, a plaintiff must plead facts sufficient to demonstrate that conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form."  *Stewart*, 81 F. Supp. 3d at 963.  Nothing in the FAC mentions a possible inequitable result.  In their opposition brief, plaintiffs mention that treating Dongwon as an entity distinct from StarKist would "result in a fraud or injustice by

United States District Court
Northern District of California

United States District Court
Northern District of California

1 | undeservedly absolving Dongwon." Oppo. Dongwon Mot. 2. But StarKist is properly before the

2 | court to answer plaintiffs' allegations that it falsely advertised its tuna. Plaintiffs fail to allege

3 | personal jurisdiction over Dongwon based on an alter ego theory.[8]

### B.   Agency Relationship

To sufficiently plead an agency relationship between a parent company and its subsidiary, a plaintiff must allege facts that demonstrate the parent's "degree of control exerted over the subsidiary . . . is enough to reasonably deem the subsidiary an agent of [the parent] under traditional agency principles." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 541 (2000). Plaintiffs argue that the question of whether StarKist is an agent of Dongwon is "factually intensive" and "ill-suited for disposition on a motion to dismiss." Oppo. Dongwon Mot. 5. They claim that because no discovery has been conducted in this case "is enough, by itself, to deny Dongwon's motion to dismiss for lack of personal jurisdiction." *Id.* at 6.

Dongwon correctly points out that courts regularly hold dismissal for lack of personal jurisdiction is proper even where no discovery has occurred. Dongwon Reply 9. A court need not permit discovery "[w]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (internal quotation marks omitted).

Plaintiffs do not sufficiently allege facts that show Dongwon's degree of control over StarKist. The conclusory allegation that "Dongwon controlled all aspects of StarKist's canned tuna business, including production, marketing, pricing, sales, hiring, budgeting, and capitalization" is not enough. FAC ¶ 107. Given the attenuated and bare allegations as to Dongwon, I find jurisdictional discovery is not appropriate at this time. I GRANT Dongwon's motion to dismiss for lack of personal jurisdiction.

### CONCLUSION

Dongwon's motion to dismiss is GRANTED for lack of personal jurisdiction. StarKist's

---

[8] At the hearing, plaintiffs cited another case where the court found unity of interest existed between StarKist and Dongwon. *See In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1065 (S.D. Cal. 2017). However, the court ultimately found no alter ego basis existed because plaintiffs did not allege that an inequitable result will follow if the veil is not pierced. *Id.*

motion to dismiss the state law claims is DENIED, and its motion to dismiss the RICO claim

is GRANTED.  Plaintiffs have leave to amend their complaint by December 23, 2019.

**IT IS SO ORDERED.**

Dated: December 2, 2019

William H. Orrick
United States District Judge