# EXHIBIT 4

1    BONNETT, FAIRBOURN, FRIEDMAN
     & BALINT, P.C.
2    PATRICIA N. SYVERSON (CA SBN 203111)
     600 W. Broadway, Suite 900
3    San Diego, California 92101
     psyverson@bffb.com
4    Telephone: (619) 798-4593

5    BONNETT, FAIRBOURN, FRIEDMAN
     & BALINT, P.C.
6    ELAINE A. RYAN (*Admitted Pro Hac Vice*)
     CARRIE A. LALIBERTE (*Admitted Pro Hac Vice*)
7    2325 E. Camelback Rd. Suite 300
     Phoenix, AZ 85016
8    eryan@bffb.com
     claliberte@bffb.com
9    Telephone: (602) 274-1100

10   *Attorneys for Plaintiffs*
     *Additional Attorneys on Signature Page*

11
                    **UNITED STATES DISTRICT COURT**
12                 **NORTHERN DISTRICT OF CALIFORNIA**

13   WARREN GARDNER, *et al.*,              Case No.:   3:19-cv-02561-WHO

14            Plaintiffs,                   **PLAINTIFFS' FIRST SET OF REQUESTS**
15                                          **FOR PRODUCTION OF DOCUMENTS**

16        v.

17   STARKIST CO., a Delaware corporation,

18            Defendant.

19

20

21

22

23

24

25

26

27

28

PROPOUNDING PARTY:     Plaintiffs WARREN GARDNER, LORI MYERS, ANGELA COSGROVE, AUTUMN HESSONG, ROBERT MCQUADE, COLLEEN MCQUADE, JAMES BORRUSO, FIDEL JAMELO, JOCELYN JAMELO, ANTHONY LUCIANO, LORI LUCIANO, ROBERT NUGENT, AVRAHAM ISAC ZELIG, KEN PETROVCIK, MEGAN KIIHNE, KATHLEEN MILLER, TARA TROJANO, JASON PETRIN, AMY TAYLOR, HEATHER MEYERS, AND RACHEL PEDRAZA

RESPONDING PARTY:     Defendant STARKIST CO.

SET NO.:     ONE (1)

Pursuant to Federal Rules of Civil Procedure Rule 34, Plaintiffs Warren Gardner, Lori Myers, Angela Cosgrove, Autumn Hessong, Robert McQuade, Colleen McQuade, James Borruso, Fidel Jamelo, Jocelyn Jamelo, Anthony Luciano, Lori Luciano, Robert Nugent, Avraham Isac Zelig, Ken Petrovcik, Megan Kiihne, Kathleen Miller, Tara Trojano, Jason Petrin, Amy Taylor, Heather Meyers, and Rachel Pedraza hereby request that Defendant StarKist Co., produce copies or permit Plaintiffs to inspect and copy originals of the documents described herein that are in the possession, custody, or control of Defendant or its officers, agents, employees, attorneys or any and all persons acting on its behalf within 30 days of service of these requests for production. Plaintiffs request that the documents be made available for inspection at the offices of Bonnett, Fairbourn, Friedman and Balint, PC, 600 West Broadway, Suite 900, San Diego, CA 92101 unless such other date or place is mutually agreed upon by counsel for the parties.

//

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

**DEFINITIONS**

1.      "Advertisement(s)," or "Advertising" means any promotion, promotional campaign, contest, or any other method used to promote the Products, including the package Labeling.

2.      "And" and "or" are to be considered conjunctively and disjunctively.  The singular form of a noun or pronoun includes the plural form and vice versa.  "Or" is understood to include and encompass "and".

3.      "Any" is understood to encompass "all".  The word "all" also includes "each" and vice versa.

4.       "Bycatch" means discarded catch of unintended marine species and unobserved mortality due to a direct encounter with fishing vessels and gear.

5.      "Communication" means the transmittal of information expressed by any means.

6.      "Document" means all documents, communications, information, or tangible things within the scope of Federal Rules of Civil Procedure 26 and 34, including electronically stored information.

7.      "Dongwon" means Industries Co. Ltd., its past and present parents, subsidiaries, affiliates, predecessors, successors, employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control.

8.       "EII" means the Earth Island Institute, its past and present parents, subsidiaries, affiliates, predecessors, successors, employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control.

9.      "EII Dolphin-Safe Logo" means the logo shown at paragraph 20 of the SAC.

10.      "Employee(s)" means any person who at any time during the Relevant Time Period (whether the person is a current or former employee) acted or purported to act on behalf of another person or persons, including all past and present directors, officers, executives, agents,

representatives, attorneys, accountants, independent contractors, contact persons, advisors, and consultants of such other person or persons.

11.     "FADs" means fish aggregating devices, or floating objects that are designed and strategically placed to attract pelagic fish.

12.     "IRI" means Information Resources, Inc.

13.     "ISSF" means the International Seafood Sustainability Foundation, its past and present parents, subsidiaries, affiliates, predecessors, successors, employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control.

14.     "Label(s)," or "Labeling" means the Products' packages and containers, any material displayed on the packages and containers, and any other promotion or promotional campaign materials that are displayed on, or come with, the Products.

15.     "MSC" means the Marine Stewardship Council.

16.     "NFI" means the National Fisheries Institute, its past and present parents, subsidiaries, affiliates, predecessors, successors, employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control.

17.     "Net sales" means the gross sales revenue less rebates, returns, and discounts.

18.     "Nielsen" means the Nielsen Company (US), LLC.

19.     "NMFS" means the National Marine Fisheries Service.

20.     "NOAA" means the National Oceanic and Atmospheric Administration.

21.     "Person(s)" means any natural person, public or private corporation, general or limited partnership, joint venture, association, government or government agency (including any government agency or political subdivision of any government), group, form of business or legal organization or arrangement, or other legal entity, including the representatives of any such person or persons.

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

22.     "Plaintiffs" means the individual named Plaintiffs in this action: Warren Gardner, Lori Myers, Angela Cosgrove, Autumn Hessong, Robert McQuade, Colleen McQuade, James Borruso, Fidel Jamelo, Jocelyn Jamelo, Anthony Luciano, Lori Luciano, Robert Nugent, Avraham Isac Zelig, Ken Petrovcik, Megan Kiihne, Kathleen Miller, Tara Trojano, Jason Petrin, Amy Taylor, Heather Meyers, and Rachel Pedraza.

23.     "PNA" means the Parties to the Nauru Agreement, which include Federated States of Micronesia (FSM), Kiribati, Marshall Islands, Nauru, Palau (PU), Papua New Guinea, Solomon Islands and Tuvalu.

24.     "Product(s)" means all StarKist cans, pouches, or other packaged shelf-stable tuna distributed for retail sale in the United States.

25.     "Relate," "relating to," "concerning," or "regarding" include, but are not limited to the following meanings: bearing upon, addressing, evidencing, respecting, discussing, mentioning, describing, reflecting, responding to, identifying, constituting, pertaining to, having to do with, or being in any way pertinent to the given subject.

26.     "Relevant Time Period" means from May 13, 2015 to present.

27.      "Revenue(s)" means all monies received from sales of the Products.

28.     "SAC" means the Second Amended Class Action Complaint (D.E. 75).

29.     "SKU" means the retailer-specific stock keeping unit alphanumeric code on the Product Label used for, *inter alia*, tracking the movement of Product inventory.

30.     "Social Media" means websites and applications that enable users to create and share content or to participate in social networking, including, but not limited to, Facebook, Instagram, LinkedIn, and Twitter.

31.     "StarKist," "You," "Your," or "Manufacturer" means StarKist Co., its past and present parents, subsidiaries, affiliates, predecessors, successors, employees, independent contractors, officers, agents, vendors, accountants, and all other persons or entities acting on its behalf or under its direct or indirect control including, without limitation, Dongwon.

32.     "UPC" means the universal product numeric code affixed to the Product by the Manufacturer.

33.     "Website" means starkist.com.

34.     "Wholesale Price" means the price the Manufacturer charges for the Product as sold in bulk less any discount or rebate provided by the Manufacturer.

35.     "WWF" means the World Wildlife Foundation.

**INSTRUCTIONS**

1.     Unless otherwise stated, each Definition and Request herein is limited to the Relevant Time Period.

2.     Whenever a reference to a business entity appears, the reference shall mean the business entity, its affiliated companies, partnerships, divisions, subdivisions, directors, officers, employees, agents, clients, or other representatives of affiliated third parties.

3.     Privilege/Redaction Log.  If any documents are within the scope of any request for production but are not being produced or are being produced with portions redacted, pursuant to any claim of privilege or confidentiality:

   a.   State the nature of the privilege claimed (i.e., attorney client, work-product, etc.);

   b.   State the name of the attorney, if any, with respect to whom the privilege is claimed;

   c.   State the facts upon which you rely as the basis for claiming any privilege as to the specific information or document; and

   d.   State the name of such document; identify the type of document (i.e., letter, memo, etc.); set forth the subject matter thereof; identify the person who prepared it and each person (if any) who signed it; identify each person to whom it was directed, circulated or shown; and identify each person now in possession of the document. If any document is produced in redacted form, the word "redacted" is to be placed in the redacted section of the document.

4.     All documents shall be produced that respond to any part or clause of any

paragraph of these requests.

5. The documents to be produced pursuant to these requests specifically embrace, in addition to documents within your possession, custody or control, documents within the possession, custody or control of any of your agents, accountants, representatives, or attorneys. Such documents also embrace originals, and identical copies (whether different from the original because of notes made thereon or otherwise) of the documents described in these requests.

6. Destruction Log. In the event that any document called for by these requests has been destroyed or discarded, that document is to be identified by stating:

    a. The nature of the document;

    b. Any addressor or addressee;

    c. Any indicated or blind copies;

    d. The document's date, subject matter, number of pages, and attachments or appendices;

    e. All persons to whom the document was distributed, shown or explained;

    f. Its date of destruction or discard, manner of destruction or discard; and

    g. The persons authorizing or carrying out such destruction or discard.

7. The following requests are continuing in nature and in the event you become aware of or acquire additional information relating or referring thereto, such additional information is to be promptly produced.

8. Documents attached to each other in their original form should not be separated.

9. In your response to each request, please: (a) identify by bates number or control number the document or documents being produced in response to such request; and (b) identify the person and department from whose files the documents is being produced.

## FORM OF PRODUCTION

10. Except for the types of documents requested in native format below, ESI should be produced as single-page, black and white, 300 DPI, 1 bit Group IV TIFF images for each page of each document, with each image file named after the production number of that page, with

extension ".tif."

11.     To the extent reasonably possible, the imaged data shall retain all attributes of the native or hard-copy file, such as document breaks and original document orientation (i.e., portrait to portrait and landscape to landscape).  Word processing documents will be processed to TIFF format and imaged showing track changes or edits, comments, notes and other similar information.

12.     Embedded files should be included in the production.

13.     To the extent a document is not already unitized, you should undertake reasonable efforts, if a document consists of more than one page, to unitize the document and any attachment(s) as in their original form when creating the image files.  You should undertake reasonable efforts to ensure that distinct documents are not merged into a single record and that single documents are not split into multiple records.

14.     Text files should be produced as one file per document, named after the starting production number assigned to the document and ending with extension ".txt," with a text directory for each production volume, and with a relative file path to the text file provided in the related database load file.  With the exception of TIFF, PDF and other image file types for which the text cannot be extracted, the text of documents should be extracted directly from the native file without using Optical Character Recognition ("OCR"), except in the case of redacted documents.  Documents produced in redacted form should not have text files populated with extracted text but should instead have text files populated with OCR data which will not contain the redacted data.  If a document does not contain extractable text, you should provide OCR files for that document to the extent possible.

15.     Data containing color need not initially be produced in color.  Reasonable requests for data containing color should be honored, if the original data contains color is necessary to understand the meaning or content of the data, including, but not limited to, photos, graphs, and charts, and which will be produced as single-page 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image.

16.     Electronic documents attached to an e-mail or electronic document and hard-copy documents attached or appended to a hard-copy document, are to be produced contemporaneously and sequentially immediately after the parent document.   Non-relevant attachments may be excluded from production, but non-relevant parent documents with relevant attachments must be produced.  All non-relevant attachments excluded from production should be produced as a slipsheet or placeholder with file name information provided on the face of the slipsheet and in the accompanying metadata.  Parent-child relationships within a document family (the association between an attachment and its parent document) shall be preserved.  A document and all other documents in its attachment range constitutes a family group.  Each document shall be produced with the production number for the first and last page of that document in the "BEGNO" and "ENDNO" fields of the data load file and with the "BEGATTACH" and "ENDATTACH" fields listing the production number for the first and last page in the document family.

17.     Each of the metadata and coding fields set forth in Table 1 that reasonably can be extracted from an electronic document shall be produced for that document.  Fields that are not populated shall be left with null values and not populated with fillers or spaces.  All metadata pertaining to dates and times will be standardized to Coordinated Universal Time (UTC).

18.     Production numbers shall be branded to the lower right hand corner of TIFF images and confidentiality designations (if applicable) shall be electronically branded or burned to the lower left hand corner of TIFF images so that they legibly print with the images.  If one or more production numbers is skipped in a production, you will so note in a cover letter accompanying the production or in a privilege log.  Reasonable efforts should be used to ensure that production numbers:  (a) are unique and consistent across the entire production, provided, however, that parties may use multiple prefixes to reflect productions from separate entities or related to specific experts; (b) maintain a constant prefix and page length (0-padded) across the production, consistent with the requirements of sub-paragraph (a); (c) contain a prefix that clearly identifies the producing party; (d) contain no special characters or embedded spaces; and (e) are

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

sequential within a given document.  Attachments will immediately follow the production number(s) for the parent document.  Production number prefixes shall be consistent across all documents a party produces in the litigation.  However, to the extent you produce documents as they were produced in prior proceedings, the documents shall retain their numbering from the prior proceedings.

19.    Accompanying image load/unitization files and delimited text files should be produced with an .opt image cross-reference file and a delimited database load file (i.e., .dat). The database load file should contain the following fields: "BEGNO," "ENDNO," "PAGES," "VOLUME" and "CUSTODIAN."

20.    Where TIFF images of certain electronic documents are not readable, you may produce such documents in native format.  To the extent a document is not adequately represented in TIFF image format, the receiving party may request that the file or document be produced in native format by identifying the document by production number, the production of which shall not unreasonably be withheld.

21.    Certain types of files such as system, program, proprietary files, audio files, and video files may not be amenable to conversion into TIFF format.  Such files will not be converted into TIFF format but will be produced in their native format.

22.    Spreadsheets, including Microsoft Excel Spreadsheets, Microsoft Access, and Google Sheets, shall be produced in native format with a single-page TIFF slipsheet/placeholder document that contains the native file name and a Bates number in its place.  These will be produced with a link to the native file in the "NATIVELINK" field, along with all extracted text and applicable metadata fields set forth in **Table 1** of the Parties' ESI Protocol. If a spreadsheet requires redactions, the redactions should be implemented while also ensuring that proper formatting and usability are maintained.

23.    Presentation files, including Microsoft PowerPoint, Google Slides, and other electronic slide programs, shall be produced in native format.  These should be produced with a link to the native file in the "NATIVELINK" field, along with all extracted text and applicable

metadata fields set forth in **Table 1**.  For presentation files, hidden slides will be revealed and all slides will be printed in Slide and Notes view (one slide per page) with the slide appearing at the top of the page and the notes appearing at the bottom of the page.  If a presentation file requires redactions, you may produce as TIFF images processed in accordance with the formatting specified for TIFF images and should be processed with hidden slides and all speaker notes unhidden and processed to show both the slide and the speaker's notes on the image.

24.     You may produce data files that require large text extractions, such as XML and XPD files, in native format.

25.     The native files shall be renamed with the Bates prefix-Bates number.

26.     Where native files are produced in lieu of TIFF images, each native file will be assigned a unique production number.  You should produce a placeholder (a single-page TIFF slipsheet indicating that the native item was produced) along with the file itself in native format; provided that, in lieu of producing a placeholder, you may produce TIFF or JPEG images of PowerPoint or other presentation files in addition to producing native files.  The placeholder will be branded with the production number in the lower right hand corner, the original filename of the native file, and the phrase "PRODUCED IN NATIVE ONLY" branded in the center of the page.  You should also brand any confidentiality or similar endorsements in the lower left hand corner of the placeholder.

27.     To the extent that any file identified for production in native format contains information subject to a claim of privilege or any other applicable protection that requires redaction, you may convert that file to TIFF format and produce it with the necessary redactions, along with OCR text that reflects such redactions.  All such OCR text will be Unicode-compliant (UTF-8) to the extent practical.  For spreadsheet files, and for other files where such conversion renders the document not reasonably usable, you should produce the document in a reasonably usable form to be agreed upon by the respective parties.  The portion of the redacted text shall be clearly identified on the face of the TIFF image, either by masking the redacted content with electronic highlighting in black or through the use of redaction boxes.  The label "Redacted" shall

appear on the face of the redacted portion of the TIFF image.  The redacted TIFF image shall be produced in accordance with the image load file specifications above, and any other provisions for the production of TIFF images contained herein.  Redacted text shall not be included in the text file for that redacted TIFF image.  The original unredacted native file shall be preserved pending conclusion of the Action.

28.     You will make reasonable efforts to remove passwords or other security protection from any native file prior to production.  If the security protection cannot be removed from a native file after reasonable efforts by the producing party, a placeholder TIFF image may be produced in place of the native file indicating that security protection could not be removed from the data.

29.     You should de-duplicate only exact duplicates based on MD5 hash values at the family level.  De-duplication shall not break apart families.  An e-mail that includes content in the "bcc" or other blind copy field shall not be treated as a duplicate of an e-mail that does not include content in the "bcc" or other blind copy field.  Alternatively, you may produce the e-mail containing the bcc by itself.  If you are de-duplicating across custodians, you shall populate a field of data that identifies each custodian who had a copy of the produced document (the "CUSTODIAN-ALL field") in addition to a separate field of data identifying the custodian whose document is produced.  If you are de-duplicating within custodians only, there is no need to create or provide the CUSTODIAN-ALL field.

30.     If you intend to use TAR/predictive coding for the purpose of identifying or culling the documents to be reviewed or produced, this intention will be disclosed prior to using any such technology and with ample time to meet and confer as to the technology to be used and come to an agreement on the search protocol.

31.     If a response to discovery requires production of ESI contained in a database or comprehensive electronic accounting system, you shall meet and confer with the requesting party concerning a reasonable method of production.  To the extent reasonably available, you shall also provide any data dictionary, key, or other information sufficient to provide a reasonable

understanding of the contents of the database or accounting system.

32.     With respect to documents that exist in hard-copy format ("Hard-Copy Materials"), you should image and produce such documents as TIFF images.   Where paper scanned images have identification spines, file folder labels, "post-it notes," or any other labels, the information on the label shall be scanned and produced to the extent practicable.   In addition, folder labels, box labels, or binder labels (including spines), or other similar top-level identifiers, to the extent practicable, shall be manually recorded at the time of scanning and coded in the Binder and/or Folder field.   Reasonable requests for documents containing color should be honored, if the original data contains color necessary to understand the meaning or content of the document, including, but not limited to, photos, graphs, and charts, and which will be produced as single-page 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image.   Load files for such productions shall include data relevant to the individual documents, including Bates numbering, custodian, OCR, and folder labels and box labels that have been manually recorded.

33.     To the extent you produce materials that were previously produced in a different action or proceeding, you shall disclose prior to production how such materials were produced in the previous action.   You may produce materials as they were produced in the prior action or proceeding but will meet and confer with the receiving party regarding any additional metadata overlays or alternative formats that may be required in order to make the materials reasonably usable.

**DOCUMENTS TO BE PRODUCED**

REQUEST FOR PRODUCTION NO. 1:    All Documents referred to or relied upon in responding to Plaintiffs' First Set of Interrogatories, including but not limited to Documents that were created outside the Relevant Time Period.

REQUEST FOR PRODUCTION NO. 2:     All Documents, including NOAA spot check audit documents, which you contend support the dolphin-safe, responsible sourcing, or sustainability

representations made in your Advertisements and Labeling for the Products.

REQUEST FOR PRODUCTION NO. 3:    All Documents and Communications that support, refer, or relate to Your verification that Your Products are dolphin-safe, do not contain tuna in which any dolphins were harmed in the procurement, and are sustainably sourced.

REQUEST FOR PRODUCTION NO. 4:    All Documents and Communications relating to or concerning documented instances of dolphins harmed or killed, whether intentionally or unintentionally, in the procurement of the tuna in your Products.  To avoid doubt, this includes any harm to dolphins occurring in fishing for tuna in your Products, even if that harm was attributable to a tuna catch that was segregated out as non-dolphin safe or where the tuna caught did not otherwise end up in your Products.

REQUEST FOR PRODUCTION NO. 5:  All Documents and Communications relating to any harm or killing, whether intentional or unintentional, of dolphins by any fishing by Your fishing fleet, or any boat in which You or Your owners have any financial interest.

REQUEST FOR PRODUCTION NO. 6:    All Documents related to or concerning tuna that was separately stored because dolphins were harmed during its procurement.

REQUEST FOR PRODUCTION NO. 7:    All Documents sufficient to show by name, country of origin, ownership, call sign, IMO number, MMSI number, and flag all boats that supplied the tuna in Your Products or that was involved in transshipping that tuna.

REQUEST FOR PRODUCTION NO. 8:    All Documents identifying by name, country of origin, ownership, call sign, IMO number, MMSI number, and flag all boats in which You or Your owners, have any ownership or financial interest.

REQUEST FOR PRODUCTION NO. 9:    All Documents relating to or concerning the fishing method(s) used by each boat that supplied the tuna in Your Products, including, without limitation,

the percentage of Your tuna procured by each fishing method.

REQUEST FOR PRODUCTION NO. 10:   For each boat identified in Request No. 8, above, produce Documents identifying the name, address, and contact information of all captains and observers, if any, on board and the time period during which they served.

REQUEST FOR PRODUCTION NO. 11:   All Documents and Communications relating to or concerning captain and observer compensation on each boat identified in response to Request No. 8, above.

REQUEST FOR PRODUCTION NO. 12:   All Documents and Communications relating to or concerning the compensation of Your tuna suppliers, their names, addresses, and contact information, and the term(s) of their engagement(s).

REQUEST FOR PRODUCTION NO. 13:   All Documents constituting or regarding inquiries, complaints, or Communications regarding Your Products whether by NMFS, NOAA, or any other governmental regulatory agency, either domestic or international.

REQUEST FOR PRODUCTION NO. 14:   Copies of all Social Media Communications relating to or concerning dolphin safety, fishing methods, and/or responsible sourcing of Your Products from the time the Products were first introduced to the present.

REQUEST FOR PRODUCTION NO. 15:   Exemplars of all sales materials, promotional materials, newsletters, informational publications, and advertisements, including, but not limited to print, radio, internet and television advertisements, and point-of-sale literature which in any way refer to, depict, and/or discuss dolphin safety, tuna fishing methods and procurement, and/or responsible tuna sourcing, including all versions and drafts from the time the Products were first introduced to the present.

REQUEST FOR PRODUCTION NO. 16:   All Documents and Communications related to or concerning the design, content, placement and distribution, budget, payment, and return on investment of or for the sales materials, promotional materials, newsletters, informational publications, advertisements, and Social Media Communications produced in response to Request Nos. 14 & 15, without temporal limitation.

REQUEST FOR PRODUCTION NO. 17:   Exemplars of all Product Labels from the time the Products were first introduced to the present, including all versions, drafts, revisions, and information regarding when and where the exemplars were utilized or disseminated.

REQUEST FOR PRODUCTION NO. 18:   All Documents and Communications related to or concerning the design and content of the Product Labels, from the time the Products were first introduced to the present, including, without limitation, the dolphin-safe, sustainability, and tracking information to be provided on the Label and placement of the dolphin-safe logo on the Label, their font size and color selection.

REQUEST FOR PRODUCTION NO. 19:   All   Documents   that   evidence,   memorialize, summarize, analyze, or discuss how to market or advertise Your Products and the return on investment or effectiveness of the marketing and advertising, created at any point from the time the Products were first introduced to the present.

REQUEST FOR PRODUCTION NO. 20:   All Documents that evidence, reflect, or relate to any marketing analysis or survey done at any time involving the importance to consumers or retailers of dolphin safety and sustainable sourcing and/or the price consumers are willing to pay for dolphin-safe and sustainably sourced tuna.

REQUEST FOR PRODUCTION NO. 21:   All Documents identifying the name, address, and contact person(s) of all retailers of Your Products in the United States, the locations of all stores where they sold Your Products in the United States, and when each store sold Your Products in

the United States.

REQUEST FOR PRODUCTION NO. 22:    All Documents and Communications with retailers related to or concerning dolphin safety, tuna sourcing methods, sustainability, FADs, and substantiation of the Products' Label representations.

REQUEST FOR PRODUCTION NO. 23:    All Documents identifying each shipment of Your Products to retailers or third party distributors for sale to U.S. consumers, including:

  1. The name and address of the recipient;
  2. The total number of units of each Product shipped;
  3. The Wholesale Price, SKU, UPC, and MSRP of each Product shipped; and
  4. The amount of any rebate on each Product shipped.

REQUEST FOR PRODUCTION NO. 24:    All Documents identifying separately by state and on a monthly basis the total number of units, SKUs, and UPCs, of each Product distributed for retail sale and the Net Sales amount You received from sales of each Product.

REQUEST FOR PRODUCTION NO. 25:    All Documents identifying separately by state and on a monthly basis the total number of units, SKUs, and UPCs, of each Product returned to You by retailers, third party distributors or consumers.

REQUEST FOR PRODUCTION NO. 26:    All Documents received from retailers, IRI, or Nielsen which refer to or concern the pricing, Revenue, and/or sales of any of the Products.

REQUEST FOR PRODUCTION NO. 27:    All Documents and Communications relating to or concerning the price premium, dollar value, or Product-associated cost of the dolphin-safe guarantee and/or sustainable sourcing.

REQUEST FOR PRODUCTION NO. 28:  All Documents and Communications relating to the use of FADs in procuring tuna in Your Products.

REQUEST FOR PRODUCTION NO. 29:    All Documents or Communications that refer to or discuss any meeting, Communication, or agreement with Tri-Union Seafoods, LLC (dba Chicken of the Sea International, Inc.) or Bumble Bee Foods, LLC concerning the marketing, Advertising, packing or co-packing, fishing methods, use or non-use of FADs, dolphin safety, or sale of Your Products, including, without limitation, the February 2012 agreement with Bumble Bee Foods, LLC and Tri-Union Seafoods, LLC (dba Chicken of the Sea International, Inc.) to not sell a branded FAD-free tuna product in the U.S. and the May 31, 2012 statement issued through the NFI on behalf of Bumble Bee, Chicken of the Sea, and StarKist.

REQUEST FOR PRODUCTION NO. 30:    All Documents referring or relating to Your Communications with EII and/or MSC regarding dolphin safety and/or sustainability standards and their respective organization's sustainability requirements.

REQUEST FOR PRODUCTION NO. 31:    All Documents and Communications which refer to or concern Your use of the EII Dolphin-Safe Logo or Your decision not to use the dolphin-safe mark codified at 50 C.F.R. § 216.95, including, without limitation, Documents and Communications concerning:

      1. Your authorization to use the logo;

      2. Your application to use the logo, including all supporting Documents;

      3. EII Dolphin-Safe Logo eligibility standards;

      4. Inspections or audits by EII and the results thereof, including captain's statements and other documents supplied to EII in the course of its inspections or audits;

      5. EII dolphin safety verification requirements; and

      6. Your compliance with and/or violation of EII Dolphin-Safe Logo standards and requirements.

REQUEST FOR PRODUCTION NO. 32:    All Documents and Communications relating to

Your membership in the ISSF.

REQUEST FOR PRODUCTION NO. 33:    Documents sufficient to show all money You paid to ISSF, MSC, NFI, or EII.  This includes, without limitation, all money paid as a result of membership dues, assessments, fees, special projects, lobbying, and the like, as well as any money voluntarily paid or donated to them.

REQUEST FOR PRODUCTION NO. 34:    All    Documents    or    Communications    with Greenpeace, Sea Shepherd, WWF, or any other Non-Governmental Organization regarding dolphins or tuna.

REQUEST FOR PRODUCTION NO. 35:    All Documents and Communications with the PNA or Pacifical relating to sustainably caught tuna or tuna Products, including communications from EII regarding tuna sourced from PNA waters or by Pacifical.

REQUEST FOR PRODUCTION NO. 36:    All Documents and Communications that involve the relationship between EII and MSC, or disputes between them, regarding their labels and certifications for tuna Products.

REQUEST FOR PRODUCTION NO. 37:    All Documents related to or concerning how and why the dolphin-safe logo on Your Products was selected, from the time the Products were first introduced to the present.

REQUEST FOR PRODUCTION NO. 38:    All Documents and Communications with ISSF, EII, WWF, NFI, or any other Non-Governmental Organization regarding dolphin safety, sustainable tuna fishing methods and procurement, tuna traceability, FADs, and Bycatch.

REQUEST FOR PRODUCTION NO. 39:  All Documents and Communications, from the time your Products were first introduced, relating to sustainability and dolphin-safe fishing standards, certifications, and labels set by industry groups, committees, and organizations, including but not

limited to EII, MSC, ISSF, and NFI. .

REQUEST FOR PRODUCTION NO. 40:    All Documents and Communications, from the time the Products were first introduced to the present, which refer or relate to Your dolphin-safe and/or sustainability policies and practices, including, without limitation, Documents and Communications concerning:

        1.  Your dolphin-safe policy;

        2.  Your sustainability policy;

        3.  Minutes of Committee meetings having to do with dolphin safety or sustainability; and

        4.  Any sustainability reports.

REQUEST FOR PRODUCTION NO. 41:    All Documents and Communications which refer or relate to the software, program, and other methods You use to track the chain-of-custody of Your tuna and verify its dolphin-safe and sustainable procurement, including, without limitation, any in-house digital supply chain mapping system.

REQUEST FOR PRODUCTION NO. 42:    All Documents referring or relating to content published on Your Website from the time the Products were first introduced to the present concerning dolphin safety, tuna fishing methods and procurement, sustainable sourcing, FADs, Bycatch, and traceability.

REQUEST FOR PRODUCTION NO. 43:    All Documents relating to Communications with consumers regarding dolphin safety, tuna fishing methods and procurement, sustainable sourcing, FADs, Bycatch, traceability, and this lawsuit from the time the Products were first introduced to the present, including, without limitation, calls received on Your consumer help line.

REQUEST FOR PRODUCTION NO. 44:    All Documents which You contend support any affirmative defense that You believe You have or will be asserting.

**REQUEST FOR PRODUCTION NO. 45:** All Documents relating to your policies and procedures with respect to the retention or destruction of documents.

**REQUEST FOR PRODUCTION NO. 46:** All organizational and management charts reflecting the structure of Your company, including the organization, structure and business operations of each subsidiary, affiliate, division, department, unit, subdivision, committee, subcommittee, task force, working group, or other formal or informal group or business unit involved in the procurement (including fishing), purchase, tracking, packing, verification, design, marketing, advertising, pricing, or sale of Your Products.

**REQUEST FOR PRODUCTION NO. 47:** All Documents relating to or concerning the identity, job title(s), duties, and reporting relationships of all officers, Employees, and independent contractors of Your company who had any authority, input, responsibilities, or other involvement with any of the following subjects:

1. sourcing the Products, including fishing;
2. purchasing the tuna in the Products;
3. Labeling the Products;
4. tracking the Products;
5. packing the Products;
6. verifying the Products are dolphin-safe;
7. distributing the Products;
8. marketing the Products;
9. pricing the Products;
10. receiving, investigating, and/or responding to customer complaints or inquiries regarding the Products; and
11. serving on, or participating or providing input to, governmental entities or industry or regional groups, committees, or organization concerning the

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

Products, sustainable fishing practices, and dolphin-safe certification, standards and labels, including, without limitation, the Department of Commerce, the United States Federal Trade Commission, the Food and Drug Administration, EII, MSC, ISSF, and NFI.

REQUEST FOR PRODUCTION NO. 48:   Documents sufficient to identify by name and address the canneries and processing facilities for Your Products and dates utilized by You.

REQUEST FOR PRODUCTION NO. 49:   All Documents and Communications relating to or concerning the services Dongwon performs for You.

REQUEST FOR PRODUCTION NO. 50:   All Documents and Communications between You and Dongwon regarding dolphin safety, sustainable sourcing of tuna, Bycatch, FADs, fishing methods, pricing of U.S. tuna products, and suppliers of U.S. tuna products.

REQUEST FOR PRODUCTION NO. 51:   All Documents identifying any consumers who purchased Your Products, including all names, email, mailing, and/or street addresses, and any information regarding their specific purchases of your Products.

REQUEST FOR PRODUCTION NO. 52:   All insurance policies or indemnification agreements or other documents, that may provide coverage to You for any of the claims or causes of action asserted in this action, or that may provide reimbursement for payments made in defense of this action, and correspondence concerning coverage related to this action.

Dated:  August 13, 2020          BONNETT, FAIRBOURN, FRIEDMAN
                                   & BALINT, P.C.

                                  /s/ *Patricia N. Syverson*
                                 Patricia N. Syverson (203111)
                                 600 W. Broadway, Suite 900
                                 San Diego, California 92101
                                 psyverson@bffb.com
                                 Telephone:  (619) 798-4593

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
Elaine A. Ryan (*Pro Hac Vice*)
Carrie A. Laliberte (*Pro Hac Vice*)
2325 E. Camelback Rd., Suite 300
Phoenix, AZ 85016
eryan@bffb.com
claliberte@bffb.com
Telephone:  (602) 274-1100

GOLDMAN SCARLATO & PENNY P.C.
Brian D. Penny (*Pro Hac Vice*)
penny@lawgsp.com
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, Pennsylvania 19428
Telephone:  (484) 342-0700

ZAREMBA BROWN PLLC
Brian M. Brown (*Pro Hac Vice*)
bbrown@zarembabrown.com
40 Wall Street, 52nd Floor
New York, NY 10005
Telephone: (212) 380-6700

ROBBINS GELLER RUDMAN & DOWD LLP
Stuart A. Davidson (*Pro Hac Vice*)
Christopher C. Gold (*Pro Hac Vice*)
Bradley M. Beall (*Pro Hac Vice*)
Dorothy P. Antullis (*Pro Hac Vice*)
sdavidson@rgrdlaw.com
cgold@rgrdlaw.com
bbeall@rgrdlaw.com
dantullis@rgrdlaw.com
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  (561) 750-3000

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 13, 2020, I served **PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS** by email and first class mail to:

PILLSBURY WINTHROP SHAW PITTMAN LLP
ROXANE A. POLIDORA
roxane.polidora@pillsburylaw.com
LEE BRAND
lee.brand@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998

Attorneys for Defendant
STARKIST CO.

I declare under the penalty of perjury that the foregoing is true and correct. Executed August 13, 2020 at San Diego, California.

/s/ *Patricia N. Syverson*
Patricia N. Syverson
*Attorney for Plaintiffs*

PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS